UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

STEVEN PONCE,

                                    Plaintiff,
                                                        9:13-CV-0274
v.                                                      (NAM/TWD)

VENKATA MANAVA, DR. RAMINENI,
K. WILLIAMS,

                                    Defendants.
_____

APPEARANCES:                                    OF COUNSEL:

STEVEN PONCE
Plaintiff pro se
37-70 104th Street
Apt. 1 Floor
Corona, NY 11368

HON. ERIC T. SCHNEIDERMAN                        JUSTIN L. ENGEL, ESQ.
Attorney General for the State of New York
Counsel for Defendants
The Capitol
Albany, NY 12224

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## **REPORT-RECOMMENDATION and ORDER**

        This pro se prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable Norman A. Mordue,

Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

Plaintiff Steven Ponce claims that Defendants violated his constitutional rights by failing to

provide him with adequate medical care at Mid-State Correctional Facility ("Mid-State").  (Dkt.

No. 13 at 2.)  Currently pending before the Court is Defendants' motion for summary judgment

pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 54.) For the reasons discussed below, I recommend that the Court grant Defendants' motion.

## I. FACTUAL AND PROCEDURAL SUMMARY

Plaintiff alleges that Defendants provided him with inadequate medical care at Mid-State Correctional Facility from April 21, 2011, through June 4, 2012. (Dkt. No. 13 at 2.)

Plaintiff saw Defendant Doctor Mannava[1] on May 3, 2011. (Dkt. No. 13 at 4; Dkt. No. 54-3 at 18; Dkt. No. 55 at 25.) This visit lasted about ten minutes. (Dkt. No. 54-3 at 18.) Plaintiff "made very vague complaints about wrist pain, tail bone pain and right knee pain." *Id.* Plaintiff's "record showed that he had a fall a year earlier with x-rays that indicated no fracture or dislocation." *Id.* Defendant Mannava's examination of Plaintiff was unremarkable with no positive findings. *Id.* Defendant Mannava recommended that Naproxen be continued, as needed, with hot showers for pain as needed. *Id.* Defendant Mannava stated in response to interrogatories that there "were no signs of fracture on that date." *Id.* Plaintiff argues in opposition to the motion for summary judgment that Defendant Mannava erred because he "did not indicate the plaintiff's wrist movement condition, merely giving his eye glance observation." (Dkt. No. 63 at 15.)

Plaintiff saw Defendant Nurse Williams on June 9, 2011, regarding a possible sexually transmitted disease. (Dkt. No. 13 at 10-11; Dkt. No. 55 at 23.) Plaintiff characterizes Defendant Williams' notes of that visit as sarcastic and as evidence of her "strong bias" against him. (Dkt. No. 13 at 10-11.)

---

[1] This Defendant's name is spelled in various ways throughout the record. The Court has used the spelling used by Defendant Mannava in responses to Plaintiff's interrogatories. (Dkt. No. 54-3 at 17.)

Plaintiff asserts that he saw Defendant Mannava again on June 28, 2011, and July 26, 2011, regarding the possible sexually transmitted disease. (Dkt. No. 63 at 15.) At those appointments, Plaintiff asserts that he attempted to complain of right wrist pain, "even indicating to [Defendant Mannava] that he felt his wrist was 'broken.'" *Id.* Plaintiff asserts that Defendant Mannava "refused to hear" him. *Id.*

Plaintiff saw Defendant Williams on July 28, 2011. (Dkt. No. 13 at 9; Dkt. No. 55 at 21.) At that appointment, Defendant Williams noted that Plaintiff complained of right knee pain from an injury that occurred "last Saturday." (Dkt. No. 55 at 21.) Defendant Williams noted that Plaintiff had not reported it to any correction officer or medical staff previously. *Id.* Defendant Williams noted that Plaintiff had seen Defendant Mannava "yesterday -- obviously didn't mention it to him." *Id.* Plaintiff requested an x-ray. *Id.* Defendant Williams noted that Plaintiff had been prescribed pain medication. *Id.* Defendant Williams reported that Plaintiff was "argumentative" and "[t]hreatened to grieve if he didn't get an x-ray." *Id.* Plaintiff asserts that Defendant Williams' characterization of his behavior is false. (Dkt. No. 63 at 17.) Defendant Williams terminated the appointment and noted that Plaintiff left with a "normal, quick gait." (Dkt. No. 55 at 21.) Defendant Williams' note concludes with the phrase "Witnessed by CO Nitte." *Id.* Plaintiff asserts that this notation indicates that Defendant Williams did not personally see Plaintiff walk with a normal, quick gait. (Dkt. No. 63 at 17-18.)

On August 11, 2011, Plaintiff complained of right wrist pain that he rated as a ten on a scale of one to ten. (Dkt. No. 55 at 19.) A non-party nurse examined Plaintiff and noted no swelling, good range of motion, and that Plaintiff did not complain of numbness or tingling. *Id.* Plaintiff asked to see a doctor. *Id.*

3

Plaintiff saw Defendant Doctor Ramineni on an August 12, 2011. (Dkt. No. 13 at 7.) At that appointment, Plaintiff complained of right wrist pain and related that he had a remote injury. (Dkt. No. 54-3 at 9-10; Dkt. No. 55 at 19.) Defendant Ramineni examined Plaintiff's wrist and determined that its motion was normal and that there was no swelling. *Id.* Based on that observation, Defendant Ramineni diagnosed the problem as soft tissue or muscular/skeletal pain. *Id.* At that appointment, Plaintiff also complained of right knee pain. *Id.* Defendant Ramineni examined Plaintiff's right knee and noted that its movement was normal. *Id.* Defendant Ramineni noted, however, that Plaintiff was obese, which can be the cause of knee pain in some people. *Id.* Defendant Ramineni's impression was that Plaintiff's knee pain was muscular/skeletal in nature. *Id.* Based upon this diagnosis, Defendant Ramineni prescribed Motrin to be taken four times a day. *Id.* In responses to interrogatories, Defendant Ramineni stated that Plaintiff did not report that he was experiencing severe pain in his right wrist on August 12, 2011. (Dkt. No. 54-3 at 11.)

Plaintiff saw Defendant Williams on August 25, 2011. (Dkt. No. 13 at 10-11; Dkt. No. 55 at 18.) On that date, Plaintiff complained of growths on his toes. *Id.* Defendant Williams characterized Plaintiff as "argumentative" in her notes. *Id.*

Plaintiff saw Defendant Mannava on September 6, 2011. (Dkt. No. 13 at 4; Dkt. No. 55 at 17.) On that date, Plaintiff complained of right knee pain lasting for more than two months. (Dkt. No. 55 at 17.) He believed that there was fluid in the knee and wanted the fluid removed. *Id.* Plaintiff stated that he would file a grievance unless Defendant Mannava removed the fluid from his knee. *Id.* On examination, Defendant Mannava found no swelling or tenderness, full range of motion, and no deformity. *Id.* Defendant Mannava recommended hot showers. *Id.* He

also prescribed a six-month supply of Motrin and stretching exercises.  (Dkt. No. 13 at 5; Dkt. No. 55 at 17.)  Plaintiff was not satisfied with this treatment and requested a "more in depth examination of the injury."  (Dkt. No. 13 at 5.)

Plaintiff saw Defendant Mannava on February 9, 2012.  (Dkt. No. 13 at 4; Dkt. No. 55 at 9.)  On that date, Plaintiff complained of right knee pain that had lasted for about a year.  (Dkt. No. 55 at 9.)  Plaintiff denied having any trouble walking.  *Id.*  On examination, Defendant Mannava found no swelling, tenderness, or instability and full range of motion.  *Id.*  He recommended strength exercises and that Plaintiff lose weight.  *Id.*  He prescribed a one-month supply of Motrin.  (Dkt. No. 13 at 5.)

Plaintiff claims that Defendant Mannava's treatment was "unsuccessful in treating [his] symptoms of pain" and that Defendant Mannava persisted in "apply[ing] the same ineffective treatment."  (Dkt. No. 13 at 5-6.)  Plaintiff alleges that Defendant Mannava "continuously deferred diagnostic testing."  *Id.* at 6.

On June 18, 2012, after being transferred to a different facility, Plaintiff was diagnosed with a fractured right wrist.  (Dkt. No. 55 at 28.)  A handwritten notation on the memorandum regarding the diagnosis states: "Note: Injured AUG 2011 at prior facility."  *Id.* (capitalization in original).  Plaintiff underwent surgery for the fracture on September 18, 2012.  (Dkt. No. 55 at 42.)

On September 5, 2012, Plaintiff was diagnosed with moderate osteoarthritis in both his right and his left knee.  (Dkt. No. 55 at 27.)  There was no fracture, dislocation, or effusion.  *Id.* X-rays of Plaintiff's lumbar spine showed "no fracture/subluxation/significant arthritis."  *Id.*

Plaintiff filed this action on March 12, 2013.  (Dkt. No. 1.)  Defendants now move

for summary judgment.  (Dkt. No. 54.)  Plaintiff has opposed the motion.  (Dkt. No. 63.)

Defendants have filed a reply.  (Dkt. No. 68.)

## II.     LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary

judgment bears the initial burden of showing, through the production of admissible evidence, that

no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir.

2006).  Only after the moving party has met this burden is the nonmoving party required to

produce evidence demonstrating that genuine issues of material fact exist.  *Id*. at 273.  The

nonmoving party must do more than "rest upon the mere allegations . . . of [the plaintiff's]

pleading" or "simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 & n.11 (1986).  Rather, a

dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  In determining whether a genuine issue of material[2] fact exists, the Court must resolve

all ambiguities and draw all reasonable inferences against the moving party.  *Major League

Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

## III.    ANALYSIS

Plaintiff claims that Defendants violated his Eighth Amendment rights by providing him

---

[2]        A fact is "material" only if it would have some effect on the outcome of the suit.
*Anderson*, 477 U.S. at 248.

with constitutionally inadequate medical care. (Dkt. No. 13 at 14.) Specifically, Plaintiff claims

that Defendants inadequately treated his right wrist, his right knee, and his back. *Id.* at 13-14.

The Court will examine these claims separately.

A.     **Claim Regarding Plaintiff's Right Wrist**

Plaintiff claims that Defendants failed to adequately treat his right wrist, which was

ultimately found to be fractured and on which he underwent surgery after transferring to a

different facility. (Dkt. No. 13 at 13-14.) Defendants move for summary judgment of this claim,

arguing that Plaintiff has not produced any evidence that they were deliberately indifferent to

Plaintiff's serious medical need. (Dkt. No. 54-4 at 7-11.[3]) Defendants are correct.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual"

punishments. The word "punishment" refers not only to deprivations imposed as a sanction for

criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble*,

429 U.S. 97, 102-03 (1976). Punishment is cruel and unusual if it involves the unnecessary and

wanton infliction of pain or if it is incompatible with "'the evolving standards of decency that

mark the progress of a maturing society.'" *Id*. at 102 (quoting *Trop v. Dulles*, 356 U.S. 86, 101

(1958). Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane

conditions of confinement" for prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In

fulfilling this duty, prison officials must ensure, among other things, that inmates receive

adequate medical care. *Id*. (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

There are two elements to a prisoner's claim that prison officials violated his or her

---

[3]     Citations to page numbers in Defendants' memorandum of law refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003) (citation omitted).

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting) (citations omitted), *accord Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), *cert. denied*, 513 U.S. 1154 (1995); *Chance v. Armstrong*, 143 F.3d 698*,* 702 (2d Cir. 1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance*, 143 F.3d at 702-03. Here, Defendants "assum[e], for the sake of argument, that plaintiff's wrist injury was sufficient to present an objectively serious condition." (Dkt. No. 54-4 at 9.) The issue, then, is whether there is a triable issue of fact that Defendants were deliberately indifferent to that serious medical condition.

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance*, 143 F.3d at 703 (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). Thus, to establish deliberate indifference, an inmate must prove

that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer*, 511 U.S. at 835. An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle*, 429 U.S. at 105-06. Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim . . . under the Eighth Amendment." *Id.* at 106. Stated another way, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.*; *see also Smith*, 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.").

Here, Plaintiff complained of right wrist pain to Defendant Mannava on May 3, 2011, and to Defendant Ramineni on August 12, 2011. (Dkt. No. 55 at 19, 25.) When he was ultimately diagnosed with a fractured right wrist on June 18, 2012, he reported that he had injured it in August 2011. (Dkt. No. 55 at 28.) Defendants argue, accordingly, that Defendant Mannava was not deliberately indifferent to Plaintiff's serious medical condition because there is no evidence that Plaintiff had the fracture when Defendant Mannava examined him in May 2011. (Dkt. No. 68 at 7.[4]) Defendants are correct. Plaintiff has not produced any such evidence. Moreover, even if the fracture existed in May 2011 and Defendant Mannava misdiagnosed it, Plaintiff has

---

[4]    Citations to page numbers in Defendants' reply memorandum of law refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

not produced any evidence raising a triable issue of fact that Defendant Mannava was deliberately indifferent. As discussed above, mere medical negligence does not rise to the level of deliberate indifference. *See Miles v. Cnty. of Broome*, No. 3:04-CV-1147, 2006 U.S. Dist. LEXIS 15482, at *22-27, 2006 WL 561247, at *8-9 (N.D.N.Y. Mar. 6, 2006) (McAvoy, J.) (holding that, even assuming that defendants misdiagnosed wrist injuries as sprains rather than fractures, misdiagnosis does not rise to level of deliberate indifference).[5] Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's claims against Defendant Mannava.

As to Defendant Ramineni, Plaintiff has not produced any evidence of deliberate indifference to Plaintiff's wrist condition. Even if Plaintiff's August 2011 injury occurred before he saw Defendant Ramineni on August 12, 2011, there is no evidence that Defendant Ramineni was deliberately indifferent. Based on observations that Plaintiff's range of motion was normal and that there was no swelling, Defendant Ramineni diagnosed the problem as soft tissue or muscular, skeletal pain. (Dkt. No. 54-3 at 9-10; Dkt. No. 55 at 19.) As discussed above, such a misdiagnosis does not rise to the level of deliberate indifference. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claim against Defendant Ramineni.

### B.     Claim Regarding Plaintiff's Right Knee

Plaintiff claims that Defendants failed to adequately treat his right knee. (Dkt. No. 13 at 3.) Defendants move for summary judgment of this claim, arguing that Plaintiff did not suffer

---

[5]     Defendants provided Plaintiff with a copy of this unpublished decision with their reply papers. (Dkt. No. 68-1 at 40-47.)

from a serious medical need and that there is no evidence that they acted with deliberate indifference.  (Dkt. No. 54-4 at 7-11.)  Defendants are correct.

As discussed above, a "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance,* 912 F.2d at 607 (Pratt, J. dissenting) (citations omitted), *accord Hathaway*, 37 F.3d at 66; *Chance*, 143 F.3d at 702. Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain.  *Chance*, 143 F.3d at 702-03.  There is no evidence in the record from which a reasonable trier of fact could conclude that Plaintiff's knee condition, which proved ultimately to be moderate osteoarthritis (Dkt. No. 55 at 27), rose to this level.  *See Santiago v. Coniglio*, No. 07-CV-0791 (M), 2009 U.S. Dist. LEXIS 100934, at *8-9, 2009 WL 3672062, at *3 (W.D.N.Y. Oct. 29, 2009) (holding that torn ACL and periodic complaints of knee pain over a one-year period did not satisfy the objective prong of the Eighth Amendment standard);[6] *Williamson v. Goord*, No. 9:02-CV-00521 (GLS/GHL), 2006 U.S. Dist. LEXIS 46828, at *11-12, 2006 WL 1977438, at *4 (N.D.N.Y. July 11, 2006) (holding that plaintiff's knee injuries, including arthrosis, degenerative joint disease, and a partially torn ACL, did not satisfy objective prong of the Eighth Amendment standard).[7]  Therefore, I recommend that the Court grant

---

[6]     Defendants provided Plaintiff with a copy of this unpublished decision with their reply papers.  (Dkt. No. 68-1 at 1-4.)

[7]     Defendants provided Plaintiff with a copy of this unpublished decision with their reply papers.  (Dkt. No. 68-1 at 5-10.)

Defendants' motion for summary judgment and dismiss the claims regarding the treatment of Plaintiff's right knee.

Even if Plaintiff's right knee condition was sufficiently serious to meet the objective prong of the Eighth Amendment test, Defendants would be entitled to summary judgment. Defendant Mannava examined Plaintiff's right knee and found no swelling or tenderness, full range of motion, and no deformity. (Dkt. No. 55 at 9, 17.) He prescribed pain medication and recommended hot showers, weight loss, and stretching exercises. *Id.* Defendant Ramineni examined Plaintiff's right knee, found that its movement was normal, recommended weight loss, and prescribed pain medication. (Dkt. No. 54-3 at 9-10; Dkt. No. 55 at 19.) Defendant Williams noted that Plaintiff had seen a doctor the previous day with no mention of knee pain, that Plaintiff was receiving prescription pain medication, and that Plaintiff's gait was normal and quick. (Dkt. No. 55 at 21.) Plaintiff's contention that Defendants persisted in "apply[ing] the same ineffective treatment" (Dkt. No. 13 at 6) constitutes a mere disagreement with the opinions of his healthcare providers. Such disagreement does not rise to the level of deliberate indifference because "[inmates] do not have a right to choose a specific type of treatment." *Veloz v. New York*, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004). Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claims regarding the treatment of Plaintiff's right knee.

## C.    Claim Regarding Plaintiff's Back

Plaintiff claims that Defendants failed to adequately treat him for lower back pain. (Dkt. No. 13 at 3.) Defendants move for summary judgment of this claim, arguing that Plaintiff's back pain does not meet the objective prong of the Eighth Amendment test. (Dkt. No. 54-4 at 7-11;

Dkt. No. 68 at 3-4.)  Defendants are correct.

Severe back pain can rise to the level of a "serious medical condition." *Thomas v. Connolly*, No. 10 Civ. 2401 (PAC) (MHD), 2012 U.S. Dist. LEXIS 124644, at *86, 2012 WL 3776698, at *26 (S.D.N.Y. Apr. 10, 2012) (denying defendants' motion for summary judgment where evidence raised a triable issue of fact that transferring plaintiff, who was on a medical hold, from one prison to another caused him severe and excruciating back pain that required immediate treatment upon arrival at new facility); *Flemming v. City of N.Y.*, No. 03-CV-0662 (NGG) (LB), 2009 U.S. Dist. LEXIS 92132, at *22-23 & n.9, 2009 WL 3174060, at *9 & n. 9 (E.D.N.Y. Sept. 30, 2009) (collecting cases); *Williams v. Smith*, No. 02 Civ. 4558 (DLC), 2009 U.S. Dist. LEXIS 69871, at *22-23, 2009 WL 2431948, at *8-9 (S.D.N.Y. Aug. 10, 2009) (collecting cases); *Morrison v. Mamis*, No. 08 Civ. 4302 (PAC) (AJP), 2008 U.S. Dist. LEXIS 106416, at *29-31, 2008 WL 5451639, at *8 (S.D.N.Y. Dec. 18, 2008) (finding in summary judgment analysis that a reasonable factfinder could consider plaintiff's diagnosed condition of degenerative disc disease a "serious medical need"); *Nelson v. Rodas*, No. 01 Civ. 7887 RCC AJP, 2002 U.S. Dist. LEXIS 17359, at *50-51, 2002 WL 31075804, at *14 (S.D.N.Y. Sept. 17, 2002) (holding that "severe back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment" but finding that plaintiff's allegations of "back spasms" without descriptions of the intensity or duration of the pain did not demonstrate such a condition).  However, courts have held that non-severe back pain does not constitute a serious medical condition.  *Gillespie v. N.Y. State Dep't of Corr. Servs.*, No. 9:08-CV-1339 (TJM/ATB), 2010 U.S. Dist. LEXIS 26246, at *16-17, 2010 WL 1006634, at *5 (N.D.N.Y. Feb. 22, 2010) (finding that it was "extremely questionable" that plaintiff had alleged

that his "degenerative osteoarthritis of his lower back" constituted a serious medical condition where medical records documented that, over a three-year period, plaintiff "periodically" claimed to suffer pain described as "intermittent," "chronic," "increasing;" plaintiff had only once described his pain as "severe" and never used adjectives such as "extreme," "excruciating," or "unbearable"); *Phillips v. Goord*, No. 08-CV-0957 A (F), 2009 U.S. Dist. LEXIS 29322, at *18, 2009 WL 909593, at *6 (W.D.N.Y. Apr. 1, 2009) (complaint of "chronic" back pain without more insufficient to find a serious medical condition); *Jackson v. Fairchild*, No. 9:04-CV-73 (FJS/DEP), 2007 U.S. Dist. LEXIS 17497, at *5, 2007 WL 778133, at *2 (N.D.N.Y. Mar. 12, 2007) (finding that plaintiff did not raise an issue of fact regarding alleged severe medical impairment based on back and knee pain when he only complained about his back pain three times over the relevant period and did not request pain medication "beyond simple Ibuprofen and similar over-the-counter medications").[8]

Here, the record does not contain any evidence from which a reasonable trier of fact could conclude that Plaintiff's back pain constituted a serious medical condition. On May 3, 2011, Plaintiff "made very vague complaints" about tail bone pain to Defendant Mannava. (Dkt. No. 54-3 at 18.) Plaintiff states that he complained of back pain again on September 6, 2011 (Dkt. No. 63 at 16), but that complaint is not reflected in Defendant Mannava's record of that visit (Dkt. No. 55 at 17). Plaintiff did not complain of back pain again until April 23, 2012. *Id.* at 7. X-rays of Plaintiff's lumbar spine taken when he moved to a different facility showed no fracture, subluxation, or significant arthritis. *Id.* at 27. None of this evidence rises to the level

---

[8] The Court will provide Plaintiff with a copy of these unpublished decisions in accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

described in the cases cited above as sufficient to establish a serious back condition. Therefore, I recommend that the Court grant Defendants' motion for summary judgment.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 54) be **GRANTED**; and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Thomas v. Connolly*, 2012 U.S. Dist. LEXIS 124644, 2012 WL 3776698 (S.D.N.Y. Apr. 10, 2012); *Flemming v. City of N.Y.*, 2009 U.S. Dist. LEXIS 92132, 2009 WL 3174060 (E.D.N.Y. Sept. 30, 2009); *Williams v. Smith*, 2009 U.S. Dist. LEXIS 69871, 2009 WL 2431948 (S.D.N.Y. Aug. 10, 2009); *Morrison v. Mamis*, 2008 U.S. Dist. LEXIS 106416, 2008 WL 5451639 (S.D.N.Y. Dec. 18, 2008); *Nelson v. Rodas*, 2002 U.S. Dist. LEXIS 17359, 2002 WL 31075804 (S.D.N.Y. Sept. 17, 2002); *Gillespie v. N.Y. State Dep't of Corr. Servs.*, 2010 U.S. Dist. LEXIS 26246, 2010 WL 1006634 (N.D.N.Y. Feb. 22, 2010); *Phillips v. Goord*, 2009 U.S. Dist. LEXIS 29322, 2009 WL 909593 (W.D.N.Y. Apr. 1, 2009); *Jackson v. Fairchild*, 2007 U.S. Dist. LEXIS 17497, 2007 WL 778133 (N.D.N.Y. Mar. 12, 2007).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)

(citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam));

28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: February 23, 2015
     Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

2009 WL 3174060
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Woodrow FLEMMING, Plaintiff,
v.
CITY OF NEW YORK, Yves Gauvin,
M.D., and Suzette McKenzie, Defendants.

No. 03-CV-0662 (NGG)(LB). | Sept. 30, 2009.

**Attorneys and Law Firms**

Woodrow Flemming, Malone, NY, pro se.

Brian M. Healy, Gillian C. Thomas, Heidell, Pittoni, Murphy & Bach, LLP, Eugene Bernard Sohn, Corporation Counsel of the City of New York, New York, NY, for Defendants.

**MEMORANDUM & ORDER**

NICHOLAS G. GARAUFIS, District Judge.

**\*1** Woodrow Flemming, a *pro se* plaintiff ("Plaintiff"), objects to Magistrate Judge Lois Bloom's Report and Recommendation dated September 11, 2009 (Docket Entry # 186) ("R & R"), which recommends that this court grant summary judgment for Defendants City of New York, Yves Gauvin, M.D., and Suzette McKenzie ("Defendants") on his Eighth Amendment claim. The court assumes the parties' familiarity with the case and with the R & R. Having reviewed the R & R and Plaintiffs Objections (*see* Docket Entry # 187), the court overrules the Objections, adopts the R & R, and grants Defendants' Motion for Summary Judgment.

**I. BACKGROUND**

In his Amended Complaint, Plaintiff claims that Defendants exhibited "deliberate indifference to [his] serious medical needs" in violation of the Eighth Amendment under *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). (*See* Am. Compl. (Docket Entry # 30), at 3.) Plaintiff alleges that Defendants were deliberately indifferent to back and shoulder injuries that he sustained in a 2002 slip-and-fall accident in prison. (*See id.* at 3-5.)He also alleges that he was denied access to an MRI to determine the seriousness of his injuries. (*See id.*)

"The deliberate indifference standard [under the Eighth Amendment] embodies both an objective and a subjective prong."*Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). To satisfy the objective prong, a plaintiff must show that "the alleged deprivation [is], in objective terms, 'sufficiently serious.' "*Id.* (*quoting Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). The objective prong considers (1) "whether the prisoner was actually deprived of adequate medical care;" and (2) "whether the inadequacy in medical care is sufficiently serious."*Salahuddin v. Goord,* 467 F.3d 263, 279-80 (2d Cir.2006).

To satisfy the subjective prong, a plaintiff must show that "the charged official [acted] with a sufficiently culpable state of mind."*Id.* at 280."[A] prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"*Hathaway,* 37 F.3d at 66 (*quoting Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994))."This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result."*Salahuddin,* 467 F.3d at 280.

In a thorough R & R, Magistrate Judge Bloom properly addressed Plaintiff's claims under the deliberate indifference standard. Judge Bloom first concluded that Plaintiff had failed to establish the objective component of his Eighth Amendment deliberate indifference claim. (*See*R & R 8-13.) Based on the medical evidence presented, she found that "plaintiff's shoulder and back injuries were not sufficiently serious to satisfy the objective component of the Eighth Amendment analysis."(R & R 10.)Her conclusion was supported by, *inter alia,* MRI and x-ray evidence showing that there were no abnormalities in Plaintiffs back and shoulder. (*Id.*)

**\*2** In addition, the Magistrate Judge Bloom concluded that Plaintiff had failed to establish that Defendants had "denied him adequate medical care." (*Id.*) Judge Bloom based this conclusion upon evidence that, following his slip-and-fall accident, Plaintiff was immediately taken for x-rays and provided pain medication. (*Id.* at 10-11.)She also cited evidence of his medical treatment at follow-up visits, including the provision of pain medication and further x-rays (which turned up negative).(*Id.* at 11.)Finally, Judge Bloom

addressed Plaintiff's particular objections to the medical care he received, concluding, *inter alia,* that his assertions amounted to "a disagreement" about whether and when an MRI might be appropriate, rather than a viable claim for an Eighth Amendment violation. (*See id.* at 12-13 (*citing, inter alia, Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim.").))

Judge Bloom also concluded that Plaintiff did not satisfy the subjective component of the deliberate indifference test. (*See id.* at 13-15.)She concluded that, based on the evidence presented, Plaintiff had been "seen routinely and consistently by medical personnel throughout his custody ...."(*Id.* at 14.)Although Plaintiff asserted that Defendants had denied him access to an MRI, Magistrate Judge Bloom noted that Plaintiff was sent for an MRI a few months after it was recommended, and that there was no "record evidence that [Defendants] delayed, denied or interfered with plaintiff getting an MRI."(*Id.* at 15;*see also id.* at 4 (noting results of MRI showing no abnormalities).)

Finally, Judge Bloom found no evidence of a municipal policy or practice, and concluded that summary judgment on Plaintiffs municipal liability claim should also be granted. (*Id.* at 15-16.) [1] She further recommended that *in forma pauperis* status should be denied for the purpose of any appeal. (*Id.* at 16.)

## II. PLAINTIFF'S OBJECTIONS TO THE R & R

On September 18, 2009, Plaintiff filed his Objections to the R & R. In these Objections, which are now before the court, Plaintiff makes a wide variety of general and vague assertions that he is entitled to relief, and that the Magistrate Judge ignored his claims or otherwise committed legal error. (*See, e.g.,* Objections ¶ 9 (reiterating that Plaintiff injured himself), ¶ 11 (explaining that Plaintiff injured his arm and shoulder), ¶ 12 (arguing that the court should reconsider its ruling), ¶¶ 14-15 (reiterating Plaintiff's liberty interest and rights under the Eighth Amendment), ¶ 16 (reiterating that Defendants were deliberately indifferent to his medical needs), ¶¶ 19-24 (reiterating that Defendants acted with a culpable mental state and pursuant to municipal policy).) These general ized objections are either concl usory or are based on arguments already made and rejected by Judge Bloom. They are reviewed for clear error, and the court has found no such error in this case. *Pall Corp. v. Entegris, Inc.,*

249 F.R.D. 48, 51 (E.D.N.Y.2008) ("[w]hen a party makes only concl usory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error") (internal quotation marks omitted). [2]

**\*3** In addition to generalized objections, Plaintiff has lodged what appear to be several specific objections to the R & R. First, Plaintiff appears to argue that Magistrate Judge Bloom erred in concluding that his injury was not serious. (Objections ¶¶ 9, 16, 18.) Second, he contends that Defendants were deliberately indifferent to his medical needs because he did not receive an MRl for his injuries until thirteen months after his accident. (*Id.* ¶¶ 10, 17.)The court has reviewed these objections *de novo, see Gupta v. New York City Sch. Constr. Auth.,* No. 04-CV-2896 (NGG)(LB), 2007 WL 1827418, at * 1 (E.D.N.Y. June 25, 2007) (court must "make a de novo review of all portions of the R & R to which Plaintiff specifically objected"), and overrules them.

First, regarding the seriousness of Plaintiff's injury, Judge Bloom began by explicitly recognizing that severe back and shoulder pain could amount to a serious injury under the Eighth Amendment. (*See*R & R 9 (citing cases).) Nonetheless, relying on medical evidence in the record, Judge Bloom determined that Plaintiff's particular injuries were not serious. (*See id.* at 9-10 (*citing* Declaration of G. Thomas dated Mar. 7, 2008 (Docket Entry # 146) ("Thomas Decl."), Exs. I, G); *see also id.* at 1-4 (recounting medical history).) Most notably, she cited an MRI of Plaintiff's back showing " 'no significant abnormalities' and 'no evidence of disc herniation or spinal stenosis' "(*id.* at 10 (*citing* Thomas Decl., Ex I, at 1a)), as well as x-rays of Plaintiff's shoulder that were " 'negative for abnormalities' " (*Id.*(*citing* Thomas Decl., Ex. G, at 64, 246)). [3] Plaintiff has not pointed to any contrary evidence that would create a disputed issue of fact regarding the seriousness of his injury. [4]

Second, regarding the MRI that Plaintiff sought, "[w]hether an MRI should have been done is a classic example of a matter for medical judgment as to the appropriate course of treatment and is not actionable under the Eighth Amendment."*Joyner v. Greiner,* 195 F.Supp.2d 500, 505 (S.D.N.Y.2002) (internal quotation marks omitted). The issue is not whether Plaintiff asked for or received a specific type of medical care. *Id.* at 504-05.Instead, for Eighth Amendment purposes, the question is whether "the treatment a prisoner receives is adequate," regardless of the prisoner's personal treatment preferences. *Vasquez v. Runned,* No. 05-cv-6082 (RCC)

(KNF), 2007 WL 891224, at * 5 (S.D.N.Y. Mar. 22, 2007) (*citing Chance,* 143 F.3d at 703).

Plaintiff was sent for various tests and treatment following his accident in September 2002. (*See, e.g., Thomas Decl., Ex.* G, at 64 (noting x-ray and prescribing pain reliever following slip-and-fall), 65-76 (describing medical evaluations in days following accident), 75-76 (noting off-and-on pain and prescribing, *inter alia,* x-ray, Motrin); *see also id.* at 214-15 (injury report indicating no fracture).) The medical record indicates that follow-up x-rays were performed and that abnormalities were not found (*see, e.g., id.* at 184, 223-24, 235-38, 246); it also indicates that Plaintiff was being provided pain medication (*see, e.g., id.* at 64, 76, 184). Plaintiff does not point to particular medical tests or other evidence indicating that he had a serious injury. Nor does he show that Defendants were aware of such an injury, or that Defendants took any actions to impede his access to appropriate medical care. [5] That Plaintiff may have desired, or requested, an MRI on a particular occasion does not mean that Defendants were deliberately indifferent to his medical needs.

**\*4** Furthermore, Plaintiff argues that Judge Bloom should have considered his deposition in her R & R. (*See* Objections ¶ 8.) To the extent that Judge Bloom failed to consider it, Plaintiff's deposition is not sufficient to salvage his claim. In a portion which he attaches to his Objections, Plaintiff states that: "[d]ue to the[ ] negligence of treatment, negligence of seeing me, ... this is what left ... me ... with this injury."(Objections (attached deposition, at 8-9).) Plaintiff merely states a legal conclusion about the nature of his claim-this does not provide evidentiary support for his conclusion. And, in any case, assertions of mere negligence are insufficient to establish deliberate indifference under the Eighth Amendment. *See Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996) ("[T]o state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice."). Plaintiff's reference to his deposition does not support a finding of deliberate indifference nor does it undermine Judge Bloom's conclusions.

In sum, Plaintiff has failed to establish a disputed issue of material fact regarding his deliberate indifference claim.

### III. CONCLUSION

Plaintiff's Objections are overruled. The court adopts the R & R and grants Defendants' Motion for Summary Judgment. The Clerk of Court is directed to enter judgment in favor of Defendants and to close the case.

SO ORDERED.

### REPORT AND RECOMMENDATION

BLOOM, United States Magistrate Judge.

Plaintiff, Woodrow Flemming, brings this pro se action under 42 U.S.C. § 1983, alleging that defendants City of New York, Yves Gauvin, M.D. and Suzette McKenzie (collectively referred to herein as "defendants"), violated his rights under the Eighth Amendment of the United States Constitution. Defendants move for summary judgment pursuant to Fed R. Civ. P. 56.[1] The Honorable Nicholas G. Garaufis referred defendants' motion to me for a Report and Recommendation in accordance with 28 U.S.C. § 626(b). For the reasons set forth below, it is respectfully recommended that defendants' motion should be granted.

### BACKGROUND

Plaintiff was in custody of the New York City Department of Corrections ("NYCDOC") from April 18, 2002 through October 3, 2003, at which time he was transferred to the New York State Department of Corrections ("NYSDOC"). (Defs.' Statement of Undisputed Facts Pursuant to Rule 56.1 "Defs.' Statement" ¶¶ 10, 30, annexed to Defs.' Notice of Motion for Summary Judgment; document 146.)[2] While exiting his cell on September 1, 2002, plaintiff alleges that he slipped on water coming from a leak in the nearby showers and fell. (Am. Compl. at 4; Flemming Dep. 95:10-14, December 6, 2006, annexed to Defs.' Notice of Motion for Summary Judgment ("Defs.' Motion," Exhibit J.))[3] Plaintiff was taken to Correctional Health Services, New York City Health and Hospitals Corporation ("CHS") where he complained of left shoulder pain and was then transferred to Bellevue Hospital, where he also complained of lower back pain. (Am. Compl. at 4; Defs.' Statement ¶¶ 14, 15.) At Bellevue, an x-ray of plaintiff's shoulder was taken and plaintiff was given ibuprofen. (Am. Compl. at 4; Defs.' Statement ¶ 15.) Plaintiff's x-ray did not show signs of a fracture. (Defs.' Statement ¶ 16.)

**\*5** Plaintiff was discharged and returned to NYCDOC's custody on September 1, 2002. (Defs.' Statement ¶ 15.) Plaintiff's treating physician was defendant Yves Gauvin, MD. (Am. Compl. at 5; Defs.' Statement ¶ 11.) Plaintiff was also seen by the patient advocate, defendant Suzette McKenzie, who was not a nurse administrator or medical personnel. (Def.'s Statement of Undisputed Facts ¶ 12.) While in NYCDOC's custody, plaintiff states that he "complain[ed] to ever [y]one from the time [he] got there and no one took th[eir] time to give [him] the proper care."(Am. Compl. at 4.) Plaintiff alleges that defendants "[k]new that [he] was complain[in]g about [his] back and shou[l]der" but were deliberately indifferent to his serious medical need. (Am. Comp. at 3.) Plaintiff states that from September 2002 to November 2002, he was told by the "Clinic Administrator" and Gauvin that he would be scheduled for an x-ray and Magnetic Resonance Imaging ("MRI") for his back, but that neither was done. (Pl.'s Aff. at 2, 5, attached to Pl.'s Motion for Summary Judgment; document 156-2.)

Plaintiff's CHS records indicate that he complained of shoulder pain the day after his fall on September 2, 2009 and again on September 4, 2002, September 6, 2002, and September 18, 2002, at which time another x-ray was recommended. (Exhibit G at 64, 65, 66, 67, 75.) Plaintiff was treated with pain relievers.(*Id.*) Plaintiff's records do not reflect that he complained of shoulder pain again until November 21, 2002, at which time he was provided with pain relievers, and then again on April 26, 2003, at which time he was sent for an x-ray, which showed no abnormalities. (*Id.* at 109, 184, 246.)Plaintiff's records reflect no complaints by plaintiff regarding his back from September 3, 2002 through November 2002, when plaintiff filed his original complaint with the Court. (Exhibit G.)

On January 2, 2003, plaintiff injured his left knee while being transported on a NYCDOC's bus. (Exhibit G at 216.) Plaintiff's knee was immobilized, and plaintiff was given a cane to assist him in ambulating. (*Id.* at 217.)Plaintiff underwent an MRI on his knee on April 22, 2003. (*Id.* at 248.)On February 21, 2003, after complaining of back pain, plaintiff was sent for an x-ray of his spine, which was interpreted as "unremarkable." (*Id.* at 223, 238.)Plaintiff underwent an x-ray on May 13, 2003, which was interpreted as "no acute fracture." (*Id.* at 224.)CHS records reflect that on April 23, 2003, plaintiff complained that he had suffered from back pain since his knee injury in January 2003. (*Id.* at 182.)On July 11, 2003, it was recommended that plaintiff receive an MRI of his spine, however the MRI

was not performed prior to plaintiff's transfer to NYSDOC's custody on October 3, 2003.[4] (Defs.' Statement ¶¶ 24, 29.) Plaintiff states that his MRI was delayed because he suffered "heart problems" and was then transferred to NYSDOC's custody shortly thereafter. (Flemming Dep. 92:3-14.) An MRI of plaintiff's back was performed on December 29, 2003 which showed "no significant [ ] abnormalities" and "no evidence of disc herniation or spinal stenosis."(Exhibit I at 1a.)

**\*6** Plaintiff states that as a result of not receiving an MRI, he is in constant pain, uses a wheel chair, walker or cane, cannot walk, stand, sit or sleep for long periods of time. (Am. Compl. at 5.) Defendants, however, argue that plaintiff suffered injury to his back and shoulder prior to the September 1, 2002 incident. Plaintiff concedes that he slipped and fell on oil while at a U-Haul in July 1998 (Flemming Dep. 12:2-3, 12:9-15) and that he hurt his back in the L4, L5, L6 regions (*id.* at 12:16-17). Plaintiff also acknowledges that he previously used a wheelchair and cane to ease the pain in his back after being pushed down on September 11, 2001. (Flemming Dep. 126:4-14.) Prior to entering NYCDOC's custody, plaintiff was also treated at St. Barnabas Hospital and the Veteran's Administration Medical Center ("VAMC") for his back. (Flemming Dep. 74:22-75:4, 77:3-6, 77:12-17; Exhibit J.)

Plaintiff argues in his affidavit in support of his motion for summary judgment, however, that he never claimed he had issues regarding his back and knee and that his complaint is for his "left shoulder, neck, arm, left hip side."(Pl.'s Aff. at 3-4.) Plaintiff also objects to defendants' inclusion of records from NYSDOC.[5] Plaintiff states that there is a pattern and practice of abuse at Rikers Island, where the medical staff "cover up for each other" and the supervisors encourage the practice of treating inmates only "60%" of the time. (Pl.'s Addendum/Opp. to Def.'s Motion for Summary Judgment "Pl.'s Addendum" at 3; document 155).[6]

## PROCEDURAL HISTORY

Plaintiff's action was filed in the Southern District of New York on November 19, 2002 and was transferred to this Court on January 15, 2003. (Documents 1, 2.) On July 8, 2003, the Court directed plaintiff to file an amended complaint and when plaintiff failed to comply with the Court's Order, the case was dismissed on October 23, 2003. (Documents

4, 5.) On October 31, 2003, the Court reopened plaintiff's case (document 7) and again extended his time to file an amended complaint (document 13). Based on the letters filed by plaintiff, the Court permitted plaintiff to file an amended complaint for inadequate medical treatment. (Document 20.) Plaintiff filed an amended complaint on August 9, 2004 naming the City of New York, Gauvin, McKenzie, John and Jane Does and NIC Rikers Island Annex. (Am. Comp.; document 30.) On September 29, 2006, the Court denied plaintiff's motion for summary judgment and granted in part defendants' motion to dismiss the unnamed defendants as well as the NIC Rikers Island Annex, a subdivision of the New York City Department of Corrections. (Document 67.) The Court denied defendants' motion as to the City of New York, Gauvin and McKenzie. (*Id.*) Defendants now move for summary judgment and plaintiff cross moves for summary judgment.

**STANDARD OF REVIEW**

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material if it is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1535 (2d Cir.1997) (quoting *Anderson,* 477 U.S. at 248); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.,* 221 F.3d 394, 398 (2d Cir.2000). For the purposes of summary judgment, the facts here are viewed in the light most favorable to plaintiff.

**\*7** "An adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for

trial." Fed.R.Civ.P. 56(e); *see Matsushita,* 475 U.S. at 586-87 (1986). In other words, the non-moving party must provide "affirmative evidence" from which a jury could return a verdict in its favor. *Anderson,* 477 U.S. at 257. "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Niagra Mohawk Power Corp. v. Jones Chemical, Inc.,* 315 F.3d 171, 175 (2d Cir.2003) (quoting *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998)). Moreover, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Id.* (quoting *Anderson,* 477 U.S. at 252). When a party is proceeding *pro se,* the Court is obliged to "interpret that party's supporting papers liberally, that is, 'interpret them to raise the strongest arguments that they suggest.'" *Forsyth v. Federation Employment and Guidance Service,* 409 F.3d 565, 569 (2d Cir.2005) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). [7]

**DISCUSSION**

**I. Eighth Amendment**

The Eighth Amendment, made applicable to the States by the Fourteenth Amendment, prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend VIII; *Estelle v. Gamble,* 429 U.S. 97, 101, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal citation omitted). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Estelle v. Gamble,* 429 U.S. at 104). To establish a violation of the Eighth Amendment, each defendant's liability depends on a showing that he or she acted with deliberate indifference. *See Brock v. Wright,* 315 F.3d 158, 164 (2d Cir.2003) (stating that plaintiff must show deliberate indifference on the part of a "particular defendant"). To establish deliberate indifference, a plaintiff must satisfy both an objective and subjective component. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003) (internal citations omitted).

**A. Objective Component of Deliberate Indifference**

Plaintiff must establish that he was subjected to conditions that are, in objective terms, "sufficiently serious." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citations omitted). "Because society does not expect that prisoners will

have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious'."*Smith,* 316 F.3d 178, 183-84.A medical condition is considered objectively serious under the Eighth Amendment if it is "a condition of urgency, one that may produce death, degeneration or extreme pain."*Morales v. Mackalm,* 278 F.3d 126, 132 (2d Cir.2002) (citing *Hathaway,* 37 F.3d at 66).

**\*8** Plaintiff argues that defendants "[k]new that [he] was complain[in]g about [his] back and shou[l]der" but were deliberately indifferent to his serious medical need. (Am. Comp. at 3.) Defendants, however, argue that plaintiff's x-ray of his shoulder was negative for abnormalities, that he was discharged from Bellevue with "full active range motion of the left shoulder," that while plaintiff "complained intermittently of back and shoulder pain, such complaints were consistent with his history of a prior, chronic, back pain" and that there was no "acute injury that mandated an MRI."(Defs.' Memorandum of Law in Support of Defs.' Motion for Summary Judgment "Defs.' Memo." at 3, 9.) Defendants also argue that "there was no evidence of any new injury, or that the injuries he suffered in the 1998 accident were exacerbated by the September 2002 fall." [8] (*Id.* at 10.)

Depending on the circumstances, severe back pain may qualify as a "serious medical need."[9] Similarly, severe shoulder pain may also qualify as a serious medical need.[10] However, in May 2004, plaintiff was informed that his back pain was due to his poor posture and that a neurosurgeon had agreed that plaintiff did not have significant lumbar disease. (*Id.* at 278). On July 5, 2004, plaintiff was observed ambulating without difficulty (*id.* at 227) and on July 28, 2004, plaintiff's x-ray results and Computed Tomography ("CT") scans returned negative (*id.* at 225). Furthermore, on April 28, 2005, it was determined, based on the MRI results of plaintiff's back, that he no longer needed a wheelchair and only needed a cane for long distances. (*Id.* at 190). In light of the MRI of plaintiff's back showing "no significant [ ] abnormalities" and "no evidence of disc herniation or spinal stenosis" (Exhibit I at 1a) and the x-rays which showed his shoulder "negative for abnormalities" (Exhibit G at 64, 246), plaintiffs shoulder and back injuries were not sufficiently serious to satisfy the objective component of the Eighth Amendment analysis. Furthermore, even if plaintiff's injuries were sufficiently serious, plaintiff fails to establish that defendants denied him adequate medical care.

"Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care."*Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citing *Farmer v. Brennan,* 511 U.S. 825, 844-47, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994))."Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."*Id.* at 280.Therefore, while failing "to take reasonable measures" in response to a medical condition can lead to liability, *Salahuddin,* 467 F.3d at 279 (citing *Farmer v. Brennan,* 511 U.S. at 847),"prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause,"*id.* (citing *Farmer v. Brennan,* 511 U.S. at 845).

**\*9** Plaintiff alleges that he suffered back and shoulder pain after slipping and falling on water. Plaintiff claims that despite his numerous requests for an MRI of his back, defendants failed to perform this test and that as a result, he is in constant pain, uses a wheel chair, walker or cane, and that he cannot walk, stand, sit or sleep for long periods of time. However, after plaintiff's fall, he was immediately taken to CHS and then to Bellevue Hospital, where an x-ray of plaintiff's shoulder was taken and he was provided with pain medication. While plaintiff's x-ray did not show signs of a fracture, defendants followed up with plaintiff on September 2, 2002, the day after his fall, and throughout the month of September.[11] During his follow up visits, plaintiff complained of shoulder pain on September 2nd, 4th, 6th and 18th, at which times he was given pain relievers and another x-ray of his shoulder was recommended. The record does not reflect complaints of shoulder pain again until November 21, 2002, and April 26, 2003, at which time plaintiff was sent for another x-ray, which again reflected no abnormalities.

Regarding plaintiff's back, the CHS records reflect that plaintiff did not begin regularly complaining about his back until January 2003, at which time he was sent for an x-ray of his spine, which was interpreted as "unremarkable." (Exhibit G at 238.) Plaintiff underwent another x-ray on May 13, 2003, which was interpreted as "no acute fracture," (*id.* at 224) and on July 11, 2003, it was recommended that plaintiff receive an MRI of his spine, which was performed on December 29, 2003 and showed "no significant [ ] abnormalities" and "no

evidence of disc herniation or spinal stenosis" (Exhibit I at 1a). Therefore, plaintiff fails to demonstrate that defendant denied him adequate medical care.

Plaintiff's claim that defendants' deliberate indifference resulted in his permanent use of a wheel chair, walker or cane is contradicted by plaintiff's medical records. Defendants argue that there is no evidence in the NYSDOC's chart that plaintiff currently uses a walker, wheelchair or cane. (Defs.' Reply ¶ 5.) Plaintiff, however, argues that he still uses a cane and a wheelchair from "time to time" (Pl.'s Aff. at 3) but the records he submits state that his use of a wheelchair has been discontinued and his cane has been taken away. (Pl.'s Exhibit at 1, 44; document 156-4; *see also* Exhibit I at 190.) Furthermore, plaintiff acknowledges that he used a wheelchair and cane to alleviate his back pain prior to entering NYCDOC's custody. (Flemming Dep. 126:4-14.)

Plaintiff repeatedly argues that he was assured by defendants that he would receive an MRI of his back but that an MRI was never performed. Defendants maintain that no MRI was recommended for plaintiff's back prior to July 11, 2003 or at anytime for his shoulder. (Defs.' Memo at 4, 5). In deliberate indifference cases, "the essential test is one of medical necessity and not one simply of desirability."*Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) (internal citations and quotations omitted)."It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."*Chance v. Armstrong,* 143 F.3d at 703;*see also Hathaway v. Coughlin,* 37 F.3d at 70 (" 'We do not sit as a medical board of review. Where the dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, we will not second guess the doctors.'") (internal citations omitted)."Whether an MRI should have been done 'is a classic example of a matter for medical judgment' as to the appropriate course of treatment and is not actionable under the Eighth Amendment."*Joyner v. Greiner,* 195 F.Supp.2d 500, 505 (S.D.N.Y.2002) (internal citation omitted); *see also Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) ("Thus, disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim. These issues implicate medical judgments and, at

worst, negligence amounting to medical malpractice, but not the Eighth Amendment."(citing *Estelle,* 429 U.S. 107); *Adams v. Perez,* No. 08 Civ. 4834(BSJ)(MHD), 2009 WL 513036, 4 (S.D.N.Y. February 27, 2009) (the decision to not order an MRI is not a situation that is actionable under the Eighth Amendment); *Nelson v. Rodas,* No. 01 Civ. 7887(RCC)(AJP), 2002 WL 31075804, 14-15 (S.D.N.Y. September 17, 2002) ("[T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.") (citing cases).

**\*10** Plaintiff received prompt and appropriate medical attention after his fall in 2002. Plaintiff's disagreement regarding his need and the appropriate time for an MRI does not establish an Eighth Amendment violation. Therefore, plaintiff fails to meet the objective prong of the deliberate indifference test.

## B. Subjective Component of Deliberate Indifference

Even if plaintiff could establish that his injury to his shoulder and back was sufficiently serious and that he was not provided with adequate medical treatment to satisfy the objective component of the deliberate indifference test, plaintiff could not satisfy the subjective component. The subjective component of deliberate indifference requires a plaintiff to establish that defendant " 'kn[e]w of and disregard[ed] an excessive risk to [his] health or safety,' "*Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Defendants had to act with a sufficiently culpable state of mind, *Smith v. Carpenter,* 316 F.3d at 184 (citations omitted), a state of mind "equivalent to the familiar standard of 'recklessness' as used in criminal law,"*Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir.2002) (per curiam).

Defendants argue that plaintiff fails to establish the requisite state of mind for defendants Gauvin and McKenzie. (Defs.' Memo at 15.) Defendants state that defendant Gauvin, requested an MRI when Bellevue deemed it necessary and that defendant McKenzie, who was not a medical care provider and therefore was not permitted to administer medication or tests, administratively followed up on plaintiff's MRI. (*Id.* at 15.)Defendants also state there has not been a "departure from the standard of care."(Exhibit A at 5.)

In the landmark case *Estelle v. Gamble,* the Supreme Court set forth cases in which prison officials were held to be deliberately indifferent to the serious medical needs of prisoners, which included a doctor throwing out a prisoner's ear and stitching the stump together, a doctor injecting a prisoner with penicillin with the knowledge that prisoner was allergic to the drug and then refusing to treat the allergic reaction, and a prison physician both refusing to administer the prescribed pain killer and rendering the prisoner's leg surgery unsuccessful by requiring the prisoner to stand despite his surgeon's contrary instructions. 429 U.S. at 104 n. 10.A finding of deliberate indifference has been reserved for cases where, for instance, "officials deliberately delayed care as a form of punishment; ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years."*Espinal v. Coughlin,* No. 98 Civ. 2579, 2002 WL 10450, at *3 (S.D.N.Y. Jan. 3, 2002) (internal quotations and citations omitted)."Mere negligence in diagnosis or treatment is insufficient to state a valid Eighth Amendment claim" and " '[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner.' "*Smith,* 316 F.3d at 184 (citing *Estelle,* 429 U.S. at 105-06).

**\*11** Plaintiff was seen routinely and consistently by medical personnel throughout his custody at NYCDOC. (Exhibit G). Aside from the date of plaintiff's slip and fall, September 1, 2002, at which time x-rays were ordered for plaintiff's shoulder, the record reflects only a few complaints of shoulder pain by plaintiff, at which time another x-ray was ordered. These x-rays showed no abnormalities. In addition, plaintiff himself states that he began suffering from consistent back pain after his knee injury in January 2003. (Exhibit G at 182.) After plaintiff began complaining of back pain, he was sent for x-rays in February 2003 and May 2003 (Exhibit G at 223, 224, 238) and an MRI was recommended in July of 2003 (Defs. Statement ¶ 24). Plaintiff alleges defendants Gauvin and McKenzie did not provide him with an MRI. However, Gauvin ordered an MRI for plaintiff when Bellevue Hospital recommended it. There is no record evidence that Gauvin or McKenzie delayed, denied or interfered with plaintiff getting an MRI. Furthermore, defendant McKenzie did not have authority to order an MRI for plaintiff. Therefore, even if plaintiff had satisfied the objective component for an Eighth Amendment violation, plaintiff fails to establish the subjective component of deliberate indifference as to defendants Gauvin and McKenzie. Therefore, defendants' motion should be granted.

## II. Municipal Liability

In order to establish municipal liability under § 1983, a plaintiff must demonstrate an officially adopted policy, custom or practice caused the deprivation of his or her constitutional rights. *Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)."Proof of a single incident of unconstitutional activity is not sufficient to impose [municipal liability]."*City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823-24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). Furthermore, "a municipality may not be found liable simply because one of its employees committed a tort."*Roe v. City of Waterbury,* 542 F.3d 31, 36 (2d Cir.2008) (quoting *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)).

Plaintiff argues that there is a pattern of abuse at Rikers Island, where the medical staff "cover up for each other" and the supervisors encourage the practice of treating inmates only "60%" of the time. (Pl.'s Addendum at 3.) However, plaintiff has failed to set forth any evidence demonstrating an officially adopted policy, custom or practice that resulted in the violation of his Eighth Amendment rights. Defendants' motion for summary judgment should therefore be granted. *See Johnson & Johnson Consumer Companies, Inc. v. Aini,* 540 F.Supp.2d 374, 383 (E.D.N.Y.2008) ("the nonmoving party may not rely on '[c]onclusory allegations, conjecture, and speculation,' but must affirmatively 'set out specific facts showing a genuine issue for trial' ") (citing *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998); Fed.R.Civ.P. 56(e)).

## III. Qualified Immunity

**\*12** As the Court finds no violation of plaintiff's Eighth Amendment rights, the Court need not address qualified immunity.

## CONCLUSION

Accordingly, defendants' motion for summary judgment should be granted and plaintiff's complaint should be dismissed. It is further recommended that for the purpose of an appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a) (3) that any appeal from a judgment entered herein would not be taken in good faith. *See Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

**FILING OF OBJECTIONS TO THIS
REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court. Any request for an extension of time to file objections must be made within the ten-day period. Failure to file a timely objection to this Report generally waives any further judicial review. *Marcella v. Capital Dist. Physician's Health Plan, Inc.,* 293 F.3d 42 (2d Cir.2002); *Small v. Sec'y of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *see Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

**Footnotes**

1    Judge Bloom concluded that qualified immunity did not have to be addressed because she had found that there was no Eighth Amendment violation. (*See id.* at 16.)

2    Plaintiff separately objects to Judge Bloom's decision to exclude various letters he sent to the court after the instant Motion was fully briefed. (*See* Docket Entries 184, 185.) In that decision, Judge Bloom also denied Plaintiff leave to amend the Amended Complaint to bring additional claims. (*See* Docket Entry # 184.) The court overrules Plaintiff's objection. There was no error in Judge Bloom's decision to exclude material that was tardy, duplicative, nonmerit orious or previously addressed by the court.

3    A recent consultative medical evaluation from Dr. Douglas S. Cohen also states that Plaintiff's medical history did not reveal "any significant or specific evidence of a traumatic injury," and that there was "no departure from the standard of care following the alleged injury in 2002."(*See* Thomas Decl., Ex. A, at 5.)

4    In the alternative, Judge Bloom went on to conclude that, even had Plaintiff made out a serious injury, he did not present sufficient evidence that Defendants denied him adequate medical care. (*See* R & R 10-13.)

5    To the extent that Plaintiff claims that Judge Bloom failed to consider the fact that Defendant Gauvin impeded his access to an MRI (Objections ¶ 10), his objection is overruled. Dr. Gauvin specifically noted an MRI request on Plaintiff's Medical Record Summary. (*See* Thomas Decl., Ex. 1, at 1.)

1    Defendants provided plaintiff with the requisite notice pursuant to Local Civil Rules 56.2. (Document 148.)

2    Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1") requires a party moving for summary judgment to submit "a separate, short and concise statement" of the allegedly undisputed material facts, set out in numbered paragraphs, on which the moving party relies in arguing that there is no genuine issue to be tried. *See* Local Rule 56.1(a); *see also Gianullo v. City of New York,* 322 F.3d 139, 140 (2d Cir.2003); *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 72 (2d Cir.2001). Although, defendants filed a 56.1(a) statement, plaintiff did not file a counterstatement. However, the Court does not rely on the statement of undisputed facts contained in the Rule 56.1 statement: "[i]t must be satisfied that the citation to the evidence in the record supports the assertion." *Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004); *see Gianullo,* 322 F.3d at 143 n. 5. Therefore, the Court deems admitted only those facts that are supported by admissible evidence and not controverted by the record. *See* Local Rule 56.1(c).

3    References are to the exhibits annexed to defendants' motion for summary judgment.

4    Plaintiff states defendants have perjured themselves because he was transferred to NYSDOC's custody on October 6, 2003. (Flemming Dep. 92:13; Pl.'s Aff. at 5.) Defendants include the CHS record in their Reply Affirmation in Support of Motion and in Opposition to Plaintiff's Motion for Summary Judgment ("Defs.' Reply"), which lists October 3, 2003 as plaintiff's discharge date. (Exhibit M.)

5    Plaintiff also includes records maintained by NYSDOC in support of his motion for summary judgment. (Pl.'s Exhibit, attached to Pl.'s Motion for Summary Judgment; 156-4.) Defendants obtained these NYSDOC's records by processing the release plaintiff signed during discovery and plaintiff was provided with copies of all medical records that were obtained.

6    Plaintiff alleges for the first time in his opposition that defendants violated his due process rights by failing to provide him with an MRI for five years (Pl.'s Addendum at 7) and for negligently creating an unsafe condition (*id.* at 9)."[I]t is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment." *Beckman v. United States Postal Serv.,* 79 F.Supp.2d 394, 407 (S.D.N.Y.2000). Plaintiff has not sought leave to amend his complaint to include these claims. Furthermore, the statute of limitations has run on any proposed due process claim, *see Storman v. Klein,* No. 09 Civ. 0338(SHS) (AJP), 2009 WL 1035964, 18 (S.D.N.Y. April 20, 2009) (statute of limitations for a § 1983 action is three years) (citing *McKithen v. Brown,* 481 F.3d 89, 100 n. 12 (2d Cir.2007), *cert. denied,* 552 U.S. 1179, 128 S.Ct. 1218, 170 L.Ed.2d 59 (2008)) and on any negligence claim, *see Smalls v. Fraser,* No. 05 Civ. 6575(WHP)(TH), 2006 WL 2336911, 5 (S.D.N.Y. August 11, 2006) ("a one year and ninety day statute of

limitations governs tort claims brought against New York municipalities [and their employees].") (citing N.Y. Gen. Mun. Law § 50-I). Therefore, the Court should not address these claims.

7    Defendants request that the Court decline to exercise supplemental jurisdiction over any state law claim that could be construed in plaintiff's amended complaint. (Defs.' Memo at 18.) However, as stated in the Order dated September 29, 2006, "this court finds no assertion of a state law claim."(Document 67 at 2, n. 1.)

8    Defendants spend great effort on relating numerous occasions where plaintiff was observed by NYSDOC's personnel "engaged in physical activities that ... would be precluded by the injuries claimed herein."Defs.' Memo. at 4. For example, on December 28, 2003 plaintiff was observed carrying a typewriter without the use of his cane or walker (Exhibit I at 291); on January 6, 2004, plaintiff had no difficulty sitting and rising from the floor (*id.* at 293); on January 13, 2004, plaintiff kneeled doing paperwork for two hours (id at 295); on February 26, 2004, a doctor noted that plaintiff walks, bends, and stoops without difficulty but "acts" stiff and grunts "in my presence" (*id.* at 209, 284). These observations do not disprove plaintiff's allegation that his condition was sufficiently serious.

9    *See Morrison v. Mamis,* No. 08 Civ. 4302(PAC)(AJP), 2008 WL 5451639, 8 (S.D.N.Y. December 18, 2008) (citing cases *Mendoza v. McGinnis,* No. 05 Civ. 1124, 2008 WL 4239760 at 10 & n. 16 (N.D.N.Y. Sept. 11, 2008)) ("In this instance, given plaintiff's diagnosed condition of degenerative disc disease ... I conclude that a reasonable fact finder could find that the condition constitutes a serious medical need."); *Nelson v. Rodas,* No. 01 Civ. 7887(RCC) (AJP), 2002 WL 31075804 at 14 (S.D.N.Y. September 17, 2002) ("Severe back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment."); *cf. Cain v. Jackson,* 05 Civ. 3914, 2007 WL 2193997 at 1, 6 (S.D.N.Y. July 27, 2007) (prisoner's degenerate disc disease in her cervical spine, which was compounded when she fell from her cell bunk and injured her back, was not "sufficiently serious" to implicate the Eighth Amendment); *Davis v. Reilly,* 324 F.Supp.2d 361, 368 (E.D.N.Y.2004) (A "sprained back and neck ... do not constitute a serious medical condition."); *Rodriguez v. Mercado,* 00 Civ. 8588, 2002 WL 1997885 at 2-3, 8 (S.D.N.Y. Aug.28, 2002) (Prisoner's back pain and migraines not "sufficiently serious" to implicate Eighth Amendment.)

10   *See Sereika v. Patel,* 411 F.Supp.2d 397, 406 (S.D.N.Y.2006) (allegations of "severe pain ... [and] reduced mobility ..." in the shoulder are sufficient to raise a material issue of fact as to a serious medical need); *Goros v. Cent. Office Review Comm.,* No. 03 Civ. 407, 2006 WL 2794415 at 6 (N.D.N.Y. Sept. 26, 2006) (plaintiff's allegations of 'worse[ning] pain' in his left shoulder and legs may establish a sufficiently serious medical need); *Guarneri v. Bates,* 05 Civ. 444(GLS) (DRH), 2008 WL 686809, 5 (N.D.N.Y. March 10, 2008) (shoulder injury constitutes a serious medical need where plaintiff contends that his alleged rotator cuff tear left him in severe pain and that he could not move his arm).

11   Plaintiff was seen by medical staff on September 4, 2002, September 6, 2002, September 11-13, 2002, September 17-20, 2002, September 24, 2002 and September 27, 2002. (Exhibit G.)

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Gillespie v. New York State Dept. of Correctional Services, Not Reported in F.Supp.2d...

2010 WL 1006634

2010 WL 1006634
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Anthony GILLESPIE, Plaintiff,
v.
NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES, et al., Defendants.

No. 9:08-CV-1339 (TJM/ATB).　|　Feb. 22, 2010.

**Attorneys and Law Firms**

Anthony Gillespie, pro se.

Michael McCartin, AAG, for Defendant.

### REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter has been referred for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable Thomas J. McAvoy, Senior United States District Judge. The case was recently re-assigned from Magistrate Judge George H. Lowe to this court.

In this civil rights complaint, plaintiff alleges that four individual defendants employed by the New York State Department of Correctional Services ("DOCS") denied him adequate medical care, in violation of the Eighth Amendment, while plaintiff was an inmate in the custody of the Mid-State Correctional Facility ("Mid-State") in 2008. (Dkt. No. 1). The complaint also makes passing references to the alleged violation of his rights under the "Patient's Bill of Rights" and the "Disability Act." Plaintiff seeks substantial monetary damages and other relief.

Presently before this court is the defendants's motion to dismiss the complaint for failure to state a viable claim, pursuant to FED.R.CIV.P. 12(b)(6). (Dkt. No. 21). Plaintiff filed a responsive affidavit and memorandum of law. (Dkt. No. 27). For the following reasons, this court recommends

that the plaintiff's complaint be dismissed, without prejudice, in its entirety.

### DISCUSSION

#### I. *Facts and Procedural History*

Plaintiff was transferred to Mid-State in early April 2008. [1] On April 24, 2008, plaintiff saw defendant Manava, a DOCS physician at Mid-State, and complained of lower back pain due to osteoarthritis. Plaintiff requested certain modes of treatment and medical orders that he had received at various prior times in other DOCS facilities-a "back brace, physical therapy, a permit for no lifting of over 25 pounds, no sitting for over 25 minutes, bottom bunk permit, light duty," and an outside consultation for an MRI. (Complaint ¶¶ 14-16). Dr. Manava examined plaintiff and observed that he had no trouble walking, bending, or doing daily chores and that he had no deformity or prior injury. Dr. Manava referred to prior X-rays of plaintiff and concluded that an MRI was not required. He also determined that plaintiff did not meet the requirements for assignment to a bottom bunk. [2] Dr. Manava continued plaintiff's prescription for Naproxen and recommended that he do stretching exercises. (Ex. A, Dkt. No. 1-2 at 2).

Over the next three months, plaintiff wrote a series of complaints and formal grievances [3] to various DOCS officials complaining of Dr. Manava's failure to order the types of treatment and accommodations that he had previously enjoyed at other DOCS facilities. On April 24, 2008, plaintiff wrote a letter to defendant Harris, a Nurse Administrator at Mid-State, who replied, the next day, that she could not override the medical decisions of a treating physician. (Complaint ¶ 18-19; Ex. C, Dkt. No. 1-2 at 21-23).

On May 8, 2008, plaintiff sent a letter of complaint about Dr. Manava and Nurse Administrator Harris to defendant Ramineni, the Facilities Health Services Director at Mid-State, but received no reply. (Complaint ¶ 21; Ex. E, Dkt. No. 1-2 at 32-34). Plaintiff penned another letter on May 18th to Dr. Ramineni, who replied two days later, stating that he had reviewed the plaintiff's chart and determined there was no medical basis for plaintiff's various requests for particular modes of treatment. (Complaint ¶¶ 22-23; Ex. F, Dkt. No. 1-2 at 36-37). On May 21, 2008, plaintiff wrote a short note to Dr. Ramineni, asking him to reconsider his prior decision, to which no reply was received. (Ex. F, Dkt. No. 1-2 at 38).

Gillespie v. New York State Dept. of Correctional Services, Not Reported in F.Supp.2d...

2010 WL 1006634

**\*2** On June 3, 2009, plaintiff wrote a letter repeating the complaints about his medical treatment at Mid-State to defendant Wright, the Chief Medical Officer of DOCS. (Complaint ¶ 28; Ex. I, Dkt. No. 1-2 at 49-51). Dr. Wright referred the letter to Regional Health Services Administrator ("RHSA") Pedro Diaz. By letter dated June 11th, RHSA Diaz summarized the course of plaintiff's prior treatment, advised that the facility physician was the final arbiter of medical decisions regarding plaintiff's care, and concluded that plaintiff's allegation that his health care needs were not being met were unsubstantiated. (Complaint ¶ 29; Ex. J, Dkt. No. 1-2 at 54). Plaintiff directed his next letter of complaint to Brian Fischer, the DOCS Commissioner who is not named in this action. Commissioner Fischer referred the letter to Dr. Wright who responded using language similar to the prior letter of RHSA Diaz. (Complaint ¶ ¶ 30-31; Ex. K & I, Dkt. No. 1-2 at 55-59). Dr. Wright and his staff repeatedly urged the plaintiff to address his health care issues using existing sick call procedures at the facility.

On July 22, 2008, plaintiff was again examined at Mid-State by Dr. Manava. The complaint alleges that plaintiff again mentioned his lower-back arthritis and complained that Naproxen was not helping meet "his medical needs." Plaintiff claims that Dr. Manava found nothing wrong with plaintiff's back and denied his requests for assistance. (Complaint ¶ ¶ 34-35). The AHR attached to the complaint reflects that the plaintiff complained of lower back pain and stiffness and stated that he had run out of Naproxen. Dr. Manava noted that plaintiff's prior X-rays confirmed mild degenerative osteoarthritis, but were otherwise normal. His examination indicated that plaintiff had no deformity and a full range of motion. He refilled plaintiff's Naproxen prescription and suggested that he use certain exercises and hot water showers to help address his symptoms. (Ex. B, Dkt. No. 1-2 at 14). Although not referenced in the complaint, the attached medical records indicate that plaintiff was also seen by the medical staff at Mid-State regarding his back and other health issues twice in August 2008. (Ex. B, Dkt. No. 1-2 at 14-15).

Plaintiff filed his complaint on December 12, 2008, naming the four defendants referenced above, as well as DOCS and "John/Jane Does 1-50 (DOCS) supervisory, training and policy personnel." The District Court denied plaintiff's request for class certification, dismissed DOCS as a defendant, and directed plaintiff to take reasonable steps to identify the John/Jane Doe Defendants. (Dkt.Nos.4, 6). Ultimately, the plaintiff advised that he intended to proceed only against the

four originally-named individual defendants, and the District Court dismissed the action against all other defendants. (Dkt.Nos.16, 18).

The complaint appears to name defendants Wright, Harris, Ramineni, and Manava in both their official and individual capacities, and this court recommends that the action be dismissed to the extent it purports to sue these defendants in their official capacities for damages. [4] The complaint will be evaluated assuming that it makes claims against the DOCS defendants only in their individual capacities.

## II. *Motion to Dismiss*

**\*3** Defendants move to dismiss the complaint, arguing (1) that plaintiff cannot establish an Eighth Amendment claim because he cannot show that he suffered from a "serious" medical condition and because he is alleging mere disagreement with the medical judgment of DOCS physicians regarding appropriate treatment; (2) that Nurse Administrator Harris's deference to the medical decision of a prison physician cannot constitute "deliberate indifference"; (3) that defendants Wright and Ramineni were not personally involved in plaintiff's medical care and cannot be liable under Section 1983; and (4) that all of the defendants are entitled to qualified immunity. This court concludes that plaintiff has failed to allege a viable claim that his disagreement with the medical decisions of DOCS physicians constituted deliberate indifference to his medical needs. The complaint's passing reference to the Patients' Bill of Rights and the Americans with Disability Act also do not state a claim upon which relief can be granted. Accordingly, this court recommends that the complaint be dismissed in its entirety, without prejudice.

## A. Legal Standard for Motion to Dismiss

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007))."Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."*Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant "fair notice of what the claim is and the grounds upon which it rests."*Id.* (citing *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121 (2d Cir.2007).

Gillespie v. New York State Dept. of Correctional Services, Not Reported in F.Supp.2d...

2010 WL 1006634

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat pro se pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia-Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam*).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment). Finally, in the case of a motion to dismiss involving a *pro se* plaintiff, the court may look beyond the complaint to plaintiff's opposition papers. *See Locicero v. O'Connell,* 419 F.Supp.2d 521, 525 (S.D.N.Y.2006) (citation omitted). In this case, plaintiff has attached various exhibits to the complaint that the court has considered in making its ruling on defendants' motion.

## B. Inadequate Medical Care

### 1. Legal Standards

 **\*4** In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."*Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard.*Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

### a. Objective Element

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citing *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer,* 511 U.S. at 844-47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280.The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id .* (citing *Helling v. McKinney,* 509 U.S. 25, 32-33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). If the "unreasonable care" consists of a failure to provide *any* treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter,* 316 F.3d 178, 185-86 (2d Cir.2003)). However, in cases where the alleged inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith,* 316 F.3d at 185). Thus, the court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

### b. Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind."*Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer,* 511 U.S. at 835-37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer,* 511 U.S. at 839-40).

**\*5** In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance,* 143 F.3d at 702). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer,* 511 U.S. at 844.Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable."*Salahuddin,* 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.* Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

**2. Application of Legal Standards**

Defendants argue that plaintiff has failed to allege that he suffered from a sufficiently "serious" medical condition to satisfy the objective element of the Eighth Amendment standards for medical care. Noticeably missing in plaintiff's complaint are any factual allegations indicating that his degenerative osteoarthritis of his lower back constituted a "condition of urgency, one that may produce death, degeneration, or extreme pain."*Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996). The medical records attached

to the complaint document that, over a period of three years, plaintiff periodically claimed to suffer pain, variously described as "intermittent," "chronic," "increasing"; but he only once used the term "severe" and never used other adjectives such as "extreme," "excruciating," or "unbearable." (Dkt. No. 1-2 at 8-15, 34, 42). It is extremely questionable that plaintiff has alleged a medical condition that is sufficiently serious for the purposes of the Eighth Amendment. *See, e.g., Veloz v. New York,* 339 F.Supp.2d 505, 522-26 (S.D.N.Y.2004) (plaintiff's chronic back pain and mild to moderate degenerative arthritis of spinal vertebrae did not establish a serious medical need); *Taylor v. Kurtz,* 00-CV-0700, 2004 WL 2414847 at \*2, \*3-\*4, 2004 U.S. Dist. LEXIS 27925 (W.D.N.Y. Oct.28, 2004) (prisoner's degenerative arthritic knee condition did not constitute a serious medical need); *Veloz v. New York,* 35 F.Supp.2d 305, 309, 312 (S.D.N.Y.1999) (prisoner's foot problem, which involved arthritis and pain, did not constitute a serious medical need); *Phillips v. Goord,* 08-CV-0957, 2009 WL 909593 at \*6, 2009 U.S. Dist. LEXIS 29322 (W.D.N.Y. Apr.1, 2009) (allegations of "chronic" back pain do not support a claim that plaintiff had a "serious" medical condition).

**\*6** In any event, plaintiff's complaints about his medical care clearly are no more than disagreements with the medical judgment of the DOCS physicians about the particular modes of treatment and medical orders that were appropriate given his medical condition. Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). The mere fact that DOCS physicians in other facilities may have previously provided plaintiff with some of the treatments and accommodations he demanded at Mid-State does not render the medical decisions of Dr. Manava "deliberate indifference ." *See, e.g., Smith v. Woods,* 9:05-CV-1439 (LEK/DEP), 2008 WL 788573 at \*2, \*8, 2008 U.S. Dist. LEXIS 22191 (N.D.N.Y. March 20, 2008) (doctor's decision to prescribe Prozac to treat plaintiff's impulse control disorder was not an Eighth Amendment violation even though doctors in other institutions had prescribed Seroquel); *Ortiz v. Makram,* 96 Civ. 3285, 2000 WL 1876667 at \*9-\*10, 2000 U .S. Dist. LEXIS 18428 (S.D.N.Y. Dec.21, 2000) (primary prison doctor was not deliberately indifferent to an inmate patient's serious medical needs when, after reviewing the report of a consulting urologist who recommended Percocet,

Gillespie v. New York State Dept. of Correctional Services, Not Reported in F.Supp.2d...

2010 WL 1006634

he made a medical judgment to prescribe a different pain killer).

Dr. Manava's decisions to treat plaintiff's arthritis with Naproxen, as opposed to other medications;[5] his conclusion that plaintiff did not require an MRI in light of the results of prior X-rays;[6] his recommendation of exercise, instead of ordering physical therapy;[7] his failure to provide plaintiff a back-brace;[8] and his decisions not to give plaintiff a "lower bunk" pass[9] or order other medical restrictions on plaintiff's work and other activities[10] were all medical judgments and did not deprive plaintiff of constitutionally adequate medical care. Similarly, Nurse Administrator Harris[11] and Dr. Ramineni, who each reviewed plaintiff's charts on one occasion in response to his complaints, and deferred to or confirmed Dr. Manava's treatment decisions, were clearly not deliberately indifferent to plaintiff's medical needs. Finally, Dr. Wright, who responded to plaintiff's complaints, directly or through subordinates, without personally reviewing or making medical decisions about plaintiff's condition, did not have sufficient direct involvement to be liable under Section 1983 even if a viable Eighth Amendment violation were alleged.[12]

## C. Patients' Bill of Rights and Americans with Disabilities Act

In his complaint, plaintiff makes passing references to violations of his rights under the Patients' Bill of Rights and the "Disability Act," presumably the Americans with Disabilities Act ("ADA"). The Patients' Bill of Rights was created by New York state law, N.Y. Public Health Law § 2803(1)(g), and a violation of state law would not implicate a federal right supporting a claim under Section 1983. *See, e.g., Fox v. Brown,* 9:05-Cv-1292 (LEK/GJD), 2007 WL 586723 at *9, n. 5, Report-Recommendation adopted at 2007 U.S. Dist. LEXIS 11876 (N.D.N.Y. Feb. 21, 2007); *Parker v. DeBuono,* 98 Civ. 5765, 2000 WL 223841 at *2, 2000 U.S. Dist. LEXIS 2131 (S.D.N.Y. Feb.25, 2000). For the reasons set forth below, plaintiff also fails to state a viable claim under the ADA.

*7 The ADA is applicable to inmates in state correctional facilities. *See Allah v. Goord,* 405 F.Supp.2d 265, 274 (S.D.N.Y.2005) (both the ADA and the Rehabilitation Act are applicable to inmates). Under the ADA, the inmate must establish that he (1) is a qualified individual with a disability; (2) is being excluded from participation in, or being denied

benefits of some service, program or activity by reason of his or her disability; and (3) the entity providing the service is a public entity. *Allah v. Goord,* 405 F.Supp.2d 265, 274 (S.D.N.Y.2005).

In order to establish a claim under the ADA, the plaintiff must first show that he has a disability. *Farid v. Bouey,* 554 F.Supp.2d 301, 326 (N.D.N.Y.2008). Under the Title II of the ADA, a disability is defined as a physical or mental impairment that substantially limits one or more of the plaintiff's major life activities. *Id.* (citing *inter alia Weixel v. Bd. of Educ. of City of New York,* 287 F.3d 138, 147 (2d Cir.2002); *Doe v. Goord,* No. 04-CV-570, 2004 WL 2829876 at *17, 2004 U.S. Dist. LEXIS 24808 (S.D.N.Y. Dec. 10, 2004); 42 U.S.C. § 12102(2); 29 U.S.C. § 705(20)(B)). Plaintiff must identify the activity that he claims is impaired and establish that it constitutes a "major life activity." *Weixel,* 287 F.3d at 147.

Major life activities include, among others, caring for oneself; performing manual tasks; seeing, hearing; speaking; breathing; learning; reading; communicating; and working. 42 U.S.C. § 12101(2)(A). Major life activities also include the operation of a major bodily function such as the immune system; digestive system; neurological system; respiratory; bladder; brain; endocrine; reproductive and circulatory systems. *Id.* § 12101(2)(B). Plaintiff in this case has not specifically identified a disability, nor has he identified a "major life activity" that he claims has been "substantially limited." A substantial limitation is one that prevents or severely restricts the individual from doing activities that are of "central importance most people's daily lives."*Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184,198 (2002).[13]

Plaintiff has osteoarthritis in his lower back. He failed to identify either any major life activity that was substantially limited by this impairments or any activity or program in which he could not participate. Nor did he allege what accommodation would have allowed him to participate in such a program. Thus, plaintiff's passing reference to the ADA does not state any claim for relief under that statute.

## D. Qualified Immunity

Defendant has invoked qualified immunity with respect to the plaintiff's claim for deliberate indifference to his serious medical needs under the Eighth Amendment, arguing that no such constitutional violation was established. Given that

Gillespie v. New York State Dept. of Correctional Services, Not Reported in F.Supp.2d...

2010 WL 1006634

this court has recommended that the defendants' motion to dismiss be granted, the qualified immunity argument need not be addressed.

**\*8 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss under FED.R.CIV.P. 12(b)(6) (Dkt. No. 21) be GRANTED and the complaint be dismissed, without prejudice, in its entirety.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

## Footnotes

1   Plaintiff referenced in his complaint attached DOCS Ambulatory Health Records ("AHRs") and other DOCS medical records, as well as documentation of his extensive complaints and grievances to DOCS regarding his medical care in 2008. (Exs.A-P, Dkt. No. 1-2). These exhibits to the complaint are referenced in outlining the facts set forth herein.

2   In various attachments to the complaint, plaintiff attempts to document that Dr. Manava's denial of a bottom bunk restriction was contrary to DOCS Health Care Services Policy No. 1.49, which includes, among the criteria for placement in a lower bunk, a "permanent physical disability, ...*e.g.* rheumatoid arthritis."(Ex. A, Dkt. No. 1-2 at 4; Ex. C, Dkt. No. 1-2 at 21-22). While it is unnecessary to discuss the differences between these two forms of arthritis in connection with this motion, it is commonly understood that they are significantly different conditions and that rheumatoid arthritis is typically more disabling than osteoarthritis. *See, e.g.,* MedLinePlus website, a service of the U.S. National Library of Medicine and the National Institutes of Health: http:// www.nlm.nih.gov/medlineplus/ency/article/000431.htm (rheumatoid arthritis) and h ttp://www.nlm.nih.gov/medlineplus/ ency/article/000423.htm (osteoarthritis).

3   The court will discuss the various letters to named defendants which form the bases for plaintiff's allegations that they violated his Eighth Amendment rights. It is not necessary to detail the several formal grievances which the plaintiff also submitted during the same time period in 2008. Defendants' motion does not assert that the plaintiff failed to exhaust his administrative remedies; and plaintiff documents that he pursued and appealed formal grievances. In response to the grievances, DOCS consistently upheld the decisions of its medical staff, but did recommend that plaintiff continue to pursue his medical issues through sick call at the facility. DOCS also offered plaintiff the option to seek an outside medical opinion at his own expense. (Complaint, ¶¶ 20, 24-27, 36; Exs. D, G-H, O-P)

4   It is now well-settled that the state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD,* 64 F.3d 810, 815 (2d Cir.1995) (*citing Will v. Michigan Department of Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)). An action against state officers in their official capacities is tantamount to an action against the state. *Yorktown Medical Laboratory, Inc. v. Perales,* 948 F.2d 84, 87 & n. 1 (2d Cir.1991) (citations omitted). To the extent that the DOCS defendants are being sued in their official capacity for money damages, that cause of action should be dismissed under the Eleventh Amendment.*Huang v. Johnson,* 251 F.3d 65, 69-70 (2d Cir.2001); *Posr v. Court Officer Shield # 207,* 180 F.3d 409, 414 (2d Cir.1999).

5   *See, e.g., Veloz v. New York,* 339 F.Supp.2d at 525 (inmate's disagreement with his medical provider about whether he needed something stronger than Tylenol for his back pain did not constitute deliberate indifference to a serious medical need).

6   *See, e.g., Nelson v. Rodas,* 01CIV7887, 2002 WL 31075804 at \*14-\*15, 2002 U.S. Dist. LEXIS 17389 (S.D.N.Y. Sept.17, 2002) (citing cases) (inmate's complaint that the prison refused his request for a CAT scan and consultation with a specialist concerning his back spasms was not the proper basis for an Eighth Amendment claim).

7   *See, e.g., Morrison v. Mamis,* 08 Civ. 4302, 2008 WL 5451639 at \*8, \*10, 2008 U.S. Dist. Lexis 106416 (S.D.N.Y. Dec.18, 2008) (doctor refusing to prescribe physical therapy, switch prescription pain killers, or allow use of Ben Gay by an inmate complaining of back pain and migraines does not give rise to a deliberate indifference claim), Report and Recommendation adopted by 2009 WL 2168845, 2009 U.S. Dist. Lexis 61772 (S.D.N.Y. July 20, 2009).

8   *See, e.g., Evans v. Manos,* 336 F.Supp.2d 255, 262, 263 (W.D.N.Y.2004) (inmate's opinion that doctor should have prescribed something stronger than Advil and a back brace does not give rise to an issue of fact as to whether his constitutional rights were violated).

9   *See, e.g., Felix-Torres v. Graham,* No. 06-CV-1090, 2009 WL 3526644 at \*8, 2009 U.S. Dist. LEXIS 98693 (N.D.N.Y. Oct. 23, 2009) (even negligently failing to assign an inmate to a lower bunk does not satisfy the subjective element of the deliberate indifference standard) (collecting cases).

Gillespie v. New York State Dept. of Correctional Services, Not Reported in F.Supp.2d...

2010 WL 1006634

**10**     *See, e.g., Estelle v. Gamble,* 429 U.S. at 100-101, 106-107 (inmate who alleged doctors did not credit his repeated assertions that severe back pain should preclude him from manual labor did not state a claim for deliberate indifference where the medical staff repeatedly saw and treated him, even if their lack of diagnosis and inadequate treatment constituted malpractice).

**11**     The claims against defendant Harris would also be subject to dismissal because, as a nurse, she lacked the authority to override the medical decision of the treating prison physician. *See, e.g., Smith v. Woods,* 9:05-CV-1439 (LEK/DEP), 2008 WL 788573 at *9, 2008 U.S. Dist. LEXIS 22191 (N.D.N.Y. March 20, 2008) (social worker and psychologist in prison had no authority to override the decision of the treating psychiatrist regarding appropriate medication for an inmate/patient; further, they had no reason to know that the psychiatrist was not appropriately treating the plaintiff). See also *Cuoco v. Moritsugu,* 222 F.3d 99, 111 (2d Cir.2000) (the failure of non-doctors at a prison to intercede in the medical treatment of an inmate in not unreasonable, because they lack the authority to intervene in medical decisions).

**12**     Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). Plaintiff's letters of complaint to Defendant Wright and Commissioner Fischer are insufficient to establish personal involvement by the DOCS Chief Medical Officer, because he referred the matter to subordinates for decision and did not personally make any medical decisions regarding the plaintiff. *See, e.g. Gonzalez v. Wright,* 07-Civ-2898, 2009 WL 3149448 at *22-*23, 2009 U.S. Dist. LEXIS 91461 (S.D.N.Y. Sept.30, 2009) (DOCS Medical director not personally involved in alleged deprivation of adequate medical care by virtue of the fact that he received a complaint from plaintiff and delegated it to a subordinate for response) (*citing Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (DOCS commissioner was not personally involved in alleged constitutional violation where he only referred plaintiff's complaint to a subordinate for decision)). Even if Dr. Wright or other DOCS officials had ignored some of plaintiff's complaints, it would not make them liable under Section 1983 for the alleged constitutional violations. *See, e.g., Greenwaldt v. Coughlin,* No. 93 Civ. 6551(LAP), 1995 WL 232736, at *4, 1995 U.S. Dist. LEXIS 5144 (S.D.N.Y. Apr.19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations .").

**13**     The court notes that amendments to the ADA, that took effect January 1, 2009 broadened the scope of the definition of disability, partially superceding *Toyota Mfg. See Guary v. Upstate Nat'l Bank,* 618 F.Supp.2d 272, 275 n. 1 (W.D.N.Y.2009) (citing ADA Amendments Act of 2008, Pub.L. 110-325, 122 Stat. 3553 (2008)). However, it has been held that these amendments do not apply retroactively, thus, they do not affect this Court's recommendation.

---

**End of Document**                                                                 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 778133
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Vernon JACKSON, Plaintiff,

v.

Cherie FAIRCHILD; W. Parmer, Nurse
Practitioner; G.A. Girdich; Lester Wright, Kim
Perrea; and John Doe, Doctor, Defendants.

No. 9:04-CV-73 (FJS/DRP).   |   March 12, 2007.

**Attorneys and Law Firms**

Vernon Jackson, Attica, NY, Plaintiff pro se.

Office of the New York State Attorney General, Senta B.
Siuda, AAG, Of Counsel, Syracuse, NY, for Defendants.

### MEMORANDUM-DECISION AND ORDER

SCULLIN, Senior Judge.

### I. INTRODUCTION

 **\*1** Plaintiff filed the complaint in this action on January
21, 2004. In his complaint, he asserts four causes of action,
pursuant to 42 U.S.C. § 1983. Specifically, he claims
that Defendants were deliberately indifferent to his serious
medical needs in violation of his Eighth Amendment right
to be free from cruel and unusual punishment. In addition,
he claims that Defendants threatened and harassed him,
retaliated against him and denied him equal protection.

Defendants moved for summary judgment on the grounds
that no reasonable factfinder could conclude either that
Plaintiff had a serious medical need or that Defendants
were deliberately indifferent to any such need. In addition,
Defendants requested that the Court dismiss Plaintiff's claims
against Defendants "John Doe" and Lester Wright because
Plaintiff failed to identify the "John Doe" Defendant and
failed to serve either the "John Doe" Defendant or Defendant
Wright. Plaintiff did not file any papers in opposition to
Defendants' motion despite the fact that the Court granted his
request for an extension of time in which to do so. SeeDkt.
No. 37.

On March 8, 2006, Magistrate Judge Peebles issued a Report
and Recommendation in which he recommended that the
Court grant Defendants' motion for summary judgment and
their request to dismiss the claims against Defendants "John
Doe" and Wright. SeeDkt. No. 41.Currently before the
Court are Plaintiff's objections to Magistrate Judge Peebles'
recommendations. SeeDkt. No. 42.

### II. DISCUSSION

**A. Standard of review**
The Court reviews *de novo* the portions of a magistrate
judge's report-recommendation to which the parties object,
*see Shabazz v. Lee,* No. 9:03-CV-1520, 2007 WL 119429,
\*1 (N.D.N.Y. Jan. 10, 2007) (citation omitted), and for clear
error those recommendations to which the parties do not
object, *see Head-Bey v.. Smith,* No. 9:04-CV-191, 2007 WL
274793, \*1 (N.D.N.Y. Jan. 26, 2007).

**B. Plaintiff's Eighth Amendment deliberate indifference
claim**
To establish an Eighth Amendment deliberate indifference
claim, a plaintiff must prove that, while he was incarcerated,
he suffered unnecessary and wanton infliction of pain due to
the defendants' deliberate indifference to his serious medical
needs. *See Estelle v. Gamble,* 429 U.S. 97, 104 (1976)
(citation omitted). In order for a plaintiff to prove that his
medical condition is sufficiently serious to rise to the level of
a constitutional claim, he must show either that his medical
need or the defendants' failure to treat that need presents "
'a condition of urgency' that may result in 'degeneration'
or 'extreme pain.' " *Chance v. Armstrong,* 143 F .3d 698,
702 (2d Cir.1998) (quotation omitted); *see also Harrison v..
Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000).

"The deliberate indifference standard embodies both an
objective and a subjective prong."*Hathaway v. Coughlin,*
37 F.3d 63, 66 (2d Cir.1994)."First, the alleged deprivation
must be, in objective terms, 'sufficiently serious.' ...Second,
the charged official must act with a sufficiently culpable
state of mind.... Deliberate indifference requires more
than negligence, but less than conduct undertaken for
the very purpose of causing harm...."*Id.*(internal citations
omitted). In other words, "[t]o establish deliberate
indifference, the plaintiff must prove that 'the prison official
knew of and disregarded the plaintiff's serious medical
needs.' ...Deliberate indifference will exist when an official

'knows the inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it....' " *Harrison,* 219 F.3d at 137 (internal quotations and citation omitted).

 **\*2** Magistrate Judge Peebles found that Plaintiff's knee condition, lower back pain and asthma did not "rise[ ] to a level of constitutional significance...."*See* Report and Recommendation, dated March 8, 2006, at 23. Specifically, he noted that "while an asthma attack which is left untreated can constitute a serious medical need, the mere fact of having been diagnosed with asthma does not suffice to establish such a need."*See id.* (citations omitted). Since Plaintiff's medical records reflected that his "asthma was well controlled, with the aid of medication, and he suffered no asthma attacks during that period," Magistrate Judge Peebles concluded that the record would not support a finding that Plaintiff's asthma constituted a serious medical need. *See id.* at 23-24.

Likewise, Magistrate Judge Peebles found that Plaintiff's complaints of back and knee pain did not show the requisite urgency or degeneration necessary to implicate an Eighth Amendment right. *See id.* at 24.He noted that,"[d]espite the frequency with which he was seen by prison medical officials ..., [P]laintiff did not voice a significant number of concerns regarding pain, nor did he request pain medication beyond simple Ibuprofen and similar over-the-counter medications." *See id.*Moreover, Magistrate Judge Peebles stated that, "over the entire period [P]laintiff complained to medical staff about lower back pain only three times ..."*See id.*(citation omitted).

Furthermore, Magistrate Judge Peebles found that, "[e]ven if [P]laintiff were able to establish the existence of one or more serious medical needs,"*see id.* at 25, he still would not prevail on his claim because he failed to show that Defendants were deliberately indifferent to his medical needs. Specifically, he found that Defendant Girdich was entitled to summary judgment because Plaintiff's complaint of deliberate indifference against him was based on his failure to grant Plaintiff's request to be transferred to another facility. *See id.* at 26 (citations omitted). Magistrate Judge Peebles reasoned that, because prisoners "have no constitutional right to be housed in any particular facility," a "denial of such a request does not give rise to a cognizable cause of action...."*See id.*(citations omitted).

In addition, Magistrate Judge Peebles found that the record failed to disclose that Defendant Fairchild was deliberately indifferent to Plaintiff's medical condition. *See id.* at 27.Rather, the record reflected that Defendant Fairchild attempted to assess and to advise Plaintiff about how to care for his medical condition despite the fact that Plaintiff threatened her and prevented her from completing her examination. *See id.* at 27 (citation omitted).

With regard to Defendant Parmer, Magistrate Judge Peebles concluded that no reasonable factfinder could find that she was deliberately indifferent to Plaintiff's medical condition. *See id* . at 28.To the contrary, the record showed that Defendant Parmer advised Plaintiff that he could "use his cane for walking significant distances, but that his knee brace would be stored with his other property."*See id.*(citation omitted). Moreover, Magistrate Judge Peebles noted that Plaintiff refused to accept Defendant Parmer's suggested orthopedic consultation. *See id.*(citation omitted).

 **\*3** Finally, Magistrate Judge Peebles found that Plaintiff's assertions against Defendant Perrea were insufficient to inculpate Defendant Perrea in any alleged deliberate indifference. *See id.* at 29.He noted that the record reflected that Defendant Perrea had very limited contact with Plaintiff and simply removed a dressing from Plaintiff's back after surgery, visited him to get his signature on an orthopedic consultation form, and prescribed "Sudafed and Ibuprofen [to Plaintiff] for his complaints of a headache and sinus congestion...."*See id.*(citations omitted).

Plaintiff objects to Magistrate Judge Peebles' recommendation that the Court should grant Defendants' motion for summary judgment with respect to his Eighth Amendment deliberate indifference claim. Plaintiff asserts that Magistrate Judge Peebles denied him the ability to submit documents as evidence to support his claims. *See* Plaintiff's Objections at ¶ 3. In addition, Plaintiff contends that, after having the opportunity to review such documents and listen to the testimony of medical experts, a reasonable factfinder would conclude that Defendants violated his right to adequate medical treatment under the law and the guidelines governing people with a disability. *See id.* at ¶ 6. Specifically, Plaintiff contends that he has documentary evidence to show that Defendants' taking of his knee brace and cane, in addition to their placement of him in a non-handicapped cell, without any support, was not the normal policy and procedure at Upstate SHU. *See id.* at ¶ 7. Finally, Plaintiff argues that, because Defendants did not want to remove him from his cell twice a day for his asthma treatments, they put him at risk to suffer

an asthma attack by discontinuing his nebulizer treatments. *See id.*

As a preliminary matter, Plaintiff's argument that Magistrate Judge Peebles refused to allow him to submit documents that would support his claim is without merit. The Court's docket shows that, to the contrary, Magistrate Judge Peebles advised Plaintiff that, if Defendants filed a motion for summary judgment, he could file those documents in opposition to that motion. *See* Dkt. No. 22. Plaintiff, however, chose not to file any papers in opposition to Defendants' motion.

Moreover, Plaintiff did not present any evidence, either in his complaint or in his objections to Magistrate Judge Peebles' recommendations, to show that Defendants refused to treat him or that there was a degeneration in his medical condition. In fact, as noted, Plaintiff did not suffer any asthma attacks during the entire period that his nebulizer treatments were discontinued. Although Plaintiff claimed that he suffered from pain while in Defendants' care, the record does not reflect that this pain was severe enough to constitute a serious medical condition for Eighth Amendment purposes; in fact, the record indicates that Plaintiff refused some of the medical attention that Defendants offered to him, for example, an orthopedic consultation and full examinations.

 **\*4** Accordingly, for all of these reasons, the Court adopts Magistrate Judge Peebles' recommendation and grants Defendants' motion for summary judgment with respect to Plaintiff's Eighth Amendment deliberate indifference claim.

### C. Plaintiff's claims of verbal threats and harassment

"It is well established that, ' "[m]ere threatening language and gestures of a custodial officer do not, even if true, amount to constitutional violations." ' " *Alnutt v. Cleary,* 913 F.Supp. 160, 165 (W.D.N.Y.1996) (quotation omitted). Noting that "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse," *see* Report and Recommendation at 30 (citation omitted), Magistrate Judge Peebles recommended that this Court grant Defendants' motion for summary judgment with respect to Plaintiff's claim that Defendants threatened him and harassed him. *See id.* at 30-31 (citation omitted).

Plaintiff objects to Magistrate Judge Peebles' recommendation that Defendants are entitled to summary judgment on this claim because Defendants threatened his life if he did not remove Defendant Fairchild from this lawsuit. *See* Plaintiff's Objections at ¶ 11.

Plaintiff's objection fails to address the critical issue, which is that verbal harassment, standing alone, does not rise to the level of a constitutional violation. *See Alnutt,* 913 F.Supp. at 165 (citations omitted). Accordingly, the Court adopts Magistrate Judge Peebles' recommendation and grants Defendants' motion for summary judgment with respect to Plaintiff's claims of verbal threats and harassment.

### D. Plaintiff's First Amendment retaliation claim

To establish a First Amendment retaliation claim against the defendants, a plaintiff must prove "non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

Magistrate Judge Peebles recommended that this Court grant Defendants' motion for summary judgment with respect to Plaintiff's First Amendment retaliation claim because his allegations were conclusory and the record was devoid of any evidence to establish a nexus between a protected activity and the adverse actions about which Plaintiff complains. *See* Report and Recommendation at 32.

Plaintiff does not object to this recommendation. A review of the record demonstrates that Magistrate Judge Peebles' conclusion was neither contrary to law nor clearly erroneous. Accordingly, the Court adopts his recommendation and grants Defendants' motion for summary judgment with respect to Plaintiff's First Amendment retaliation claim.

### E. Plaintiff's equal protection claim

To establish an equal protection claim against the defendants, a plaintiff must prove "purposeful discrimination ... directed at an identifiable or suspect class...." *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (internal citations omitted). In addition, a plaintiff "must show that the disparity in treatment cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not 'reasonably related to [any] legitimate penological interests.' " *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005 (quotation omitted).

**\*5** Magistrate Judge Peebles recommended that this Court dismiss Plaintiff's equal protection claim because he "failed to offer any evidence that he was treated differently than other inmates at Upstate because of intentional discrimination directed at an identifiable class...."*See* Report and Recommendation at 33.

Plaintiff does not object to this recommendation. A review of the record demonstrates that Magistrate Judge Peebles' conclusion was neither contrary to law nor clearly erroneous. Accordingly, the Court adopts his recommendation and grants Defendants' motion for summary judgment with respect to Plaintiff's equal protection claim.

### F. Plaintiff's claims against Defendant "John Doe" and Defendant Lester Wright

"[W]hen a plaintiff is proceeding in forma pauperis the court is obligated to issue plaintiff's process to a United States Marshal who must in turn effectuate service upon the defendants, thereby relieving a plaintiff of the burden to serve process once reasonable steps have been taken to identify for the court the defendants named in the complaint."*Byrd v. Stone,* 94 F.3d 217, 219 (6th Cir.1996) (citations omitted). However, " 'a plaintiff may not remain silent and do nothing to effectuate service. At a minimum, a plaintiff should request service upon the appropriate defendant and attempt to remedy *any apparent service defects of which a plaintiff has knowledge.*' " *VanDiver v. Martin,* 304 F.Supp.2d 934, 940 (E.D.Mich.2004) (quotation omitted).

Magistrate Judge Peebles recommended that this Court dismiss Plaintiff's claims against Defendants "John Doe" and Wright without prejudice because the Court lacks jurisdiction over them due to Plaintiff's failure to serve them within the required time period. *See* Report and Recommendation at 14 (citation omitted). He reasoned that, although Plaintiff is entitled to some leniency with regard to Rule 4(m)'s service requirement due to his *pro se* status, he is still responsible for serving all Defendants with process. *See* Report and Recommendation at 12-13 (citations omitted). He also noted that the Court advised Plaintiff " 'that the U.S. Marshals cannot effect service on a "John Doe" defendant.' " *See id.* at 14 (quotation omitted). Furthermore, the Court explained to Plaintiff the consequences of his failure to serve these two Defendants. *See id.*Based upon these facts, Magistrate Judge Peebles concluded that Plaintiff should have been reasonably aware of the failure of service. *See id.* at 13.

Plaintiff objects to Magistrate Judge Peebles' recommendation on the ground that the Court should not hold the service errors against him because he followed the proper procedure and it was not his fault that the U.S. Marshal's Service did not serve these Defendants. *See* Plaintiff's Objections at ¶ 9.

Plaintiff's objection is without merit. Although the U.S. Marshal's Service is required to serve Defendants because Plaintiff is proceeding *in forma pauperis,* Plaintiff must also identify, with some specificity, the individuals whom he wants the Marshal's Service to serve. *See Byrd,* 94 F.3d at 219. Plaintiff's designation of a defendant as "John Doe" does not meet this burden. *See id.*Furthermore, although the Court informed Plaintiff about why the Marshal was unable to to serve Defendants "Doe" and Wright and further explained to Plaintiff the consequences of failing to serve these Defendants, Plaintiff did not take any steps to remedy the situation. Accordingly, the Court adopts Magistrate Judge Peebles' recommendation and dismisses Plaintiff's claims against Defendants "John Doe" and Lester Wright without prejudice.

### III. CONCLUSION

**\*6** After reviewing Magistrate Judge Peebles' March 8, 2006 Report and Recommendation, Plaintiff's objections thereto, the relevant parts of the record and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Magistrate Judge Peebles' March 8, 2006 Report and Recommendation is **ADOPTED** in its entirety; and the Court further

**ORDERS** that Defendants' motion for summary judgement is **GRANTED** with respect to all of Plaintiff's claims against Defendants Fairchild, Parmer, Girdich, and Perrea; and the Court further

**ORDERS** that Defendants' request to dismiss Plaintiff's claims against Defendants "John Doe" and Lester Wright because Plaintiff did not effect service of process on them is **GRANTED WITHOUT PREJUDICE;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgement and close this case.

**IT IS SO ORDERED.**

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 5451639
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Patrick MORRISON, Plaintiff,
v.
Dr. MAMIS, Defendant.

No. 08 Civ. 4302(PAC)(AJP). | Dec. 18, 2008.

### *REPORT AND RECOMMENDATION*

ANDREW J. PECK, United States Magistrate Judge.

**\*1 To the Honorable Paul A. Crotty, United States District Judge:**
Pro se plaintiff Patrick Morrison, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brought this action pursuant to 42 U.S.C. § 1983, alleging that his physician, Dr. Mamis, "has ignored [his] complaint [f]or [a][b]ack injury [f]or 5 months and has denied [him] proper medical treatment and physical therapy."(Dkt. No. 2: Compl. ¶ II.D.)

Presently before the Court is defendant's summary judgment motion. (Dkt. No. 20: Notice of Motion.) For the reasons set forth below, defendant's summary judgment motion should be GRANTED.

### *FACTS*

Plaintiff Patrick Morrison was an inmate in Fishkill Correctional Facility's SHU unit from September or October 2007 until August 2008, when he was transferred to Southport Correctional Facility. (Dkt. No. 22: Mamis Rule 56.1 Stmt. ¶ 1; Dkt. No. 2: Compl. ¶ II.C.; Dkt. No. 23: Mamis Aff. ¶ 2.) During that time at Fishkill, Morrison signed up for "sick call" (a request to see a nurse) [1] almost every day and frequently asked to be placed on the "call-out" schedule (a list of inmates who want to see a doctor) [2] because of his claimed "serious medical and mental injuries," including a "back injury." (Mamis Rule 56.1 Stmt. ¶¶ 3, 6; Morrison Dep. at 34-37; Morrison Br. Ex. 6: Morrison Med. Records at 22-24, 26-27, 29-30, 32-33, 35, 37, 40-41, 43-45, 47-49, 51-53, 57-68, 71-75, 80.) During "sick call," Morrison often

complained to the nurses about his back pain and migraines. (Dkt. No. 25: Mamis Br. at 3; Mamis Rule 56.1 Stmt. ¶ 6; Mamis Aff. ¶ 7; Morrison Dep. at 35-36, 49; Morrison Br. at 3; Morrison Med. Records at 21, 23-24, 26, 29, 31, 35, 37, 40-41, 43-46, 48, 51-53, 55-68, 70-76, 82, 86.) Morrison was seen by a nurse every day to receive his medication. (Morrison Dep. at 34-35.)

Defendant Dr. Harry Mamis, [3] who has been employed by DOCS for 25 years, is "the primary care physician for inmates locked in SHU" at Fishkill and sees SHU inmates on the call-out schedule on Mondays and Fridays. (Mamis Aff. ¶¶ 1-3; Morrison Dep. at 34, 36-37; Mamis Interrog. Resp. ¶ 2.) Dr. Mamis "do[es] not have the authority to decline to see inmates who request treatment."(Mamis Aff. ¶ 3.) Dr. Mamis was Morrison's primary care physician at Fishkill. (Mamis Aff. ¶ 2.) Dr. Mamis' "recollection of [Morrison's] medical treatment is solely based on a review of [Morrison's] medical records maintained by DOCS."(Mamis Aff. ¶ 4.)

Dr. Mamis saw Morrison for the first time on November 9, 2007. (Mamis Rule 56.1 Stmt. ¶ 5; Mamis Aff. ¶ 5; Morrison Medical Records [4] at 79.) Dr. Mamis ordered an MRI to discern the cause of Morrison's headaches and prescribed Ibuprofen for his pain. (Mamis Rule 56.1 Stmt. ¶¶ 7-8; Mamis Aff. ¶ 6; Morrison Br. Ex. 6: X-ray & MRI Records at 108; Morrison Dep. at 56-57, 59; Morrison Med. Records at 79.)

**\*2** Upon questioning by the MRI facility staff, Morrison reported that he had bullets in his chest. [5] (Morrison Dep. at 58-59; Proposed Am. Compl. at 1.) As a result, the MRI was postponed and Dr. Mamis (or Dr. Sotille) ordered an x-ray to "evaluate [the] bullets." (X-ray & MRI Records at 106, 108-09; Morrison Dep. at 45, 57-59; Proposed Am. Compl. at 1; Mamis Interrog. Resp. ¶ 15.) [6] Morrison alleges that he asked Dr. Mamis to remove the bullets from his body, but that Dr. Mamis refused. (Morrison Br. at 3-4.)

In December 2007, Morrison complained that his migraines persisted and that the Ibuprofen gave him "little relief." (Morrison Med. Records at 71-76.) At that time, Dr. Mamis refused to prescribe Elavil, a prescription pain medication, because Morrison was already "on Celexa." (Morrison Med. Records at 75.) On December 21, 2007, Dr. Mamis ordered a CAT scan. (Morrison Med. Records at 72.) On January 2, 2008, after continued complaints by Morrison, Dr. Mamis prescribed 25 mg. of Elavil "for [Morrison's] headaches" to be taken in addition to

Ibuprofen and Motrin. (Morrison Med. Records at 70; Mamis Rule 56.1 Stmt. ¶¶ 6-7; Mamis Aff. ¶ 6; Morrison Dep. at 54, 56, 58-60, 67.)

On January 14, 2008, Dr. Mamis increased Morrison's Elavil dosage to 50 mg. and instructed Morrison also to continue taking Ibuprofen. (Morrison Med. Records at 69; Mamis Rule 56.1 Stmt. ¶ 7; Mamis Aff. ¶ 6; Morrison Dep. at 54, 60-61.) On February 3, 2008, Dr. Mamis increased Morrison's Elavil dosage to 75 mg. because Morrison had been complaining that 50 mg. of Elavil had not alleviated his pain. (Morrison Med. Records at 66-67; Morrison Dep. at 54, 57, 60-61; Mamis Rule 56.1 Stmt. ¶ 7; Mamis Aff. ¶ 6.) In late February, Morrison reported that the increased Elavil dosage had "some effect on [his] headache pain," but no effect on his back pain. (Morrison Med. Records at 62.)

In March through June 2008, Morrison frequently reported that the Elavil was "not working," expressed concern about continuing to take Elavil without seeing mental health professionals, [7] and requested a new pain prescription. (Morrison Med. Records at 24-26, 32, 41, 44-45, 56.) Dr. Mamis continued to prescribe the same dosage of Elavil and Ibuprofen, even after he saw Morrison on April 25, 2008. (Morrison Med. Records at 23, 36, 53.) [8] During April through June 2008, Morrison asked for Ben Gay several times for his back; the nurses initially denied Morrison's request, subsequently granted it, and later denied it "per Dr. Mamis." (Morrison Med. Records at 27, 32, 39, 41, 45.) In April 2008, Morrison stated that he "wanted to do push up[s] and pull ups," but the nurse on sick call advised Morrison to refrain from doing so until the "cause of [his] back pain [is] resolved."(Morrison Med. Records at 35.)

On May 6, 2008, an x-ray was taken of Morrison's back. (Mamis Rule 56.1 Stmt. ¶ 9; Morrison Br. Ex. 3: 5/7/08 CORC Denial of Grievance; Morrison Dep. at 45, 49; Morrison X-ray & MRI Records at 105; Mamis Aff. ¶ 8.) Dr. Mamis concluded that the x-ray showed that Morrison had a degenerative discogenic change, "which in layman's terms means that [Morrison] has an arthritic back."(Mamis Aff. ¶ 8; Morrison X-ray & MRI Records at 105.) According to Dr. Mamis, the proper treatment for an "arthritic back" is "over-the-counter pain medication such as Tylenol, Advil and Motrin ."(Mamis Aff. ¶ 8.) On June 5, 2008, Dr. Mamis scheduled a "neurology consult" for Morrison. (Morrison Med. Records at 20.)

**\*3** In addition to the times Dr. Mamis saw Morrison, Dr. Mamis "reviewed [Morrison's] charts frequently and followed up on his status and made necessary documentation noting his treatment status."(Mamis Aff. ¶ 5; *see also, e.g.,* Morrison Med. Records at 20, 23, 53, 57-58, 62, 66-67, 72, 75, 77.)

### *ANALYSIS*

## I. *SUMMARY JUDGMENT STANDARD*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary "judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c); *see also, e. g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. *See, e.g., Adickes v.. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608 (1970); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994); *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir.1994). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552-53.

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts."*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986). Instead, the non-moving party must "set out specific facts showing a genuine issue for trial."Fed.R.Civ.P. 56(e); *accord, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. at 1356; *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (At summary judgment, "[t]he time has come ...'to put up or shut up.'") (citations omitted), *cert. denied,*540 U.S. 811, 124 S.Ct. 53 (2003).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the

non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. at 2513.[9] The Court draws all inferences in favor of the nonmoving party only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g., Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 489 (1987)."If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper."*Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d at 37.

**\*4** In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. *See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987); *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510.While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,][f]actual disputes that are irrelevant or unnecessary will not be counted."*Id.* at 248, 106 S.Ct. at 2510 (citations omitted); *see also, e.g., Knight v. U.S. Fire Ins. Co.,* 804 F.2d at 11-12.

"The Court recognizes that it must 'most extend extra consideration' to pro se plaintiffs" and that "pro se parties are to be given special latitude on summary judgment motions."*Salahuddin v. Coughlin,* 999 F.Supp. 526, 535 (S.D.N.Y.1998) (Peck, M.J.) (citations & internal quotations omitted); *see, e.g., McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (a pro se party's pleadings should be read liberally and interpreted " 'to raise the strongest arguments that they suggest' ").[10] "Nevertheless, proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment."*Cole v. Artuz,* 93 Civ. 5981, 1999 WL 983876 at \*3 (S.D.N.Y. Oct. 28, 1999) (citing cases).[11]

## II. *DEFENDANT MAMIS' SUMMARY JUDGMENT MOTION SHOULD BE GRANTED*

Morrison alleges that Dr. Mamis "has ignored [his] complaint [f]or [a][b]ack injury [f]or 5 months and has denied [him] proper medical treatment and physical therapy."(Dkt. No. 2: Compl. ¶ II.D.) Dr. Mamis argues that summary judgment should be granted because Morrison's back problem is not a "serious medical condition" and Dr. Mamis was not "[d]eliberately [i]ndifferent" to Morrison's back pain. (Dkt. No. 25: Mamis Br. at 6-8.)

### A. *Legal Standard Governing* § 1983 *Eighth Amendment Deliberate Indifference To Serious Medical Needs Claims*

To prevail in a § 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law. *See* 42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254-55 (1988). "Section 1983 itself," however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere."*Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citation omitted), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749 (1994).

**\*5** The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials and conduct that offends "evolving standards of decency." *E.g., Hudson v. McMillan,* 503 U.S. 1, 5, 8, 112 S.Ct. 995, 998, 1000 (1992); *Wilson v. Seiter,* 501 U.S. 294, 297, 308, 111 S.Ct. 2321, 2323, 2329 (1991); *Estelle v. Gamble,* 429 U.S. 97, 102, 104-05, 97 S.Ct. 285, 290, 291 (1976); *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925 (1976).

To establish an Eighth Amendment violation based on a claim that a prison official has placed an inmate's health in danger, the inmate must show that the prison official acted with "deliberate indifference" to the inmate's serious medical needs. *E.g., Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 2480 (1993); *Estelle v. Gamble,* 429 U.S. at 104-05, 97 S.Ct. at 291.[12]

As the Second Circuit has explained, "the deliberate indifference standard embodies both an objective and a subjective prong."*Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).[13] "Objectively, the alleged deprivation must be 'sufficiently serious.' "*Hathaway v. Coughlin,* 99 F.3d at 553;*see, e.g., Hudson v. McMillan,* 503 U.S. at 9, 112 S.Ct. at 1000 ("Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference

to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious' "); *Smith v. Carpenter,* 316 F.3d at 183-84 ("The objective "medical need" element measures the severity of the alleged deprivation ..."). [14] " 'The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves ....' " *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324 (1991) (citation omitted); *see also, e.g., Dean v. Coughlin,* 804 F.2d at 215 (" '[T]he essential test is one of medical necessity and not one simply of desirability.' "). Thus, Eighth Amendment protection is limited to " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d at 702; [15] *accord, e.g., Fransua v. Vadlamudi,* 2008 WL 4810066 at *1; *Morales v. Mackalm,* 278 F.3d 126, 132 (2d Cir.2002); *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) ("A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.' ").

The Second Circuit has stated that determining whether a deprivation is objectively serious entails two inquiries:

Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, "prison officials who act reasonably [in response to an inmate health risk] cannot be found liable under the Cruel and Unusual Punishments Clause," and, conversely, failing "to take reasonable measures" in response to a medical condition can lead to liability.

**\*6** Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Factors relevant to the seriousness of a medical condition include whether "a reasonable doctor or patient would find [it] important and worthy of comment,"

whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain." In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry "focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone."Thus although we sometimes speak of a "serious medical condition" as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

*Salahuddin v. Goord,* 467 F.3d at 279-80 (citations omitted).

"Subjectively, the charged official must act with a sufficiently culpable state of mind."*Hathaway v. Coughlin,* 99 F.3d at 553;*accord, e.g., Fransua v. Vadlamudi,* 2008 WL 4810066 at *1; *Salahuddin v. Goord,* 467 F.3d at 280-81; *Smith v. Carpenter,* 316 F.3d at 184 ("[T]he subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind."); *Selby v. Coombe,* 17 Fed. Appx. at 37; *Chance v. Armstrong,* 143 F.3d at 702."The required state of mind, equivalent to criminal recklessness, is that the official " 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." ' " *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (quoting *Hathaway v. Coughlin,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979 (1994))). [16]

Deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison [officials or] guards in intentionally denying or delaying access to medical care."*Estelle v. Gamble,* 429 U.S. at 104-05, 97 S.Ct. at 291 (fn.omitted); *accord, e.g., Kaminsky v. Rosenblum,* 929 F.2d 922, 926 (2d Cir.1991) ("Cruel and unusual punishment may consist of prison officials delaying an inmate access to needed medical care ."). [17] However, an "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle v. Gamble,* 429 U.S. at 105-06, 97 S.Ct. at 292;*accord, e.g., Burton v. New York State Dep't of Corr.,* 93 Civ. 6028, 1994 WL 97164 at *2 (S.D.N.Y. March 21, 1994) (Sotomayor, D.J.)."Thus, a complaint that

a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Estele v. Gamble,* 429 U.S. at 106, 97 S.Ct. at 292. [18] As the Supreme Court has stated, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estele v. Gamble,* 429 U.S. at 106, 97 S.Ct. at 292; *accord, e.g., Smith v.. Carpenter,* 316 F.3d a 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."); *Hathaway v. Coughlin,* 99 F.3d at 553; *Burton v. New York State Dep't of Corr .,* 1994 WL 97164 at *2.

**\*7** An act of malpractice will amount to deliberate indifference only if "the malpractice involves culpable recklessness, *i.e.,* an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d at 553); *Harrison v. Barkley,* 219 F.3d at 139 ("We agree that the mere malpractice of medicine in prison does not amount to an Eighth Amendment violation.... This principle may cover a delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless, or that treatment is unreliable, or that the cure is as risky or painful or bad as the malady.... [But] [c]onsciously disregarding an inmate's legitimate medical needs is not 'mere medical malpractice.' "); *Hathaway v. Coughlin,* 37 F.3d at 66 ("Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.").

"It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong,* 143 F.3d at 703; *accord, e.g., Hathaway v. Coughlin,* 37 F.3d at 70 (Jacobs, C.J., dissenting) (" 'We do not sit as a medical board of review. Where the dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, we will not second guess the doctors.' "); *Scott v. Laux,* No. 07-CV-936, 2008 WL 4371778 at *4 (N.D.N.Y. Sept. 18, 2008) ("[D]isagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a § 1983 claim.")

(citation & quotations omitted); *Culp v. Koenigsmann,* 99 Civ. 9557, 2000 WL 995495 at *7 (S.D.N.Y. July 19, 2000) (Peck, M.J.) ("Mere disagreements with the quality of medical care, however, do not state an Eighth Amendment claim."); *see also, e.g., Troy v. Kuhlmann,* 96 Civ. 7190, 1999 WL 825622 at *6 (S.D.N.Y. Oct. 15, 1999) ("a prisoner's disagreement with the diagnostic techniques or forms of treatment employed by medical personnel does not itself give rise to an Eighth Amendment claim"); *Brown v. Selwin,* 250 F.Supp.2d 299, 308 (S .D.N.Y.1999) (citing cases), *aff'd,* 29 Fed. Appx. 762 (2d Cir.2002); *Negron v. Macomber,* 95 Civ. 4151, 1999 WL 608777 at *6 (S .D.N.Y. Aug. 11, 1999); *Espinal v. Coughlin,* 98 Civ. 2579, 1999 WL 387435 at *3 (S.D.N.Y. June 14, 1999). [19]

"Just as the relevant 'medical need' can only be identified in relation to the specific factual context of each case, the severity of the alleged denial of medical care should be analyzed with regard to all relevant facts and circumstances. The absence of adverse medical effects or demonstrable physical injury is one such factor that may be used to gauge the severity of the medical need at issue. Indeed, in most cases the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith v. Carpenter,* 316 F.3d at 187 (citations omitted).

## B. *Defendant Mamis' Summary Judgment Motion Should Be Granted*

**\*8** Morrison claims that Dr. Mamis was deliberately indifferent to a serious medical need by "ignor[ing][his] complaint [f]or [a] [b]ack injury [f]or 5 months and ... den[ying] [him] proper medical treatment and physical therapy."(Dkt. No. 2: Compl. ¶ II.D.)

Dr. Mamis argues that "[a]part from plaintiff's conclusory assertions, there is nothing in the record to support his claim that he suffered from a serious medical condition."(Dkt. No. 25: Mamis Br. at 6.) Dr. Mamis focuses solely on Morrison's back pain, and ignores Morrison's migraines. (*Id.*) Dr. Mamis is not entitled to summary judgment on this basis. Depending upon the circumstances, severe back pain, especially if lasting an extended period of time, and migraine headaches may qualify as "serious medical needs" under the Eighth Amendment. *See, e.g., Mendoza v. McGinnis,* No. 05-CV-1124, 2008 WL 4239760 at *10 & n. 16 (N.D.N.Y. Sept. 11, 2008) ("The question of whether chronic back pain

can rise to a level of constitutional significance is dependent upon the circumstances of the particular case presented. In this instance, given plaintiff's diagnosed condition of degenerative disc disease, and resolving all ambiguities in plaintiff's favor, I conclude that a reasonable factfinder could find that the condition constitutes a serious medical need."Moreover, "defendants fail to address plaintiff's migraine headaches, which can also constitute a serious medical need."); *Guarneri v. Hazzard,* No. 06-CV-0985, 2008 WL 552872 at *6 (N.D.N.Y. Feb. 27, 2008) (quoting *Nelson v. Rodas,* 01 Civ. 7887, 2002 WL 31075804 at *14 (S.D.N.Y. Sept. 17, 2002) (Peck, M.J.)); *Peterson v. Miller,* No. 04-CV-797, 2007 WL 2071743 at *7 (N.D.N.Y. July 13, 2007) (Migraine headaches have "been found by other courts to represent a sufficiently serious potential medical need as to survive a motion for summary judgment."); *Faraday v. Lantz,* No. 03-CV-1520, 2005 WL 3465846 at *5 (D.Conn. Dec. 12, 2005) (Persistent complaints of "lower back pain caused by herniated, migrated discs [and] sciatica ..." leading to severe pain constitute a serious medical need.); *Moriarty v. Neubould,* No. 02-CV-1662, 2004 WL 288807 at *2 n. 2 (D.Conn. Feb. 10, 2004) (Plaintiff's migraine headaches could constitute a sufficiently serious condition to warrant Eighth Amendment protection since they can be "extremely painful and debilitating."); *Nelson v. Rodas,* 2002 WL 31075804 at *14 ("Severe back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment.") ( & cases cited therein).[20]

Morrison, however, cannot establish deliberate indifference to his medical needs. The SHU nurses dispensed medicine to Morrison and responded to his complaints almost every day. (*See* page 2 above.) Dr. Mamis saw Morrison at least three times between October 2007 and May 2008[21] and reviewed Morrison's medical records frequently. (*See* pages 3-6 above.) Dr. Mamis also responded to Morrison's continued complaints of pain by prescribing Elavil upon Morrison's complaining that the Ibuprofen was not working, and then increasing the Elavil dosage twice. (*See* page 4 above.) Dr. Mamis ordered an MRI to discern the cause of Morrison's headaches. (*See* page 3 above.)[22] When Dr. Mamis discovered that Morrison had bullets in his body, Dr. Mamis ordered x-rays to "evaluate [the] bullets" and provide information on Morrison's back pain. (*See* pages 3, 6 above.) Dr. Mamis also ordered a CAT scan and neurological consult to discover the cause of Morrison's migraines. (*See* pages 4, 6 above.) *See, e.g., Johnston v. Maha,* No. 06-CV-6001, 2008 WL 4823607 at *3 (W.D.N.Y. Nov. 6, 2008) (No deliberate indifference where, after

plaintiff fell and injured himself, plaintiff "was taken to an outside hospital where he was treated and released the same day. X-rays were taken of plaintiff, he was given medication, and diagnosed with degenerative lower back pain and a right knee contusion," and received "followup care, including examinations by physicians and the prescription of medication."); *Abney v. McGinnis,* 01 Civ. 8444, 2007 WL 844675 at *3 (S.D.N.Y. Mar. 16, 2007) (No deliberate indifference where the orthotics specialist met with plaintiff thirteen times within an almost two year period and responded to plaintiff's complaints about his orthotic boot "by refitting and reforming the orthoses. Additionally, while there were time lags between [the orthotic specialist's] visits to plaintiff and between plaintiff's request for a visit from [the orthotic specialist] and [the orthotic specialist]'s subsequent visit, no evidence suggests an intentional delay that could support a claim of deliberate indifference."); *Davidson v. Scully,* 155 F.Supp.2d 77, 83-84 (S.D.N.Y.2001) (No subjective deliberate indifference to plaintiff's foot problems where "plaintiff was examined and treated ... on numerous occasions by DOCS medical personnel as well as by outside orthopedic doctors to whom plaintiff was referred by DOCS ."); *Williams v. M.C.C. Inst.,* 97 Civ. 5352, 1999 WL 179604 at *9 (S.D.N.Y. Mar. 31, 1999) (No subjective deliberate indifference where plaintiff was examined for dental problems on eight separate occasions during one year and five different occasions the next year and was always given treatment when he sought it.), *aff'd,*101 Fed. Appx. 862 (2d Cir.2004); *Keyes v. Strack,* 95 Civ. 2367, 1997 WL 187368 at *4 (S.D.N.Y. Apr. 16, 1997) ("The record shows that defendants were not deliberately indifferent to [plaintiff's] medical needs. The Fishkill medical staff made continual efforts to treat and care for plaintiff," with thirty visits to the facility's clinic over an eleven month period.); *Alston v. Howard,* 925 F.Supp. 1034, 1040 (S.D.N.Y.1996) (No deliberate indifference where plaintiff "was afforded consistent, attentive surgical and therapeutic medical care on about a weekly basis in a comprehensive attempt to remedy the source of [plaintiff's] ankle pain."); *Johnson v. Dep't of Corr.,* 92 Civ. 7716, 1995 WL 121295 at *3 (S .D.N.Y. Mar. 21, 1995) (No deliberate indifference where "[d]uring the nine month period that plaintiff was in DOC custody he was examined and treated on numerous occasions for his hip condition and a myriad of other ailments.").

**\*9** Morrison, however, argues that Dr. Mamis was deliberately indifferent because he "skipped" appointments with Morrison. (*See* page 5 n. 8 above.) As noted above (page 16 n. 19), the Second Circuit has held that:

Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, [the Second Circuit] has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a "life-threatening and fast-degenerating" condition for three days; or delayed major surgery for over two years.

*Demata v. New York State Corr. Dep't of Health Servs.,* No. 99-0066, 198 F.3d 233 (table), 1999 WL 753142 at *2 (2d Cir. Sept. 17, 1999)* (citations omitted). Dr. Mamis' actions do not rise to the level of deliberate indifference contemplated by the Second Circuit in *Demata.* Even assuming Dr. Mamis "skipp[ed]" appointments, Dr. Mamis still saw Morrison three to five times during the relevant time period and also regularly reviewed Morrison's medical chart. (*See* pages 3-6, 19 n. 21 above.) The medical records do not indicate that Dr. Mamis "deliberately delayed care as a form of punishment," but rather that time ran short or certain appointments needed to be rescheduled. (*See* page 5 n. 8 above.) Furthermore, while Morrison's medical conditions were serious, neither was "life-threatening" nor "fast-degenerating." *See, e.g., Evan v. Manos,* 336 F.Supp.2d 255, 261-63 (W.D.N.Y. Sept. 23, 2004)* (Physician was not deliberately indifferent to plaintiff's back pain, despite the "nine-day delay between being placed on the callout list and plaintiff's initial visit" and despite the physician's command during the first appointment with plaintiff that plaintiff "get the hell out of [his] office" when the plaintiff "questioned the delay," ..."plaintiff has not identified anything that [the physician] could or should have done had he examined plaintiff sooner, nor has he shown that he was harmed by any delay in treatment.... Even if [the physician] arguably acted hastily, or overreacted, by terminating plaintiff's first visit when plaintiff began complaining about the delay in seeing him, that does not show that [the physician] had a culpable state of mind for Eighth Amendment purposes. [The physician]'s actions hardly amount to conduct that is 'repugnant to the conscience of mankind,' which is necessary to make out a claim under the Eight Amendment."); *Rogers v. Morgan,* No. 02-CV-6004, 2003 WL 23350429 at *3, 5 (W.D .N.Y. Oct. 14, 2003)* (No deliberate indifference where plaintiff, who suffered from chronic back pain, "had to wait, at most, 39 days to be examined by an orthopedic specialist. There is nothing in the record to indicate that this wait was unreasonable under

the circumstances, or that it was in any way attributable to defendant. In the interim, defendant continued to provide plaintiff with painkillers and muscle relaxants. Furthermore, plaintiff has failed to demonstrate that his condition worsened during that period, or that he was otherwise prejudiced by the delay."). [23]

**\*10** Morrison also maintains that Dr. Mamis was deliberately indifferent by refusing to switch Morrison from Elavil to another prescription pain killer and refusing to allow Morrison to take Ben Gay. As noted in Section II.A. above, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."*Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998).* Morrison filed his complaint in May 2008, but only began complaining in March 2008 that the final 75 mg. Elavil dosage was not working. (*See* page 5 above.) Dr. Mamis' treatment plan certainly appears to be "adequate," particularly since Morrison had only been taking the 75 mg. dosage of Elavil for approximately three months when he filed his complaint and Dr. Mamis ordered a neurological consult, x-rays and a CAT scan to discover the cause of Morrison's back pain and migraines. (*See* pages 4-6 above.) Morrison's allegations merely amount to a disagreement about the treatment plan and not deliberate indifference. *See, e.g., Wright v. New York State Dep't of Corr. Servs.,* 06 Civ. 3400, 2008 WL 5055660 at *17 (S.D.N.Y. Oct. 19, 2008)* (The physician's decision to start plaintiff, who suffered from acid reflux, at a lower dosage of Prevacid than recommended by plaintiff's gastroenterologist due to a concern about Prevacid's potential side effects on plaintiff "qualifies as an exercise of 'medical judgment,' and does not give rise to a constitutional violation."), *report & rec. adopted,* 2008 WL 5084193 (S.D.N.Y. Nov. 24, 2008);* *Scott v. Laux,* No. 07-CV-936, 2008 WL 4371778 at *4 (N.D.N.Y. Sept. 18, 2008)* ("[D]isagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a § 1983 claim.") (citation & quotations omitted); *Verley v. Wright,* 02 Civ. 1182, 2007 WL 2822199 at *12 (S.D.N.Y. Sept. 27, 2007)* (The health services director of a correctional facility was not deliberately indifferent to plaintiff's hepatitis C, despite that the director did not follow the treating physician's recommendation to refer plaintiff to a nutritionist and hepatologist, because the director "made an independent medical determination that it was unnecessary for [plaintiff] to visit a specialist in light of the care that he

was already receiving."The director considered the specialists that the plaintiff was already seeing, that plaintiff's medical records did not indicate a hepatologist was necessary, "that 'there was no available retreatment approved by the FDA for patients' in [plaintiff]'s circumstance," and that plaintiff had managed his weight "without consulting a nutritionist."); *Goros v. Pearlman,* No. 03-CV-1303, 2007 WL 1423718 at *3 (N.D.N.Y. May 10, 2007) ("Plaintiff['] s disagreements over the proper dosage of Prevacid or how long a canister of albuterol lasts does not evidence deliberate disregard."); *Messa v. LeClaire,* No. 03-CV-1385, 2007 WL 2292975 at *6 n. 8 (N.D.N.Y. Feb. 26, 2007) ("To the extent that [plaintiff] contends he should have been provided the pain medication recommended by the outside specialist, this claim must fail because mere disagreement over proper treatment does not create a constitutional claim as long as the treatment was adequate."), *report & rec. adopted,* 2007 WL 2285106 (N.D.N.Y. Aug 6, 2007).

**\*11** Morrison's additional claim that Dr. Mamis was deliberately indifferent because he refused to take the bullets out of Morrison's body also amounts to mere disagreement about the treatment plan and not deliberate indifference. Dr. Mamis' attentiveness to the bullets in Morrison's body certainly cannot be questioned because Dr. Mamis ordered x-rays to "evaluate the bullets." (*See* page 3 above.) Furthermore, Morrison does not provide any evidence supporting that the bullets needed to taken out of his body. Indeed, the only reason he gives for wanting the bullets removed is so he can have an MRI. But Morrison presents no evidence that an MRI is essential where x-rays and a CAT scan are used instead. *See, e.g., Estelle v. Gamble,* 429 U.S. 97, 107, 97 S.Ct. 285, 293 (1976) ("[T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court ...."); *Kelley v. Lutz,* No. 95-16003 87 F.3d 1320 (table), 1996 WL 341299 at *1 (9th Cir. June 19, 1996) (prison doctor's denial of inmate's request for CAT scan did not constitute deliberate indifference where inmate had been seen by several specialists and x-rays did not reveal any abnormality); *Ferrera v. Fisher,* 06 Civ. 1158, 2008 WL 4443920 at *14 (S.D.N.Y. Sept. 30, 2008) (No deliberate indifference where plaintiff had not "provided evidentiary support for his conclusory statements that he is a good candidate for surgery, that additional specialists referrals were warranted or that the

various tests performed and treatments prescribed did not constitute adequate treatment."); *Encarnacion v. Wright,* No. 04-CV-6064, 2007 WL 2892626 at *6 (W.D.N.Y. Sept. 28, 2007) ("[I]t is clear that the most serious matters about which Plaintiff complains, i.e., that he was denied surgery for his various ailments, amount to disagreements over treatment, which are not actionable as constitutional violations. More specifically, Plaintiff relies only on his own subjective belief that he should have surgery."); *Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *8-9 & n. 26 (S.D.N.Y. Apr. 23, 2001) (Peck, M.J.) (Physician's failure to order CAT scan reflected, "at most, ... a difference in opinion as to [prisoner's] medical treatment rather than any deliberate indifference to [prisoner's] medical needs," citing cases); *Culp v. Koenigsmann,* 99 Civ. 9557, 2000 WL 995495 at *9 (S.D.N.Y. July 19, 2000) (Peck, M.J.) (Plaintiff's deliberate indifference "claim is based on the fact that one doctor recommended arthroscopic surgery... while another doctor ... concluded that surgery was not warranted until more conservative measures like physical therapy had been tried and failed. At most, [plaintiff]'s treatment reflects a difference in opinion as to his medical treatment rather than any deliberate indifference to his medical needs."); *Vento v. Lord,* 96 Civ. 6169, 1997 WL 431140 at *5 (S.D.N.Y. July 31, 1997) (Sotomayor, D.J.) ("plaintiff's [denied] x-ray request and claim that without new x-rays her physical therapy is ineffective fails to state a claim of deliberate indifference"); *Wicks v. Qualtere,* No. 95-CV-426, 1997 WL 176338 at *3 (N.D.N.Y. Apr. 4, 1997) (Pooler, D.J .) (refusal to order x-ray did not state a claim); *Sharp v. Jeanty,* 93 Civ. 0220, 1993 WL 498095 at *2 (S.D.N.Y. Nov. 30, 1993) (Leval, D.J.) (dismissing complaint where prisoner's knee was x-rayed but he was not given an orthroscan, because plaintiff's medical "records indicate[d] an extensive and ongoing course of medical treatment" of his injury, and many of his allegations amounted to "second-guessing the treatments of his health care providers", and explaining that " '[a] prisoner's disagreement with his prescribed treatment does not afford a basis for relief under § 1983.' "). [24]

**\*12** Accordingly, since Morrison has failed to show that Dr. Mamis was deliberately indifferent to his medical needs, Dr. Mamis' summary judgment motion should be ***GRANTED.***

### CONCLUSION

For the reasons set forth above, defendant's summary judgment motion should be GRANTED.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Crotty, 500 Pearl Street, Room 735, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Crotty (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466 (1985); *IUE AFL-CIO Pension Fund v. Hellmann,* 9 F .3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825 (1992); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v.. Canadair Ltd.,* 838 F.2d 55, 57-59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983); 28 U.S.C. § 636(b) (1); Fed.R.Civ.P. 72, 6(a), 6(d).

## Footnotes

1   SHU inmates at Fishkill may seek "non-emergency medical" attention by "request[ing] a sick call the night before so that a nurse can see [the inmate] the next day."(Mamis Aff. ¶ 3; Dkt. No. 24: Lee Aff. Ex. C: Morrison Dep. at 34-37.) The nurses working in SHU are available from 6:30 a.m. to 12:00 a.m. (Mamis Aff. ¶ 3 .)

2   If an inmate wants to see a doctor for a "non-emergency medical issue," the inmate may request to be placed on the "call-out" schedule. (Mamis Aff. ¶ 3; Morrison Dep. at 33.) "On the day of the scheduled call-outs, a corrections officer escorts the inmates on the call-out list to the treatment room in the SHU unit to be seen by the primary care physician."(Mamis Rule 56.1 Stmt. ¶ 3; *see* Mamis Aff. ¶ 3; Morrison Dep. at 33 .)

3   Dr. Mamis' license to practice medicine was revoked in "Massachusetts due to a disciplinary action in New York State."(Morrison Br. Ex. 5: Mamis Interrog. Resp. ¶ 4.) In addition, Dr. Mamis has been "suspended from work for wrongful conduct" and has been "found liable for [somebody] dying under [his] care."(Morrison Br. Ex. 5: Mamis Interrog. Resp. ¶¶ 9, 11.)

4   Morrison claims that Dr. Mamis "[f]alsified [p]aperwork," seemingly referring to Morrison's medical records. (Morrison Br. at 3, 8.) Morrison, however, has not presented any admissible evidence to support this allegation.

5   Morrison alleges that a nurse explained to him that Dr. Mamis should have asked Morrison whether he had any bullets in his body prior to ordering an MRI. (Proposed Am. Compl. at 1.) This is inadmissible hearsay, and not cognizable on this motion. Dr. Mamis answered Morrison's interrogatory question, "[d]id you conduct a questionair[re] while Mr. Morrison was present" by stating that, "[b]efore an MRI is given, the patient fills out a form."(Mamis Interrog. Resp. ¶¶ 15-18.)

6   On January 3, 2008, Dr. Mueller, a roentgenologist, x-rayed Morrison's chest and discovered a "1.5cm metallic fragment in anterior soft tissues left upper thorax."(X-ray & MRI Records at 106.)

7   Morrison sees a "[p]sychiatrist and social worker" for "mental health" treatment. (Morrison Dep. at 77; Morrison Med. Records at 22, 25, 27, 34, 37-38, 48, 50, 54, 56, 71, 76-78, 80-84, 88-90.) His mental health treatment is not at issue in this case.

8   Morrison disputes that Dr. Mamis saw him on April 25, 2008. (Morrison 56.1 Stmt. ¶ 5.) Morrison also alleges that he was scheduled for "call outs" on January 4 and 23, 2008, February 7 and 25, 2008, March 10 and 24, 2008, May 30, 2008 and July 28 and 31, 2008, but that Dr. Mamis intentionally "skipped" the appointments. (Morrison Br. at 2; Compl. at 9.) Morrison's medical records show the following: (a) Dr. Mamis noted that Morrison's January 9, 2008 call out was "cancelled" (Morrison Med. Records at 70); (b) Morrison was scheduled for a call out on February 18, 2008 that did not occur (Morrison Med. Records at 65); (c) Morrison was scheduled for a call out on February 29, 2008 that had to be re-scheduled for March 24, 2008 (Morrison Med. Records at 57-58); (d) Morrison was scheduled for a call out on March 14, 2008 but the appointment had to be rescheduled because "time ran short and call out did not get completed" (Morrison Med. Records at 52); (e) Morrison was scheduled for a call out on March 31, 2008, but Dr. Mamis indicated that Morrison was "not seen" (Morrison Med. Records at 47, 49); (f) Morrison was on the call-out list on April 21, 22 and 23, 2008 (Morrison Med. Records at 37-38, 44); (g) on May 11, 2008, Morrison was scheduled for a call-out on May 30, 2008 (Morrison Med. Records at 27).

9   *See also, e.g., Feingold v. New York,* 366 F.3d 138, 148 (2d Cir.2004); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d at 36; *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d at 1223.

10  *See also, e.g., Ferran v. Town of Nassau,* 471 F.3d 363, 369 (2d Cir.2006); *Fuller v. Armstrong,* 204 Fed. Appx. 987, 988 (2d Cir.2006), *cert. denied,* 128 S.Ct. 209 (2007); *Gildor v. United States Postal Serv.,* 179 Fed. Appx. 756, 758 (2d Cir.2006); *Porter*

*v. Coughlin,* 421 F.3d 141, 144 n. 2 (2d Cir.2005); *Hemphill v. New York,* 380 F.3d 680, 687 (2d Cir.2004); *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003); *Johnson v. Buffalo Police Dept.,* 46 Fed. Appx. 11, 12 (2d Cir.2002), *cert. denied,*539 U.S. 959, 123 S.Ct. 2645 (2003).

11 *See also, e.g., United States v. Acomb,* No. 99-6308, 216 F .3d 1073 (table), 2000 WL 899482 at *1 (2d Cir. June 29, 2000); *James v. Phillips,* 05 Civ. 1539, 2008 WL 1700125 at *3 (S.D.N.Y. Apr. 9, 2008); *Thompson v. Tracy,* 00 Civ. 8360, 2008 WL 190449 at *5 (S.D.N.Y. Jan. 17, 2008); *Bunting v. Nagy,* 452 F.Supp.2d 447, 454 (S.D.N.Y.2006); *Rodriguez v. McClenning,* 399 F.Supp.2d 228, 234 & n. 52 (S.D.N.Y.2005); *Pack v. Artuz,* 348 F.Supp.2d 63, 78 (S.D.N.Y.2004); *Rector v. Sylvania,* 285 F.Supp.2d 349, 353 (S.D.N.Y.2003); *Walker v. Vaughan,* 216 F.Supp.2d 290, 296-97 (S.D.N.Y.2002); *Hussein v. The Waldorf-Astoria,* 134 F.Supp.2d 591, 596 (S.D.N.Y.2001), *aff'd,*31 Fed. Appx. 740 (2d Cir.2002).

12 *See also, e.g., Fransua v. Vadlamudi,* No. 05-1715-pr, 2008 WL 4810066 at *1 (2d Cir. Nov. 3, 2008); *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006); *Smith v. Carpenter,* 316 F.3d 178, 183 (2d Cir.2003); *Selby v. Coombe,* 17 Fed. Appx. 36, 37 (2d Cir.2001) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

13 *Accord, e. g., Fransua v. Vadlamudi,* 2008 WL 4810066 at *1); *Salahuddin v. Goord,* 467 F.3d at 279-81; *Smith v. Carpenter,* 316 F.3d at 183; *Selby v. Coombe,* 17 Fed. Appx. at 37; *Chance v. Armstrong,* 143 F.3d at 702.

14 *See also, e.g., Fransua v. Vadlamudi,* 2008 WL 4810066 at *1; *Salahuddin v. Goord,* 467 F.3d at 279-80; *Selby v. Coombe,* 17 Fed. Appx. at 37; *Chance v. Armstrong,* 143 F.3d at 702.

15 The Second Circuit in *Chance v. Armstrong* identified several factors that are relevant in determining whether a serious medical condition exists, including " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.' " 143 F.3d at 702.

16 *See also, e.g., Fransua v. Vadlamudi,* 2008 WL 4810066 at *1; *Salahuddin v. Goord,* 467 F.3d at 280 ("Deliberate indifference is a mental state equivalent to subjective recklessness.... This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result."); *Smith v. Carpenter,* 316 F.3d at 184; *Selby v. Coombe,* 17 Fed. Appx. at 37; *Chance v. Armstrong,* 143 F.3d at 702; *LaBounty v. Coughlin,* 137 F.3d 68, 72-73 (2d Cir.1998) ("To succeed in showing deliberate indifference, [plaintiff] must show that the acts of defendants involved more than lack of due care, but rather involved obduracy and wantonness in placing his health in danger.").

17 *See, e.g., Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994) (delay for more than two years in removing broken pins from prisoner's hip despite nearly seventy complaints of pain), *cert. denied,*513 U.S. 1154, 115 S.Ct. 1108 (1995); *Liscio v. Warren,* 901 F.2d 274, 277 (2d Cir.1990) (failure to provide medical attention to a delirious inmate for three days); *Archer v. Dutcher,* 733 F.2d 14, 15-17 (2d Cir.1984) (denying summary judgment where plaintiff "identifie[d] intentional efforts on the part of defendants to delay her access to medical care at a time [when] she was in extreme pain"); *Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974).

18 *Accord, e.g., Salahuddin v. Goord,* 467 F.3d at 280; *Hathaway v. Coughlin,* 99 F.3d at 553; *Felipe v. New York State Dep't of Corr. Servs.,* No. 95-CV-1735, 1998 WL 178803 at *3 (N.D.N .Y. Apr. 10, 1998) (Pooler, D.J.).

19 Furthermore, a delay in medical treatment does not necessarily invoke the Eighth Amendment:

> Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, this Court has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a "life-threatening and fast-degenerating" condition for three days; or delayed major surgery for over two years. No such circumstances are present here. At no point was [plaintiff's] condition "fast-degenerating" or "life-threatening," and there is no indication that [defendant] delayed treatment in order to punish him. Moreover, any delay in treatment in this case does not rise to the egregious level identified in *Hathaway.*That [plaintiff] feels something more should have been done to treat his injuries is not a sufficient basis for a deliberate indifference claim.

> *Demata v. New York State Corr. Dep't of Health Servs.,* No. 99-0066, 198 F.3d 233 (table), 1999 WL 753142 at *2 (2d Cir. Sept. 17, 1999) (citations omitted) (Summary judgment for defendants where plaintiff complained of knee injury in February 1994 and surgery not performed until March 1997.); *accord, e.g., Smith v. Carpenter,* 316 F.3d at 185 ("When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay or interruption* in treatment rather than the person's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim.") (emphasis in original); *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *9 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.) (No Eighth Amendment claim against nurse who scheduled inmate with appendicitis requiring appendectomy for appointment two hours later rather than seeing inmate immediately where "[t]here was nothing in [the inmate]'s medical history which would have put [the nurse] on notice that [plaintiff] was suffering from the onset of appendicitis ... and there is no evidence that [the officer] gave [the nurse] any reason to believe that there was an emergency on hand."); *Culp v. Koenigsmann,* 2000 WL 995495 at *7-8 (rejecting claim based on fact that one doctor recommended arthroscopic surgery for knee injury in April 1999, while

another doctor concluded that surgery was not warranted until more conservative measures like physical therapy had been tried and failed).

20    *But cf. Cain v. Jackson,* 05 Civ. 3914, 2007 WL 2193997 at *1, 6 (S.D.N.Y. July 27, 2007) (prisoner's degenerate disc disease in her cervical spine, which was compounded when she fell from her cell bunk and injured her back, was not "sufficiently serious" to implicate the Eighth Amendment); *Goros v. Cent. Office Review Comm .,* No. 03-CV-407, 2006 WL 2794415 at *6 (N.D.N.Y. Sept. 26, 2006) ("Case law certainly exists suggesting that ... Plaintiff's arthritis and gastrointestinal disorders may not rise to the level of a sufficiently serious medical condition for purposes of the Eighth Amendment. In particular, noticeably missing from Plaintiff's allegations are any factual assertions indicating that his conditions, when experienced together, constituted a 'condition of urgency, one that may produce death, degeneration, or extreme pain.' The closest Plaintiff comes to alleging a sufficiently serious medical need is through his allegations of 'worse[ning] pain' in his left shoulder and legs (presumably, arthritic pain).") (citation omitted); *Davis v. Reilly,* 324 F.Supp.2d 361, 368 (E .D.N.Y.2004) (A "sprained back and neck ... do not constitute a serious medical condition."); *Rodriguez v. Mercado,* 00 Civ. 8588, 2002 WL 1997885 at *2-3, 8 (S.D.N.Y. Aug. 28, 2002) (Prisoner's back pain and migraines not "sufficiently serious" to implicate Eighth Amendment.).

21    Although Morrison disputes that Dr. Mamis saw him on April 25, 2008, Morrison concedes that Dr. Mamis saw him at least three and possibly five times. (*See* page 5 n. 8 above; Dkt. No. 24: Lee Aff. Ex. C: Morrison Dep. at 55-60.)

22    Morrison claims that Dr. Mamis was deliberately indifferent for not questioning Morrison about whether he had bullets in his body before ordering the MRI. According to Dr. Mamis, the proper protocol is for a patient to "fill[ ] out a form ... before an MRI is given." (*See* page 3 n. 5 above.) Even if, as Morrison alleges, the proper protocol is for the doctor to administer the questionnaire before ordering the MRI, Dr. Mamis' failure to do so at most demonstrates his negligence, not deliberate indifference, particularly in light of the cancellation of the MRI as soon as Morrison informed the MRI staff that he had bullets in his body. As noted in Section II.A. above, a doctor's negligence does not warrant Eighth Amendment protection. Moreover, even if this constituted deliberate indifference-which it does not-Morrison suffered no injury as a result. *See Bellotto v. County of Orange,* 248 Fed. Appx. 232, 237 (2d Cir.2007) ("[Plaintiff]'s treatment, which allegedly included missed medication dosages and inadequate monitoring of medications, ... could not be found to rise to the level of a constitutional violation because the risk of harm that [plaintiff] faced as a result of the alleged treatment was not substantial.... [T]he only medical consequence he alleges was an anxiety attack, which, according to both [plaintiff]'s testimony and his medical records, resulted in no physical injuries and 'no acute distress.' "); *Smith v. Carpenter,* 316 F.3d 178, 187 (2d Cir.2003) ("The absence of adverse medical effects or demonstrable physical injury is one such factor that may be used to gauge the severity of the medical need at issue. Indeed, in most cases the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm.") (citations omitted); *Young-Flynn v. Wright,* 05 Civ.1488, 2007 WL 241332 at *18-19 (S.D.N.Y. Jan. 26, 2007) (granting motion to dismiss on plaintiff's claims of deliberate indifference to plaintiff's complaints including chest pains because plaintiff did not address how "defendants' failure to take any action ... directly caused him any specific injury").

23    *See also, e.g., Myrie v. Calvo/Calvoba,* 07 Civ. 8834, 2008 WL 5062734 at *7 (S.D.N.Y. Nov. 25, 2008) (Doctor was not deliberately indifferent to plaintiff's vision problems where doctor failed to promptly re-schedule plaintiff's optometrist appointment. Plaintiff did not make the doctor aware that "serious harm could occur if an optometrist's appointment was not re-scheduled immediately."); *Fuller v. Hohensee,* No. 03-CV-0514, 2008 WL 4826261 at *11 (W.D.N.Y. Nov. 5, 2008) ("While dental pain and toothaches can be excruciatingly painful and proper dental care is an important part of overall health, short, intermittent delays in appointment times, absent any indication of serious infection or aggravation of the condition and absent any knowledge of the inmate's complaints or suffering, cannot support a finding of an Eighth Amendment violation under section 1983."); *James v. Phillips,* 05 Civ. 1539, 2008 WL 1700125 at *7 n. 1 (S.D.N.Y. Apr. 9, 2008) ("Plaintiff also asserts that [Dr.] Mamis cancelled a follow-up appointment for Physiatry for his right knee on November 14, 2003 out of a retaliatory motive because of prior grievances plaintiff filed against him. Whether viewed through the lens of medical indifference or retaliation for engaging in speech or a protected activity, the canceling of one appointment is not sufficiently serious to amount to a cognizable claim under any theory."); *Taylor v. Valamudy,* No. 03-CV-1029, 2006 WL 2795304 at *12 (N.D.N.Y. Sept. 26, 2006) ("Although Plaintiff feels like his surgery should have been expedited, the surgery occurred approximately two months after the recommendation was made by the ENT specialist. This 'delay' does not invoke the Eighth Amendment."); *Lighthall v. Vadlamudi,* No. 04-CV-0721, 2006 WL 721568 at *4-6, 12 (N.D.N.Y. Mar. 17, 2006) (Defendants were not deliberately indifferent to the medical needs of plaintiff, who had low B-12 levels, prostate dysfunction, bladder dysfunction, cysts on his testicles, heart dysfunction and back pain due to a bulging disc. "Some delays in receiving consultations naturally occurred since they had to be approved ostensibly by either the administration or consultant. Once approved, however, appointments and even follow-up visits were scheduled. For example, a urological consult was ordered a few days after Plaintiff's colonoscopy and Plaintiff received the consult about two months after the request was placed.").

24    *See also, e.g., Burley v. O.D.O.C.,* No. CV-99-1462, 2000 WL 1060658 at *4-5 (D.Or. July 11, 2000) (granting defendants summary judgment on Eighth Amendment claim where "[p]laintiff disputes that the lumbar/sacral spine x-ray shows that nothing is wrong

with his head, neck, and back" and "believes that only an 'MRI' or 'Cat Scan' can confirm his injuries in those areas"); *Lewis v. Herbert,* No. Civ. A. 96-2933, 1996 WL 663874 at *4 (E.D .Pa. Nov. 14, 1996) ("[E]ven if Defendant's decision not to ... order an X-Ray or Cat Scan ... amounted to medical malpractice, a tort is not transformed into a constitutional violation simply because the victim is a prisoner."); *Coppage v. Mann,* 906 F.Supp. 1025, 1038-39 (E.D.Va.1995) (rejecting plaintiff's argument that prison doctor was deliberately indifferent when he ordered two diagnostic tests which were less effective than an MRI; "The case law draws a clear distinction between situations in which the physician provides no medical care, which may amount to deliberate indifference, and those in which the physician provides merely substandard care, which amounts at most to negligence."); *Trejo v.. Gomez,* No. C-93-0360, 1995 WL 429247 at *3 (N.D.Cal. July 13, 1995) (rejecting claim that prison doctor's failure to order CAT scan or MRI for inmate complaining of neck, back and shoulder pain constituted deliberate indifference); *Johnson v. Dep't of Corr.,* 92 Civ. 7716, 1995 WL 121295 at *3 (S.D.N.Y. Mar. 21, 1995) (summary judgment for defendants where inmate suffering from hip condition who was examined and treated on numerous occasions complained he should have received an MRI; "the Eighth Amendment does not mandate the use of any particular medical technology or course of treatment"); *Wilkerson v. Marshall,* No. C 94-0009, 1994 WL 564650 at *1-4 (N.D.Cal. Oct. 3, 1994) (rejecting inmate's claim that prison doctor's failure to order an MRI constituted deliberate indifference); *Lopez v. Medical Dep't,* Civ. A. No. 90-5287, 1990 WL 174361 at *1 (E.D.Pa. Nov. 6, 1990) (prison medical staff's refusal to "take x-rays, perform a CAT scan and administer other medical tests" did not give rise to Eighth Amendment claim).

---

**End of Document**  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 31075804
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jeffrey NELSON, Plaintiff

v.

Byron RODAS, et al., Defendants.

No. 01CIV7887RCCAJP. | Sept. 17, 2002.

Prison defendants moved for summary judgment on prisoner's civil rights claims. In issuing his report and recommendation, United States Magistrate Judge Peck, held that: (1) prisoner did not satisfy Prison Litigation Reform Act's (PLRA) exhaustion requirements with respect to non-medical claims; (2) if a prisoner's § 1983 complaint contains exhausted and unexhausted claims, district court may address the merits of the exhausted claims and dismiss only those that are unexhausted; and (3) prisoner failed to establish that prison defendants demonstrated deliberate indifference serious medical and dental conditions.

Motion granted as to exhausted claims; unexhausted claims dismissed.

West Headnotes (5)

[1]    **Civil Rights**
       👉 Criminal Law Enforcement;  Prisons

       Prisoner's complaint letter to Commissioner of New York State Department of Correctional Services (DOCS) with respect to non-medical claims did not satisfy Prison Litigation Reform Act's (PLRA) exhaustion requirements in prisoner's civil rights action. 42 U.S.C. § 1997e(a).

       12 Cases that cite this headnote

[2]    **Civil Rights**
       👉 Criminal Law Enforcement;  Prisons

       Prisoner asserting civil rights claims did not satisfy Prison Litigation Reform Act's (PLRA) exhaustion requirements with respect to non-medical claims by filing appeals from various disciplinary hearing dispositions. 42 U.S.C. § 1997e(a).

       6 Cases that cite this headnote

[3]    **Civil Rights**
       👉 Criminal Law Enforcement;  Prisons

       If a prisoner's § 1983 complaint contains exhausted and unexhausted claims, district court may address the merits of the exhausted claims and dismiss only those that are unexhausted under Prison Litigation Reform Act (PLRA). 42 U.S.C. § 1983; 42 U.S.C. § 1997e(a).

       5 Cases that cite this headnote

[4]    **Civil Rights**
       👉 Criminal Law Enforcement;  Prisons

       Prisoner failed to establish that prison defendants demonstrated deliberate indifference to serious medical and dental conditions regarding an abnormal growth of tissue-cells within his chest, a defective back, and worn-out amalgams fillings that caused him a perpetual headache; prisoner offered no evidence to support his claims other than conclusory allegations and refused to accept dental treatment. U.S.C.A. Const.Amend. 8; 42 U.S.C. § 1983.

       42 Cases that cite this headnote

[5]    **Conspiracy**
       👉 Pleading

       Prisoner's conclusory allegations did not state conspiracy claim under § 1985(3); additionally, conspiracy claim was not stated since prisoner failed to allege that defendants conspired against him because of any racial or class-based, invidious discriminatory animus. 42 U.S.C. § 1985(3).

       Cases that cite this headnote

**REPORT AND RECOMMENDATION**

PECK, Magistrate J.

**\*1** Pro se plaintiff Jeffrey Nelson, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, alleging that numerous Green Haven Correctional Facility employees violated his constitutional rights, and asserting claims for: (1) deliberate indifference to serious medical needs; (2) conspiracy; (3) retaliation; (4) deliberate indifference to serious harm; (5) excessive force; and (6) denial of due process. (Dkt. No. 2: Compl.; Dkt. No. 40: Am. Compl.) Nelson demands compensatory damages of $1.329 billion and punitive damages of an additional $1.329 billion. (Am. Compl. at 36–37.) After the conclusion of discovery, defendants moved for summary judgment under Fed.R.Civ.P. 56, or, in the alternative, to dismiss the amended complaint under Fed R. Civ. P. 12(b)(6).

For the reasons set forth below, (1) defendants' summary judgment motion should be GRANTED as to Nelson's claims against defendants Rodas, Koenigsmann and Licerio for deliberate indifference to serious medical needs and conspiracy; and (2) Nelson's remaining claims should be DISMISSED WITHOUT PREJUDICE for failure to exhaust administrative remedies.

### PROCEDURAL BACKGROUND

At all times relevant to this action (October 2000 through May 2001), Nelson was an inmate under DOCS custody at Green Haven Correctional Facility (Dkt. No. 40: Am. Compl. at 3–6, 15–21; Dkt. No. 46: Defs. Br. at 2; Dkt. No. 48: Defs. 56.1 Stmt. ¶ 1),[1] and defendants were employed by DOCS at Green Haven.[2]

Nelson commenced this action by filing a complaint dated July 18, 2001, received by this Court's Pro Se Office on July 25, 2001 and filed as of August 23, 2001. (Dkt. No. 2: Compl.) The Court directed Nelson to amend his complaint to provide additional facts supporting the allegations in his complaint. (Dkt. No. 32: 2/6/02 Memo Endorsed Order.) On March 8, 2002, Nelson's amended complaint was filed. (Dkt. No. 40: Am. Compl.)

Nelson's claims in the amended complaint can be divided into two categories. The first category involves claims against defendants Byron Rodas, Dr. Carl Koenigsmann and Edward Licerio for deliberate indifference to Nelson's serious medical (and dental) needs and conspiracy relating thereto (hereafter, the "Medical Claims"). (Am. Compl. at 3–14; Dkt. No. 52: Nelson 4/30/02 Aff. ¶¶ 4–14; Dkt. No. 53: Nelson Br. ¶¶ 5–8.) The second category involves claims against the remaining sixteen defendants for excessive force, deliberate indifference to serious harm, denial of due process,[3] retaliation, and conspiracy relating to a variety of incidents at Green Haven, including, *inter alia,* physical attacks by corrections officers and fellow inmates, and various disciplinary measures levied against Nelson (hereafter, the "Non–Medical Claims"). (Am. Compl. at 15–35; Nelson 4/30/02 Aff. ¶¶ 15–33; Nelson Br. ¶¶ 9–12.)[4]

At the close of discovery, defendants moved for summary judgment, or, in the alternative, to dismiss the amended complaint. (Dkt.Nos.45–49, 54.)[5]

### ANALYSIS

## I. NELSON'S NON–MEDICAL CLAIMS SHOULD BE DISMISSED WITHOUT *PREJUDICE FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES*

**\*2** Under 42 U.S.C. § 1997e(a), as amended by the Prison Litigation Reform Act of 1996 ("PLRA"), a prisoner must exhaust administrative remedies before bringing suit in federal court under federal law:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a) This provision requires complete exhaustion in accordance with the administrative procedures within the New York State Department of Correctional Services ("DOCS"). Exhaustion is required even when a prisoner seeks a remedy that cannot be awarded by such administrative procedures. *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 988, 152 L.Ed.2d 12 (2002); *Booth v. Churner,* 532 U.S. 731, 741, 121 S.Ct. 1819, 1825, 149 L.Ed.2d 958 (2001). The Supreme Court this past term made clear that there are no exceptions to the PLRA's exhaustion requirement:

[W]e hold that the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.

*Porter v. Nussle,* 122 S.Ct. at 992; *accord, e.g., Feaster v. United States Bureau of Prisons,* No. 00–0118, 37 Fed. Appx. 15, 16, 2002 WL 970941 at *1 (2d Cir. May 10, 2002) (applying *Porter v.. Nussle* holding to require exhaustion of prisoner's due process and retaliation claims).[6] Dismissal of an action for failure to comply with the PLRA is without prejudice. *E.g., Morales v. Mackalm,* 278 F.3d 126, 128, 131 (2d Cir.2002) (per curiam) (Second Circuit "clarif[ies] that if a district court dismisses a prisoner's complaint for failure to exhaust administrative remedies, it should do so without prejudice.").

DOCS has a well-established inmate grievance procedure ("IGP"):

> It consists of three levels. The first is the filing of a complaint with the facility's Inmate Grievance Review Committee. The second is an appeal to the facility superintendent. The final level is an appeal to the DOCS Central Office Review Committee in Albany.... A prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure.

*Hemphill v. New York,* 198 F.Supp.2d 546, 548 (S.D.N.Y.2002); *see also, e.g., Perez v. Blot,* 195 F.Supp.2d 539, 542–43 (S.D.N.Y.2002); *Cruz v. Jordan,* 80 F.Supp.2d 109, 117–18 (S.D.N.Y.1999); *Vasquez v. Artuz,* 97 Civ. 8427, 1999 WL 440631 at *5 (S.D.N.Y. June 28, 1999) (Peck, M.J.); N.Y. Correct. Law §§ 138–39 (McKinney's 2002); Official Compilation of Codes, Rules & Regulations of the State of New York ("NYCRR") Title 7, § 701.1 *et seq.*.

Nelson did not exhaust DOCS' grievance procedures with respect to any of the Non–Medical Claims.[7] Nelson concedes that he did not follow the formal grievance procedure with respect to his excessive force claim, but rather appealed directly to DOCS Commissioner Glenn Goord in a letter dated March 10, 2001. (Dkt. No. 52: Nelson 4/30/02 Aff.

Ex. 1: 3/10/01 Nelson Letter to Goord; *see* Dkt. No. 50: 3/11/02 Hearing Tr. at 22; Dkt. No. 53: Nelson Br. at 9–11; Am. Compl. at iv; *see also* Dkt. No. 47: Gould Aff. Ex. B: Egan 3/25/02 Aff.) Nelson argues that, in light of correction officers' violent attacks and retaliatory behavior, he had "no other resource or remedy at the facility other than to file his complaint(s) ... directly to" Commissioner Goord. (Nelson Br. at 9; 3/11/02 Hearing Tr. at 22; Nelson 4/30/02 Aff. Ex. 1: 3/10/01 Nelson Letter to Goord.) According to Nelson, his situation qualified as an "emergency" under the IGP, thus allowing an appeal directly to Commissioner Goord in lieu of ordinary exhaustion. (Nelson Br. at 9–10.)

**\*3** Nelson is mistaken. DOCS grievance procedure establishes an expedited grievance procedure in cases of alleged staff "harassment" of an inmate, defined as "employee misconduct meant to annoy, intimidate, or harm an inmate." 7 NYCRR § 701.11(a). That procedure is as follows:

> (b) Procedure.

> (1) An inmate who feels that s(he) has been the victim of employee misconduct or harassment should first *report such occurrences to the immediate supervisor of that employee.* This does not preclude submission of a formal grievance.

> (2) All allegations of employee misconduct shall be given a grievance calendar number and recorded in sequence. All documents submitted with the allegation must be *forwarded to the superintendent* by close of business that day.

> (3) The superintendent or his designee shall promptly determine whether the grievance, if true, would represent a bona fide case of harassment as defined in subdivision (a) of this section. If not, then it shall be returned to the IGRC for normal processing.

7 NYCRR § 701.11(b) (emphasis added). Nelson did not follow this procedure when he wrote to Commissioner Goord.[8]

**[1]** Courts have repeatedly held that complaint letters to the DOCS Commissioner or the facility Superintendent do not satisfy the PLRA's exhaustion requirements. *See, e.g. Saunders v. Goord,* 98 Civ. 8501, 2002 WL 1751341 at *3 (S.D.N.Y. July 29, 2002) ("It is well established that '[p]laintiffs may not bypass this procedure by sending letters directly to the Superintendent.' "); *Byas v. State,* 99 Civ. 1673,

2002 WL 1586963 at *2 (S.D.N.Y. July 17, 2002) ("Prisoners may not bypass this procedure [in 7 NYCRR § 701.11(b)] by sending letters directly to the Superintendent.") (citing cases); *Nunez v. Goord,* 99 Civ. 4640, 2002 WL 1162905 at *1 (S.D.N.Y. June 3, 2002) (inmate's letter to prison Superintendent in lieu of filing grievance failed to exhaust excessive force claim); *Hemphill v. New York,* 198 F.Supp.2d at 548–49 (same; letter to Superintendent does not satisfy 7 NYCRR § 701.11 procedures either); *Mills v. Garvin,* 99 Civ. 6032, 2001 WL 286784 at *3 (S.D.N.Y. Mar.2, 2001) (inmate's letters to prison officials were insufficient to exhaust his administrative remedies; "letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA."); *Noguera v. Hasty,* 99 Civ. 8786, 2000 WL 1011563 at *12 n. 23 (S.D.N.Y. July 21, 2000) (Peck, M.J.) ("The Court notes that simple letter complaints to the Commissioner of the New York State Department of Correctional Services about excessive force and medical indifference appear quite common, and such complaints are not normally sufficient to serve as a proxy for following and exhausting proper administrative remedies.") (citing cases), *report & rec. adopted in part,*2001 WL 243535 (S.D.N.Y. Mar.12, 2001) (Wood, D.J.); *Beatty v. Goord,* 98 Civ. 2136, 2000 WL 288358 at *4–5 (S.D.N.Y. Mar.16, 2000) (complaint dismissed without prejudice for failure to exhaust where inmate sent letters to prison medical director, Superintendent and Commissioner rather than following IGP); *Adams v. Galletta,* 96 Civ. 3750, 1999 WL 959368 at *3 (S.D.N.Y. Oct.19, 1999) (letter to warden insufficient to exhaust administrative remedies); *Salahuddin v. Mead,* 95 Civ. 8581, 1997 WL 357980 at *4 (S.D.N.Y. June 26, 1997) (letter to Superintendent and Commissioner insufficient to exhaust), *rev'd on other grounds,*174 F.3d 271 (2d Cir.1999).[9]

**\*4** **[2]** Nelson also appears to claim that he satisfied the exhaustion requirement by filing appeals from various disciplinary hearing dispositions. (Dkt. No. 40: Am. Compl. at iv: "Chronology—Exhaustion of Administrative Remedies.") However, "[e]xhausting appeals of a disciplinary hearing determination does not constitute exhausting administrative remedies for [the inmate's] grievance, even if the underlying facts are the same."*Benjamin v. Goord,* 02 Civ. 1703, 2002 WL 1586880 at *2 (S.D.N.Y. July 17, 2002); *accord, e.g., Byas v. State,* 2002 WL 1586963 at *3 & n. 3 (inmate's claim unexhausted despite "the two letters he sent to Sing Sing Superintendent Greiner within days of the incident and ... his appeal of the disciplinary hearing determination;""the fact that plaintiff appealed his disciplinary finding does not relieve him of the

obligation to file a grievance"); *Cherry v. Selsky,* 99 Civ. 4636, 2000 WL 943436 at *1, 7 (S.D.N.Y. July 7, 2000) (exhaustion of grievance procedure necessary even though inmate appealed disciplinary charges).

Nelson asserts several other exhaustion arguments that border on the frivolous. He argues that the exhaustion requirement is satisfied if the inmate's complaint has been "reviewed at the highest levels of the agency."(Nelson Br. at 10, citing *Noguera,* 2000 WL 1011563 at *10–11.) While this may be true, Nelson has not submitted any evidence that his complaints were, "in fact," investigated at that level. Nelson also argues that a grievance procedure is essentially unavailable if the inmate does not know the identities of the relevant prison officials. (Nelson Br. at 11.) Whether or not this could ever be a factor, here Nelson has had no difficulty identifying his alleged attackers. (*See* Am. Compl. at 15–21.)

Finally, Nelson argues that "an administrative remedy may be inadequate 'because of some doubt as to whether the agency was empowered to grant effective relief' ' or because exhaustion would otherwise be futile. (Nelson Br. at 10–11, quoting *McCarthy v. Madigan,* 503 U.S. 140, 147, 112 S.Ct. 1081, 1088, 117 L.Ed.2d 291 (1992).) The Supreme Court, however, has made clear that *McCarthy* was superseded by the PLRA: "Congress has mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures." *Booth v. Churner,* 532 U.S. at 739–41 & n. 6, 121 S.Ct. at 1824–25 & n. 6 ("we will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise"); *see also, e.g., Saunders v. Goord,* 2002 WL 1751341 at *3 (rejecting plaintiff's argument that corrections officers interfered with his ability to file administrative grievances, stating that "there is no general futility exception [to] the exhaustion requirement under the PLRA.")

In short, Nelson's Non–Medical Claims have not been administratively exhausted, and therefore should be dismissed without prejudice.[10]

Defendants argue, however, that "pursuant to the PLRA's requirement that 'no action' may be brought until administrative remedies are exhausted, 42 U.S.C. § 1997e(a)," Nelson's failure to exhaust his excessive force claims requires the Court to dismiss Nelson's *entire* complaint. (Defs. Br. at 38.) Defendants offer no case law or analysis to support this proposition (*id.*), despite this Court's

specific instructions to defense counsel to address the issue. (*See*Dkt. No. 50: 3/11/02 Conf. Tr. at 23–26.)

**\*5** **[3]** The issue thus is whether the PLRA compels a rule of "total exhaustion"—whether a district court must dismiss a prisoner's entire § 1983 action if some but not all claims are administratively unexhausted, or if the Court may dismiss only those claims that are unexhausted while ruling on the exhausted claims. The decisions are divided on the issue. Some require "total exhaustion." *See, e.g., Julian– Bey v. Crowley,* No. 00–2313, 24 Fed. Appx. 393, 395, 2001 WL 1555950 at \*2 (6th Cir. Dec.3, 2001) (dismissing "mixed" complaint; rejecting argument that "the exhaustion of at least one claim is sufficient to prevent dismissal"); *Graves v. Norris,* 218 F.3d 884, 885 (8th Cir.2000) ("When multiple prison condition claims have been joined, as in this case, the plain language of § 1997e(a) requires that all available prison grievance remedies must be exhausted as to all of the claims."); *Taylor v. Clarke,* No. C 99– 4190, 2002 WL 535421 at \*2 (N.D.Cal. Apr.3, 2002) ("An action containing both exhausted and unexhausted [§ 1983] claims at the time of filing should be dismissed without prejudice."); *Rivera v. Whitman,* 161 F.Supp.2d 337, 339– 43 (D.N.J.2001) (plain language of § 1997e(a), as well as the legislative intent and policy interests behind it, compel a "total exhaustion" rule). [11] Other decisions, however, do not. *See, e.g., McElhaney v. Elo,* No. 98–2173, 230 F.3d 1358 (table), 2000 WL 1477498 at \*3 (6th Cir. Sept.25, 2000) ("If a [§ 1983] complaint contains exhausted and unexhausted claims, the district court may address the merits of the exhausted claims and dismiss only those that are unexhausted."); *Riley v. Richards,* No. 99–1327, 210 F.3d 372 (table), 2000 WL 332013 at \*2 (6th Cir. Mar.23, 2000) (same); *Hartsfield v. Vider,* 199 F.3d 305, 309 (6th Cir.1999) (same); *Johnson v. True,* 125 F.Supp.2d 186, 188 (W.D.Va.2000) ( "total exhaustion" rule contradicts congressional intent and policy), *appeal dismissed,*32 Fed. Appx. 692 (4th Cir.2002); *Cooper v. Garcia,* 55 F.Supp.2d 1090, 1094–95 (S.D.Cal.1999) (same); *Jenkins v. Toombs,* 32 F.Supp.2d 955, 958–59 (W.D.Mich.1999) (same).

The Second Circuit has not addressed the issue, and the few district court decisions in this Circuit also are split. *Compare Saunders v. Goord,* 2002 WL 1751341 at \*3 (dismissing inmate complaint containing some unexhausted claims, citing "the plain language of 42 U.S.C. § 1997e(a)"), *with Espinal v. Coughlin,* 98 Civ. 2579, 2002 WL 10450 at \*1 (S.D.N.Y. Jan.3, 2002) (dismissing unexhausted claims while ruling on

merits of exhausted claims, without discussing why court could do so).

The Court need not try to predict what the Second Circuit (and eventually the Supreme Court) will do, nor take its own position in this general debate. At least on the particular facts of this case, the Court believes it appropriate to address the merits of the exhausted Medical Claims while dismissing the Non–Medical Claims without prejudice. [12]

**\*6** Discovery in this case was completed at the time of the Supreme Court's February 26, 2002 *Porter v. Nussle* decision. (*See*Dkt. No. 18: Rule 16 Scheduling Order, setting a 2/27/02 discovery cut-off date.) The parties and the Court expended a great deal of resources before *Porter v. Nussle* changed the governing law in the Second Circuit. That alone does not preclude retroactive application of *Porter v. Nussle* to pending cases. Here, however, it is significant that the Medical and Non–Medical Claims are easily separated, since they involve discrete parties and acts. (*Compare* Am. Compl. at 3–14 *with id.* at 15–35.)Even under these facts, the Court could dismiss the entire action without prejudice. But I see no reason why the Court cannot exercise its discretion in these particular circumstances to dismiss without prejudice the separable Non–Medical Claims while reaching the merits (or rather, lack thereof) of the fully exhausted Medical Claims.

Accordingly, I recommend that only the Non–Medical Claims be dismissed without prejudice as unexhausted, and that the separable exhausted Medical Claims be adjudicated on the merits.

## II. SUMMARY JUDGMENT SHOULD BE GRANTED TO DEFENDANTS WITH RESPECT TO NELSON'S CLAIMS OF DELIBERATE INDIFFERENCE TO *SERIOUS MEDICAL NEEDS AND CONSPIRACY RELATING THERETO*

### A. *Factual Background Regarding Nelson's Medical Claims*

Shortly after Nelson was transferred to Green Haven on October 11, 2000 (Dkt. No. 48: Defs. 56.1 Stmt. ¶ 11; Dkt. No. 40: Am. Compl. ¶ 8), he submitted a letter dated October 16, 2000 to Green Haven's "Health Services Director," stating:

> May I please be seen by an Medical Doctor. I am requesting a full check up for an blood test for hormone poison, level of mercury poison, problems with my back as i am in need of defecating my back start's stiffen with pressur.

And my left knee have a tore tigament. As i walk up the stair's my knee give out.

May I please be seen and treated by an Independent Medical Doctor.

(Dkt. No. 47: Gould Aff. Ex. 1; [13] *see* Am. Compl. at 3; Defs. 56.1 Stmt. ¶ 11.) Two days later, on October 18, 2000, Nelson was interviewed by defendant Byron Rodas, a Green Haven physician's assistant. (Am. Compl. at 3; Dkt. No. 52: Nelson 4/30/02 Aff. ¶ 5; Defs. 56.1 Stmt. ¶¶ 7, 9, 12.) Nelson alleges that while he "was explaining his medical condition, ... Rodas became very defensive saying 'I'm the doctor here and I determine what examination and treatment you require, and from what i see here there is nothing wrong with you.'The interview was terminated and plaintiff was not physically examine [d]." (Am. Compl. at 3; *see* Nelson 4/30/02 Aff. ¶ 5.)

Nelson wrote a second letter, dated October 23, 2000, to defendant Dr. Carl Koenigsmann, Green Haven's Medical Director, complaining about Rodas' conduct, claiming that he was suffering from "hormone poison, mercury poison," muscle spasms in his back, and torn ligaments in his knee, and requesting a full examination by an "Independent Outside Medical Doctor" as well as a blood test and a "CAT scan." (Gould Aff. Ex. 2; Am. Compl. at 4.) [14] Dr. Koenigsmann responded to Nelson's October 16 and 23, 2000 letters by memorandum dated November 1, 2000, stating: "This will acknowledge receipt of your letter regarding treatment issues and/or issues with your Primary Care Provider ["PCP"]. A copy of your letter has been forwarded to your Primary Care Provider for response. The PCP's response and your medical folder will be reviewed."(Gould Aff. Ex. 3; *see* Am. Compl. at 4; Defs. 56.1 Stmt. ¶ 13.)

**\*7** Nelson alleges that on October 24, 2000, he was examined by defendant Edward Licerio, a Green Haven dentist, who allegedly advised Nelson that at a "follow-up appointment," Nelson's "worn-out amalgams fillings" that were causing Nelson's "headache and memory-loss" would be removed. (Am. Compl. at 4; Nelson 4/30/02 Aff. ¶ 6; *see* Defs. 56.1 Stmt. ¶¶ 7, 9.) Nelson allegedly explained to Licerio that as Nelson was eating, the "silver spoon ...came in contact with the worn-out fillings, causing plaintiff to receive an electric-charge."(Am. Compl. at 4.) Nelson claims that at a November 14, 2000 follow-up appointment, Licerio refused to remove the fillings, "giving plaintiff no logical reason" for the refusal. (Am. Compl. at 4–5; Nelson 4/30/02 Aff. ¶ 6.) Licerio also requested Nelson to "sign some medical

document(s)," which Nelson refused because he allegedly did not understand the handwriting. (Am. Compl. at 5.)

Nelson's Dental Treatment Records, signed by Licerio, state in relevant part:

Oct 26 2000 Place on [illegible] & filling list

Nov 14 2000 Doesn't want any dental filling done on him, he wants me to take out all his silver fillings in his mouth his request has been denied, he refused to sign the refusal slip.

(Nelson 2/22/02 Aff. Ex. 8.)

Nelson claims that "Licerio was deliberately indifferent to plaintiff serious medical needs by his reckless and complete denial to treat plaintiff for the worn-out filling within his teeth."(Am. Compl. at 6.)

Nelson references a November 19, 1998 report by Dr. Elizabeth Gaary:

Bilateral mammography was performed in the craniocaudad and mediolateral oblique projections. There are no prior studies available for comparison.

There are no clustered irregular microcalcifications. There is no evidence of skin thickening or nipple retraction. There are no lymph nodes visualized. Bilateral right greater than left gynecomastia is noted. [15]

Clinical correlation recommended. If there is a palpable abnormality, ultrasound may be of help for further evaluation.

IMPRESSION: Bilateral gynecomastia right greater than left. If there is a palpable abnormality, ultrasound may be of help for further evaluation.

(Nelson 2/22/02 Aff. Ex. 6; *see* Am. Compl. at 6; Nelson 4/30/02 Aff. ¶ 8.) Based on this report, Nelson claims that Rodas and Dr. Koenigsmann knew of and were deliberately indifferent to Nelson's serious medical needs, presumably regarding the gynecomastia, in denying Nelson access to a doctor for diagnosis and treatment. (Am. Compl. at 6; Nelson 4/30/02 Aff. ¶ 9.)

Based on the above allegations, Nelson charges Rodas, Dr. Koenigsmann, and Licerio with "conspiracy." (Am. Compl. at 10–11; Nelson 4/30/02 Aff. ¶¶ 12–14.)

Nelson filed an "Inmate Grievance Complaint" dated November 21, 2000, in which he requested to be examined by an independent outside medical doctor, a "TOMOGRAPHY, and CAT–SCAN for detail viewing of my back and knee, a blood test to identifie certain poison, and to be treated by an out-side dentist who is knowledgeable in removing worn-out toxic amalgams fillings."(Gould Aff. Ex. 4; *see* Am. Compl. at iv; Defs. 56.1 Stmt. ¶ 14.)

 **\*8** On December 6, 2000, Dr. Koenigsmann responded by memo to an inquiry from the facility grievance coordinator:

> I have reviewed the medical record as it relates to this grievance. I have also referred it to the Dental Department for evaluation. The investigation reveals that the patient has had evaluations for his back and knee pains in the past including x rays. The decision to proceed with additional studies or specialty referrals is best determined by the Primary Provider. At his time, based on prior examination and results of prior work up, the Primary Provider does not feel these needs exist. Regarding the follow up of the laboratory work performed, the results are available on the medical record and have been reviewed by the Primary Provider. I will request a follow up appointment with the Provider to review the laboratory results.
>
> Pertaining to [Nelson's] claim that a Dental provider had recommended the removal of the patient's amalgam fillings, this is incorrect. The Dental provider responded that [Nelson] requested the removal of the amalgam fillings. Currently there are no generally accepted Dental recommendations for the removal of amalgam fillings nor restrictions on the use of amalgam fillings.

(Gould Aff. Ex. 5; *see* Defs. 56.1 Stmt. ¶ 15.)

The Inmate Grievance Resolution Committee held a hearing on January 2, 2001, and denied Nelson's complaint. (Gould Aff. Ex. 6, first page; Defs. 56.1 Stmt. ¶¶ 16–17.) Nelson appealed to Superintendent Greiner (Gould Aff. Ex. 6, last page; Defs. 56.1 Stmt. ¶ 17), who denied the grievance in a statement dated January 10, 2001:

> Grievant would like a check up from an outside doctor, including such tests as a CAT scan and blood work. He also would like to have work done by an outside Dentist.
>
> The investigation indicates that X-rays have been completed for knee & back pain. Your primary provider feels that further studies are not indicated at this time.

> Your primary provider should set up an appointment with you to review results of the lab work. There was no indication that your amalgam fillings need to be removed and this is generally not recommended. There are also no restrictions on using said filling. The use of an outside dentist[ ] is not indicated.
>
> Grievance is denied.

(Gould Aff. Ex. 7; *see* Defs. 56.1 Stmt. ¶ 17.)

Nelson appealed Superintendent Greiner's decision to the Central Office Review Committee ("CORC"), noting the additional complaint that he had mistakenly been provided with "hemorrhoidal ointment" instead of appropriate medicine for his back pain. (Gould Aff. Ex. 7; Defs. 56.1 Stmt. ¶¶ 17–18.) The CORC issued a unanimous report dated February 21, 2001:

> Upon full hearing of the facts and circumstances in the instant case, and upon recommendation of the Division of Health Services, the action requested herein is hereby accepted only to the extent that CORC upholds the determination of the Superintendent for the reasons stated.

 **\*9** CORC notes that the grievant has been examined by the doctor and received appropriate medical treatment. CORC also notes that the doctor determined that there was no medical need for the additional tests requested by the grievant. Contrary to the grievant's assertions, CORC has not been presented with sufficient evidence to substantiate any malfeasance by the employee referenced in this instant complaint.

CORC asserts that, consistent with Health Services Policy Manual Item # 1.21—Health Care Referrals, the Facility Health Services Directors (FHSD) have the sole responsibility for providing treatment to the inmates under their care. The FHSDs have the responsibility of determining what outside health referrals are needed by the target population. Outside specialists may only make recommendations for treatment; however, the implementation of those recommendations is at the discretion of the FHSDs, based on their professional judgment.

(Gould Aff. Ex. 8; *see* Defs. 56.1 Stmt. ¶ 19.)

## B. *Summary Judgment Standards in Section 1983 Cases* [16]

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c); *see also, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment—here, defendants. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994); *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir.1994). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552–53.

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts."*Matsushita Elec. Indus. Co. v. Zenith Radio Corp. .,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial."Fed.R.Civ.P. 56(e); *accord, e.g ., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. at 1356.

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."*Anderson v. Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513;*see also, e.g., Chambers v. TRM,* 43 F.3d at 36; *Gallo v. Prudential,* 22 F.3d at 1223. The Court draws all inferences in favor of the nonmoving party—here, Nelson—only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g., Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.), *cert.*

*denied,*484 U.S. 977, 108 S.Ct. 489 (1987)."If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper."*Chambers v. TRM,* 43 F.3d at 37.

**\*10** In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. *See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987); *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,*480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. *See, e.g., Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment [,] [f]actual disputes that are irrelevant or unnecessary will not be counted."*Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510 (citations omitted); *see also, e.g., Knight v. United States Fire Ins. Co.,* 804 F.2d at 11–12.

"The Court recognizes that it must 'extend extra consideration' to pro se plaintiffs" such as Nelson and that "pro se parties are to be given special latitude on summary judgment motions."*Salahuddin v. Coughlin,* 999 F.Supp. at 535 (citations & internal quotations omitted); *see also, e.g., McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (a pro se party's pleadings should be read liberally and interpreted " 'to raise the strongest arguments that they suggest' "). Moreover, the pro se party must be given express notice of the consequences of failing to respond appropriately to a motion for summary judgment. *See, e.g., Trammel v. Coombe,* No. 97–2622, 201 F.3d 432 (table), 1999 WL 1295856 at \*2 (2d Cir. Dec.23, 1999); *McPherson v. Coombe,* 174 F.3d 276, 280–81 (2d Cir.1999) (" '[t]he failure of a district court to apprise *pro se* litigants of the consequences of failing to respond to a motion for summary judgment is ordinarily grounds for reversal.' ") (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999); *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Defendants' notice of motion duly advised Nelson of the nature of a summary judgment motion and the consequences of failing to appropriately respond. (*See*Dkt. No. 45: Notice of Motion for Summary Judgment; Dkt. No.

49: 3/25/02 Notice to Pro Se Litigant Opposing Motion for Summ. Judgment Per Local Civil Rule 56.2.)

"Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment."*Cole v. Artuz,* 93 Civ. 5981, 1999 WL 983876 at *3 (S.D.N.Y. Oct.28, 1999) (citing cases); *see also, e.g., Smith v. Planas,* 975 F.Supp. 303, 305 n. 2 (S.D.N.Y.1997).

Because Nelson has verified his Amended Complaint (Dkt. No. 40: Am. Compl.; Dkt. No. 41: Nelson 2/22/02 Aff. In Supp. of Am. Compl. ¶ 2), this Court will accept for purposes of this motion all admissible facts set forth in the Amended Complaint that are based on Nelson's personal knowledge and about which Nelson is competent to testify. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes ... provided that it meets the other requirements for an affidavit under Rule 56(e)... requiring affidavits to be made on personal knowledge, to set forth facts that would be admissible in evidence, and to demonstrate the affiant's competency to testify to the matters in the affidavit ..."); *accord, e.g., Davidson v. Bennis,* No. 96–2999, 152 F.3d 917 (table), 1998 WL 391112 at *1 (2nd Cir. May 20, 1998) (pro se prisoner's verified complaint was "treat[ed] as an affidavit for summary judgment purposes"); *Johnson v. Doe,* 00 Civ. 3920, 2001 WL 314618 at *1 (S.D.N.Y. Mar.30, 2001) ("Although a verified complaint may serve as an affidavit for summary judgment purposes, [citing *Colon* ], mere verification does not transform rhetoric, conclusions, and other non-admissible statements into admissible evidence.").

## C. Applicable Law Regarding Claims of Deliberate Indifference to Serious Medical *Needs* [17]

**\*11** To prevail in a § 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law. *See* 42 U .S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254–55, 101 L.Ed.2d 40 (1988). "Section 1983 itself," however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere."*Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citation omitted), *cert. denied,*512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994).

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials and conduct that offends "evolving standards of decency." *E.g., Hudson v. McMillan,* 503 U.S. 1, 5, 8, 112 S.Ct. 995, 998, 1000, 117 L.Ed.2d 156 (1992); *Wilson v. Seiter,* 501 U.S. 294, 297, 308, 111 S.Ct. 2321, 2323, 2329, 115 L.Ed.2d 271 (1991); *Estelle v. Gamble,* 429 U.S. 97, 102, 104–05, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976).

To establish an Eighth Amendment violation based on a claim that a prison official has placed an inmate's health in danger, the inmate must show that the prison official acted with "deliberate indifference" to the inmate's serious medical needs. *See, e.g., Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993); *Estelle v. Gamble,* 429 U.S. at 104–05, 97 S.Ct. at 291. The deliberate indifference test applies to dental as well as medical claims. *Chance v. Armstrong,* 143 F.3d 698, 702–03 (2d Cir.1998) (citing cases).

As the Second Circuit has explained, "the deliberate indifference standard embodies both an objective and a subjective prong."*Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1994), *cert. denied,*513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995)."Objectively, the alleged deprivation must be 'sufficiently serious .' " *Id.; see also, e.g., Hudson v. McMillian,* 503 U.S. at 9, 112 S.Ct. at 1000 ("Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious' "). " 'The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves ....' " *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (citation omitted); *see also, e.g., Dean v. Coughlin,* 804 F.2d at 215 (" '[T]he essential test is one of medical necessity and not one simply of desirability." ' ). Thus, Eighth Amendment protection is limited to " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d at 702; [18] *accord, e.g., Morales v. Mackalm,* 278 F.3d 126, 132 (2d Cir.2002); *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) ("A serious medical condition exists where 'the failure to treat a

prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." ').

 **\*12** "Subjectively, the charged official must act with a sufficiently culpable state of mind."*Hathaway v. Coughlin,* 99 F.3d at 553. "The required state of mind, equivalent to criminal recklessness, is that the official " 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." " ' *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (quoting *Hathaway v. Coughlin,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994))); *see also, e.g., LaBounty v. Coughlin,* 137 F.3d 68, 72–73 (2d Cir.1998) ("To succeed in showing deliberate indifference, [plaintiff] must show that the acts of defendants involved more than lack of due care, but rather involved obduracy and wantonness in placing his health in danger.").

Deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care."*Estelle v. Gamble,* 429 U.S. at 104–05, 97 S.Ct. at 291 (fn.omitted); *accord, e.g., Kaminsky v. Rosenblum,* 929 F.2d 922, 926 (2d Cir.1991) ("Cruel and unusual punishment may consist of prison officials delaying an inmate access to needed medical care."). [19] However, an "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle v. Gamble,* 429 U.S. at 105–06, 97 S.Ct. at 292;*accord, e.g., Burton v. New York State Dep't of Corrections,* 93 Civ. 6028, 1994 WL 97164 at \*2 (S.D.N.Y. March 2, 1994) (Sotomayor, D.J.)."Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment."*Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. at 292. [20] As the Supreme Court has stated, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner."*Estelle v. Gamble,* 429 U.S. at 106, 97 S.Ct. at 292;*accord, e.g., Hathaway v. Coughlin,* 99 F.3d at 553; *Burton v. New York State Dep't of Corrections,* 1994 WL 97164 at \*2. An act of malpractice will amount to deliberate indifference only if "the malpractice involves culpable recklessness, *i.e.,* an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm." ' *Chance v. Armstrong,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d at 553); *Harrison v. Barkley,* 219 F.3d at 139 ("We agree that the mere malpractice of medicine in prison does not

amount to an Eighth Amendment violation.... This principle may cover a delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless, or that treatment is unreliable, or that the cure is as risky or painful or bad as the malady.... [But] [c]onsciously disregarding an inmate's legitimate medical needs is not 'mere medical malpractice." '); *Hathaway v. Coughlin,* 37 F.3d at 66 ("Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.").

 **\*13** "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."*Chance v. Armstrong,* 143 F.3d at 703;*accord, e.g ., Hathaway v. Coughlin,* 37 F.3d at 70 (Jacobs, C.J., dissenting) (" 'We do not sit as a medical board of review. Where the dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, we will not second guess the doctors." '); *Culp v. Koenigsmann,* 2000 WL 995495 at \*7 ("Mere disagreements with the quality of medical care, however, do not state an Eighth Amendment claim."); *see also, e.g., Troy v. Kuhlmann,* 96 Civ. 7190, 1999 WL 825622 at \*6 (S.D.N.Y. Oct.15, 1999) ("a prisoner's disagreement with the diagnostic techniques or forms of treatment employed by medical personnel does not itself give rise to an Eighth Amendment claim"); *Brown v. Selwin,* 98 Civ. 3008, 1999 WL 756404 at \*6 (S.D.N.Y. Sept.24, 1999) (citing cases); *Negron v. Macomber,* 95 Civ. 4151, 1999 WL 608777 at \*6 (S.D.N.Y. Aug.11, 1999); *Espinal v. Coughlin,* 98 Civ. 2579, 1999 WL 387435 at \*3 (S.D.N.Y. June 14, 1999). [21]

### D. *Nelson's Medical Indifference Claims Should Be Dismissed*

 **[4]** Nelson asserts that defendants demonstrated deliberate indifference to the following three "serious medical conditions":

(i) ... an abnormal growth of tissue-cells within plaintiff chest that serve no physiological function.

(ii) The worn-out amalgams fillings thats causing plaintiff perpetual headache especially when awaking in the morning, and chewing certain food, and

(iii) plaintiff defective back—as plaintiff in need of having to defecate his back muscle stiffen with pressure.

(Dkt. No. 40: Am. Compl. at 5; *see* Dkt. No. 52: Nelson 4/30/02 Aff. ¶ 11.)

Nelson offers no evidence to support his claims other than the conclusory allegations in his verified complaint. (Am. Compl. at 3–14; *see also* Nelson 4/30/02 Aff. ¶¶ 4–14.) Unfortunately, defendants fail to fill the gap: through attorney neglect they did not depose Nelson (*see* fn.5 above) and have submitted no admissible evidence on this motion other than copies of Nelson's complaint letters, the State's written responses, and the records pertaining to Nelson's grievance procedure, largely consisting of rank hearsay. (Dkt. No. 47: Gould Aff. Exs. 1–8; *see also* Dkt. No. 46: Defs. Br. at 6–14.) Indeed, defense counsel has not bothered to submit copies of Nelson's medical records.[22] The Assistant Attorney General's performance in this case did little to help the Court, or his clients. The Court thus is left guessing as to Nelson's course of medical treatment or lack thereof.[23]

Nevertheless, Nelson has the burden on this motion. While a plaintiff alleging medical indifference in a Section 1983 action is not required to produce "expert medical testimony," *Hathaway v. Coughlin,* 37 F.3d 63, 68 (2d Cir.1994), Nelson "may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that '[his] version of the events is not wholly fanciful.' " *Morris v. Lindau,* 196 F.3d 102, 109 (2d Cir.1999) (§ 1983 action) (quoting *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.), *cert. denied,* 524 U.S. 911, 118 S.Ct. 2075, 141 L.Ed.2d 151 (1998)). And although Nelson, as a pro se litigant, is granted a certain degree of leeway, the superficial allegations of his amended complaint fail to satisfy the stringent requirements of an Eighth Amendment claim, for the following reasons.

**\*14** Nelson's first grievance relates to "an abnormal growth of tissue-cells within plaintiff chest that serve no physiological function." (Am. Compl. at 5; *see* Nelson 4/30/02 Aff. ¶ 11.) This apparently refers to a November 19, 1998 report by Dr. Elizabeth Gaary which noted that Nelson's "bilateral right ...gynecomastia" was "greater" than his left gynecomastia. (*See* pages 16–17 above.) Nelson, however, entirely fails to allege how this gynecomastia is " 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Morales v. Mackalm,* 278 F.3d 126, 132

(2d Cir.2002); *see also* cases cited at pages 25–26 above. His allegations thus fail to satisfy the pleading standard for a medical indifference claim, much less the standard for opposing a summary judgment motion.

Second, Nelson complains of indifference to his "defective back—as plaintiff in need of having to defecate his back muscle stiffen with pressure." (Am. Compl. at 5; *see* Nelson 4/30/02 Aff. ¶ 11.) Nelson elsewhere referred to this problem as "muscle spasm[s]" in his back. (Nelson 2/22/02 Aff. Ex. 4: 10/23/00 Nelson Letter to Koenigsmann.) This claim should be rejected, both because there is no evidence that Nelson's alleged back problems were sufficiently serious to qualify as an Eighth Amendment violation, and because Nelson's claim concerns not the absence of help, but the choice of a certain course of treatment.

Severe back pain, especially if lasting an extended period of time, can amount to a "serious medical need" under the Eighth Amendment.[24] Here, however, Nelson merely alleges "back spasms," without describing the intensity or duration of the pain. That is insufficient to survive a summary judgment motion, even under the most liberal standard. *See, e.g., Tobias v. County of Putnam,* 191 F.Supp.2d 364, 379 (S.D.N.Y.2002) ("we do not believe that [plaintiff's] injuries caused him such extreme pain as to meet his burden. He does not allege in his complaint that he suffered extreme pain, but rather just vague 'physical injury.' "); *Benitez v. Pecenco,* 92 Civ. 7670, 1995 WL 444352 at *3 (S.D.N.Y. July 27, 1995) (§ 1983 medical indifference claim dismissed because "there is nothing in the record to suggest that plaintiff's back pain was severe or excruciating"); *Sassower v. City of White Plains,* 89 Civ. 1267, 1995 WL 222206 at *8 (S.D.N.Y. Apr.13, 1995) (granting defendants summary judgment because, *inter alia,* "Plaintiff does not even attest that she experienced a life threatening condition, nor that she suffered from extreme pain or the threat of death or degeneration. In fact, according to Plaintiff's affidavits, she suffered simply from 'stress and strain.' ").[25] While Nelson's pleading might survive a motion to dismiss, more is required to survive summary judgment, even from a pro se plaintiff.

In addition, Nelson's complaint seems to be, not that the prison authorities failed to treat his back pain, but that they refused Nelson's request for a CAT scan and for a consultation with an outside physician. (*See* pages 15, 17–18, 29–31 above.) Nelson's complaints thus amount to no more than a disagreement about the proper course of treatment that cannot form the basis of an Eighth Amendment claim:

*15 [T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court ....

*Estelle v. Gamble,* 429 U.S. 97, 107, 97 S.Ct. 285, 293, 50 L.Ed.2d 251 (1976); *accord, e.g., Randle v. Mesrobian,* No. 98–1590, 165 F.3d 32 (table), 1998 WL 551941 at *3 (7th Cir. Aug.27, 1998) ("inmates have no automatic right to consult with outside physicians") (citing cases); *Austin v. Rhode Island Dep't of Corr.,* No. 00–104, 2001 WL 1136101 at *5 (D.R.I. Aug.24, 2001) (refusal of prisoner's request to be examined by outside physician did not state a § 1983 claim); *Fulmore v. Mamis,* 2001 WL 417119 at *8–9 & n. 26 (Physician's failure to order CAT scan or orthopedic shoes, and refusal to refill prisoner's inhaler medication on certain occasions reflected, "at most, ... a difference in opinion as to [prisoner's] medical treatment rather than any deliberate indifference to [prisoner's] medical needs," citing cases); *Wicks v. Qualtere,* 95–CV–426, 1997 WL 176338 at *3 (N.D.N.Y. Apr.4, 1997) (Pooler, D.J.) (refusal to order X-ray did not state a claim). [26]

Finally, Nelson claims an Eighth Amendment violation based on indifference to his "worn-out amalgams fillings thats causing plaintiff perpetual headache especially when awaking in the morning, and chewing certain food(s)." (Am. Compl. at 5; *see* Nelson 4/30/02 Aff. ¶ 11.) In contrast to his other medical indifference claims, Nelson's dental indifference claim at least minimally alleges the nature and severity of his pain, which allegations might be sufficient to state a claim. *Cf. Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (Denying summary judgment: "District courts in this Circuit have ruled that a one-year delay in treating a cavity can evidence deliberate indifference on the part of prison officials.... It follows that (1) outright refusal of any treatment for a degenerative condition that tends to cause acute infection *and* pain if left untreated and (2) imposition of a seriously unreasonable condition on such treatment, both constitute deliberate indifference on the part of prison officials."); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (Denying motion to dismiss where prisoner "alleged that he has been in 'great pain'

for at least six months, that he has been unable to chew properly, ... that he has choked on his food," and that he has lost "one and possibly three of his teeth,""all because of [the prison doctors'] actions."); *Ramos v. O'Connell,* 28 F.Supp.2d 796, 802 (W.D.N.Y.1998) (summary judgment denied where prisoner alleged that his tooth pain was so "unbearable" that "he was unable to chew food properly, and that the denial of dental treatment caused the infected tooth to abscess"); *Dennis v. Milicevic,* 97 Civ. 7147, 1998 WL 474200 at *3 (S.D.N.Y. Aug.13, 1998) (severe chronic headache following operation raised issue of material fact "of whether a sufficiently serious [medical] condition existed"). But here, again, Nelson's complaint appears to be not that his dental problems were not treated, but that they were not treated to his liking—namely, by taking out all of the silver (amalgam) fillings in his mouth that were allegedly causing his headaches and memory loss. (Am. Compl. at 4–5; Nelson 4/30/02 Aff. ¶ 6; Nelson 2/22/02 Aff. Ex. 8: Dental Treatment Record.) [27] Such a disagreement over the proper course of treatment cannot support an Eighth Amendment Claim, especially where plaintiff offers no evidence as to the efficacy of the requested alternative treatment.

*16 Indeed, Nelson's refusal to accept dental treatment (*see* Nelson 2/22/02 Aff. Ex. 8: Dental Treatment Record) effectively rebuts his claim of deliberate indifference to serious medical needs. *See, e.g., Brown v. Selwin,* 98 Civ. 3008, 1999 WL 756404 at *6–7 (S.D.N.Y. Sept.24, 1999) (finding no deliberate indifference when it was "uncontroverted that [plaintiff] refused medical treatment on several occasions"); *Ross v. Kelly,* 784 F.Supp. 35, 46–47 (W.D.N.Y.) (evidence failed to establish deliberate indifference to medical needs where plaintiff was largely to blame for many of the delays in his treatment due to his second-guessing of physician's advice and refusal of treatment), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828, 121 L.Ed.2d 698 (1992).

### E. Nelson's Conspiracy Claims Under §§ 1983 and 1985 Should Be Dismissed

[5] Nelson alleges that defendants Rodas, Koenigsmann, and Licerio conspired to deny him adequate medical care in violation of 42 U.S.C. §§ 1983 and 1985. (Dkt. No. 40: Am. Compl. at 3–14; Dkt. No. 52: Nelson 4/30/02 Aff. ¶¶ 4–14.) "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done

in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999). [28] "To state a cause of action under § 1985(3), a plaintiff must allege (1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." *Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999). Further, the § 1985 conspiracy must also be motivated by " 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." ' *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.,* 7 F.3d 1085, 1088 (2d Cir.1993).

Nelson's conspiracy allegations are entirely conclusory, and should therefore be dismissed. *See, e.g., Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir.1993) (affirming summary judgment dismissing conspiracy claim based only on conclusory allegations); *Rivera v. Goord,* 119 F.Supp.2d 327, 345 (S.D.N.Y.2000) (Plaintiff "alleges no specific facts that would indicate the existence of any kind of conspiracy against him. The mere use of the word 'conspiracy,' without more, does not state a claim under § 1985."). Further, Nelson's § 1985 conspiracy claim should be dismissed for the additional reason that he failed to allege that defendants conspired against him because of any racial or class-based, invidious discriminatory animus. *See, e.g., Brown v. City of Oneonta,* 221 F.3d 329, 341 (2d Cir.2000); *Moore v. Gardner,* 199 F.Supp.2d 17, 24 (W.D.N.Y.2002).

**CONCLUSION**

**\*17** For the reasons set forth above, defendants should be granted summary judgment dismissing Nelson's medical claims, and Nelson's remaining claims should be dismissed without prejudice for failure to exhaust administrative remedies.

**FILING OF OBJECTIONS TO THIS
REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Richard C. Casey, 500 Pearl Street, Room 1950, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Casey. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Footnotes

1    On November 19, 2001, Nelson was transferred to Clinton Correctional Facility. (Am. Compl. at 1–2.)

2    Defendants include: physician's assistant Byron Rodas, Medical Director Carl Koenigsmann, dentist Edward Licerio, corrections counselors Joseph Joseph and Jim Temple, Superintendent Charles Greiner, Deputy Superintendents Jeff McKoy and Gayle Haponik, Corrections Officers Tracy Kohler, Barry Barizone, Jim Lawyer, James Weckesser, "Kordougber," Alvin Thomas and Charles Butenhoff, Sergeant John Ross, Lieutenant Michael Nagy, education supervisor Frank Meeuwisse, and an unknown "John Doe." (Am. Compl. at iii.)

     Nelson's original complaint also named Commissioner Goord and Attorney General Spitzer as defendants. (Compl.) On Nelson's consent at the February 6, 2002 conference, his claims against those defendants were dismissed with prejudice. (Dkt. No. 33: 2/8/02 Order .)

3    While Nelson's amended complaint does not expressly reference the Due Process Clause, his allegations, construed liberally, appear to claim a denial of due process in various disciplinary proceedings. (Am. Compl. at 15–21.) *See, e.g., LaBounty v. Kinkhabwala,*

No. 99–0329, 2 Fed. Appx. 197, 200–01, 2001 WL 99819 at *2–3 (2d Cir.2001) (reversing dismissal of procedural due process claim arising out of prisoner's disciplinary hearing).

4  Nelson's submissions are not a model of clarity, often rendering his claims difficult to understand. In one particularly bizarre passage, Nelson appears to confuse this Court with NASA Mission Control:

Therefore the Magistrate Judge residing is a scientist in the Laws of Land of the United States in the Southern Jurisdiction, District Court of New York State whom adheres and give fair elevation to the United States Constitution and the laws subsequently thereof. As in the near future the constitution and the Laws of the Land of the United States will be firmly establish in the United States Space Society. As the United States NASA—"NATIONAL AERONAUTICS AND SPACE ADMINISTRATION" path the way by advancing the technology for adequate comfortable living condition in such atmosphere.

(Dkt. No. 41: Nelson 2/22/02 Aff. ¶ 5.)

5  The Court's ability to decide the summary judgment motion was seriously hampered by the failure of the Assistant Attorney General on this case to take plaintiff Nelson's deposition. The Assistant Attorney General tried to "pull a fast one" by submitting a proposed order for the taking of Nelson's deposition (an order is needed to depose an incarcerated party) *after* the discovery cut-off date, which the Court accordingly denied. (*See* Dkt. No. 39: 3/11/02 Memo Endorsed Order; *see also* Dkt. No. 43: 3/20/02 Memo Endorsed Order, again denying request to depose Nelson, noting that "[t]he Court is not amused by defense counsel's conduct.")

6  Prior to the Supreme Court's decision in *Porter v. Nussle,* the Second Circuit had ruled that claims like Nelson's which applied only to the plaintiff, such as "particular instances of assault or excessive force," did not relate to general "prison conditions" and thus were not subject to the PLRA's exhaustion requirement. *Nussle v. Willette,* 224 F.3d 95, 106 (2d Cir.2000), *rev'd, Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In *Porter v. Nussle,* the Supreme Court reversed, declaring that claims of every sort relating to prison life—including claims for excessive force against an individual inmate—had to be exhausted before an action could be commenced in this Court pursuant to 42 U.S.C. § 1983. *Porter v. Nussle,* 122 S.Ct. at 988; *see also Lawrence v. Goord,* 238 F.3d 182, 185 (2d Cir.2001) (retaliation claims need not be exhausted), *vacated,* 535 U.S. 901, 122 S.Ct. 1200, 152 L.Ed.2d 139 (2002).

7  Defendants originally asserted that only Nelson's excessive force claim was unexhausted, (Dkt. No. 46: Defs. Br. at 34–38; Dkt. No. 54: Defs. Reply Br. at 6–10), effectively ignoring Nelson's apparent failure to exhaust the remaining Non–Medical Claims. Rather than *sua sponte* dismissing such claims for lack of exhaustion, the Court gave Nelson an "opportunity to be heard" on the exhaustion issue (Dkt. No. 57: 8/5/02 Order), as required by *Neal v. Goord,* 267 F.3d 116, 123–24 (2d Cir.2001). Nelson, however, did not respond.

8  The IGP also provides for other "emergency situations" as follows:

(a) Definition. An emergency shall include, but is not limited to, a situation, action, or condition in which an inmate or an employee's health, safety, or welfare is in serious threat or danger. The IGP supervisor will determine if a grievance falls within this category.

(b) The IGP supervisor shall refer any grievance of an emergency nature directly to the appropriate response level with the authority to ensure an immediate or expeditious, meaningful response.

7 NYCRR § 701.9. The "IGP supervisor" is a prison employee at Green Haven, *see* 7 NYCRR §§ 701.4(a)(2), 701.4(b)(2)(i), 701.4(d), and is not Commissioner Goord. Nelson thus has no basis to argue that the IGP's exhaustion procedure can be circumvented by the "emergency situation" procedure contained in 7 NYCRR § 701.9, which simply requires the IGP supervisor to direct a grievance to an "appropriate response level" in the event of an emergency.

9  Contrary to the *dicta* in *Perez v. Blot,* 195 F.Supp.2d 539, 544–46 (S.D.N.Y.2002), this Court construes *Marvin v. Goord,* 255 F.3d 40, 43 n. 3 (2d Cir.2001), as holding merely that a grievance through informal channels satisfies the exhaustion requirement *if* the prisoner thereby obtained a favorable resolution of his grievance.

10  In a March 25, 2002, letter to the Court, Assistant Attorney General Anthony Gould represented that:

In light of the Court's concern [expressed at the March 11, 2002 conference] that a dismissal of this action on exhaustion grounds might leave plaintiff without a remedy for his excessive force claim, Deputy DOCS Commissioner Anthony Annucci has indicated that, given the particular facts and circumstances of this case, plaintiff herein will be permitted to file a late grievance as to the alleged excessive force incident in March 2001, and that the grievance will be addressed on its merits without reference to the late date of its filing.

(Dkt. No. 58.) By letter dated September 16, 2002, the State declined to extend that position to all the unexhausted claims. (Dkt. No. 63: 9/16/02 Letter to Court from Assistant Attorney General Rebecca Ann Durden.) The Court strongly suggests to Nelson that he file all grievances within fourteen days of this Report & Recommendation. *See* 7 N.Y.C.R.R. § 701.7(a)(1). The Court need not decide now what the effect would be on a future suit if DOCS denies Nelson's grievance as untimely. The Court reiterates its concern, however, that while DOCS' requirement that grievances be brought within fourteen days may serve valid institutional purposes, it may be too short a "statute of limitations" period to the extent exhaustion of grievance procedures is a PLRA prerequisite to a § 1983 lawsuit. The Court's concern is especially great for suits, such as Nelson's, brought during the period before the Supreme Court clarified the exhaustion requirement. The Court further notes that 7 N.Y.C.R.R. § 701.7(a) provides

for "exceptions" to the fourteen day limit "based on mitigating circumstances" and gives as an example of such a circumstance "referrals back to the IGP by the courts."DOCS would be well-advised to carefully decide whether to grant an "exception" in this case.

11　　See also, e.g., *Lira v. Director of Corr. of State of Calif.,* No. C 00–905, 2002 WL 1034043 at *3 (N.D.Cal. May 17, 2002); *Thorp v. Kepoo,* 100 F.Supp.2d 1258, 1263 (D.Haw.2000); *Keenan v. Twommey,* No. 1:97–cv–549, 1999 U.S. Dist. LEXIS 11829 at *2–17 (W.D.Mich. July 29, 1999), *aff'd,*229 F.3d 1152 (6th Cir.2000); *Abenth v. Palmer,* No. C 96–3938, 1997 WL 255332 at *1 (N.D.Cal. Apr.28, 1997).

12　　The alleged acts about which Nelson complains in his Non–Medical Claims took place from October 2000 through May 2001 (Dkt. No. 40: Am. Compl. at 15–21), and Nelson thus may have relied on the Second Circuit's August 24, 2000 decision in *Nussle v. Willette,* 224 F.3d 95, 106 (2d Cir.2000), *rev'd, Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), in which the Second Circuit held that the PLRA's exhaustion requirements did not apply to excessive force claims. Inmates who relied on the Second Circuit's *Nussle* decision would have a good argument after dismissal of such a suit that DOCS′ time limits for grievances should be extended for a reasonable time after the dismissal order. *See, e.g., Peoples v. Beldock,* No. 01–CV–6326, 2002 WL 1750742 at *2 (W.D.N.Y. July 10, 2002) (complaint dismissed without prejudice for failure to exhaust despite fact that Second Circuit's *Nussle* decision governed at the time complaint was filed; "Should plaintiff choose to file a new grievance, he can thus attempt to show that the intervening change in the law occasioned by [the Supreme Court's decision in] *Nussle* constitutes 'mitigating circumstances' that would justify an exception to the time limit imposed by the [DOCS grievance] regulations. 7 N.Y.C.R.R. § 701.7(a)(1)."); *Hemphill v. New York,* 198 F.Supp.2d 546, 550 (S.D.N.Y.2002) ("Since reliance on the Second Circuit's interpretation [in *Nussle* ] of the PLRA would be the only possible factor that might augur in favor of non-retroactive application of the Supreme Court's [*Porter v. Nussle* ] decision, there is no equitable basis to evade the firm rule of retroactivity" where Second Circuit decision in *Nussle* came long after plaintiff failed to file a grievance).

13　　Where both parties submitted the same document, the Court refers to only a single cite for the exhibit.

14　　Nelson also requested "tomography" (Gould Aff. Ex. 2)—an apparently redundant request for a "CAT scan" ("Computerized Axial Tomography ").*See Dorland's Illustrated Medical Dictionary,* 295, 1847–48 (29th ed.2000).

15　　"Gynecomastia" is "excessive growth of the male mammary glands, in some cases including development to the stage at which milk is produced, usually associated with metabolic derangements that lead to estrogen accumulation, testosterone deficiency, and hyperprolactinemia. A mild form may develop transiently during normal puberty."*Dorland's Illustrated Medical Dictionary* (29th ed.2000).

16　　For additional cases authored by this Judge discussing the summary judgment standards in Section 1983 cases, in language substantially similar to that in this entire section of this Report and Recommendation, *see, e.g., Walker v. Pataro,* 99 Civ. 4607, 2002 WL 664040 at *4–5 (S.D.N.Y. Apr.23, 2002) (Peck, M.J.); *Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070 at *5–7 (S.D.N.Y. May 7, 2001)(Peck, M.J.); *Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *5 (S.D.N.Y. Apr.23, 2001) (Peck, M.J.); *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *4 (S.D.N.Y. Sept.29, 2000) (Peck, M.J.); *Culp v. Koenigsmann,* 99 Civ. 9557, 2000 WL 995495 at *4 (S.D.N.Y. July 19, 2000) (Peck, M.J.); *Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *4 (S.D.N.Y. June 13, 2000) (Peck, M.J.); *Greenfield v. City of New York,* 99 Civ. 2330, 2000 WL 124992 at *3 (S.D.N.Y. Feb.3, 2000) (Peck, M.J.); *Salahuddin v.. Coughlin,* 999 F.Supp. 526, 534 (S.D.N.Y.1998) (Rakoff, D.J. & Peck, M.J.); *Watson v. McGinnis,* 981 F.Supp. 815, 817 (S.D.N.Y.1997) (Kaplan, D.J. & Peck, M.J.).

17　　For additional cases authored by this Judge discussing the governing standard in medical indifference claims, in language substantially similar to that in this entire section of this Report and Recommendation, *see Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070 at *7–10 (S.D.N.Y. May 7, 2001)(Peck, M.J.); *Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *7–8 (S.D.N.Y. Apr.23, 2001) (Peck, M.J.); *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *5–6 (S.D.N.Y. Sept.29, 2000) (Peck, M.J.); *Culp v. Koenigsmann,* 99 Civ. 9557, 2000 WL 995495 at *6–7 (S.D.N.Y. July 19, 2000) (Peck, M.J.); *Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *5–6 (S.D.N.Y. June 13, 2000) (Peck, M.J.).

18　　The Second Circuit in *Chance v. Armstrong* identified several factors that are relevant in determining whether a serious medical condition exists, including " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." ' 143 F.3d at 702. The Second Circuit in that case stated that a medical condition could be serious where the prisoner alleged that he "suffered extreme pain, his teeth deteriorated, and he has been unable to eat properly." *Id.* at 703.

19　　*See, e.g., Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994) (delay for more than two years in removing broken pins from prisoner's hip despite nearly fifty complaints of pain), *cert. denied,*513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Liscio v. Warren,* 901 F.2d 274, 277 (2d Cir.1990) (failure to provide medical attention to a delirious inmate for three days); *Archer v. Dutcher,* 733 F.2d 14, 15–17 (2d Cir.1984) (denying summary judgment where plaintiff "identifie[d] intentional efforts on the part of defendants to delay her access to medical care at a time [when] she was in extreme pain"); *Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974).

20    *Accord, e.g., Hathaway v. Coughlin,* 99 F.3d at 553; *Felipe v. New York State Dep't of Correctional Servs.,* No. 95–CV–1735, 1998 WL 178803 at *3 (N.D.N.Y. Apr.10, 1998) (Pooler, D .J.).

21    Furthermore, a delay in medical treatment does not necessarily invoke the Eighth Amendment:

> Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, this Court has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a "life-threatening and fast-degenerating" condition for three days; or delayed major surgery for over two years. No such circumstances are present here. At no point was [plaintiff's] condition "fast-degenerating" or "life-threatening," and there is no indication that [defendant] delayed treatment in order to punish him. Moreover, any delay in treatment in this case does not rise to the egregious level identified in *Hathaway.* That [plaintiff] feels something more should have been done to treat his injuries is not a sufficient basis for a deliberate indifference claim.

> *Demata v. New York State Correctional Dep't of Health Servs.,* No. 99–0066, 198 F.3d 233 (table), 1999 WL 753142 at *2 (2d Cir. Sept.17, 1999) (citations omitted) (summary judgment for defendants where plaintiff complained of knee injury in February 1994 and surgery not performed until March 1997); *accord, e.g., Freeman v. Strack,* 2000 WL 1459782 at *9 (no Eighth Amendment claim against nurse who scheduled inmate with appendicitis requiring appendectomy for appointment two hours later rather than seeing inmate immediately where "[t]here was nothing in [the inmate's] medical history which would have put [the nurse] on notice that [plaintiff] was suffering from the onset of appendicitis ... and there is no evidence that [the officer] gave [the nurse] any reason to believe that there was an emergency on hand"); *Culp v. Koenigsmann,* 2000 WL 995495 at *7–8 (rejecting claim based on fact that one doctor recommended arthroscopic surgery for knee injury in April 1999, while another doctor concluded that surgery was not warranted until more conservative measures like physical therapy had been tried and failed).

22    Nelson submitted copies of his cryptic dental treatment records from Green Haven. (Dkt. No. 41: Nelson 2/22/02 Aff. Ex. 8.)

23    Although defendants submitted a statement pursuant to Rule 56.1 (Dkt. No. 48), it largely fails to cite supporting admissible evidence. *See* S.D.N.Y. Local Civil Rule 56.1(d) ("Each statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible ....").

24    *See, e.g., Hathaway v. Coughlin,* 37 F.3d at 67 (finding plaintiff with degenerative hip condition who experienced great pain over an extended period of time and had difficulty walking had "serious medical needs"); *Ramos v. Artuz,* 00 Civ. 0149, 2001 WL 840131 at *11 (S.D.N.Y. July 25, 2001) (claim of chronic back pain survived motion to dismiss); *Cole v. Artuz,* 97 Civ. 0977, 2000 WL 760749 at *5 (S.D.N.Y. June 12, 2000) (claim relating to chronic back injury survived motion to dismiss); *Bryant v. Artuz,* 96 Civ. 3274, 1998 WL 24360 at *2 (S.D.N.Y. Jan.23, 1998) (prisoner's allegation of severe back pain following disc surgery was held to be sufficiently serious medical condition to survive a motion for summary judgment); *Gill v. Gilder,* 95 Civ. 7933, 1996 WL 103837 at *5 (S.D.N.Y. Mar.8, 1996) (denying defendants' motion to dismiss where plaintiff had alleged that a back problem caused him "severe pain"); *cf., Solomon v. Moore,* 97 Civ. 0201, 2000 WL 385521 at *2–3 (S.D.N.Y. Apr.14, 2000) (back pain did not rise to level of violation: "These alleged problems [including back pain] taken together are clearly 'conditions which many people suffer from and function despite on a day-to-day basis and the fact that a sufferer is incarcerated does not elevate every perceived lack of treatment to the level of cruel and unusual punishment.' ").

25    *See also, e.g., Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *8 (S.D.N.Y. Apr.23, 2001) (Peck, M.J.) ("At no point was [plaintiff's] condition 'fast-degenerating' or 'life-threatening,' and there is no indication that [defendant] delayed treatment in order to punish him. Moreover, any delay in treatment in this case does not rise to the egregious level identified in *Hathaway [v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ]. That [plaintiff] feels something more should have been done to treat his injuries is not a sufficient basis for a deliberate indifference claim.").

26    *See, e.g., Kelley v. Lutz,* No. 95–16003 87 F.3d 1320 (table), 1996 WL 341299 at *1 (9th Cir. June 19, 1996) (prison doctor's denial of inmate's request for CAT scan did not constitute deliberate indifference where inmate had been seen by several specialists and x-rays did not reveal any abnormality); *Vento v. Lord,* 96 Civ. 6169, 1997 WL 431140 at *5 (S.D.N.Y. July 31, 1997) (Sotomayor, D.J.) ("plaintiff's [denied] x-ray request and claim that without new x-rays her physical therapy is ineffective fails to state a claim of deliberate indifference"); *Sharp v. Jeanty,* 93 Civ. 0220, 1993 WL 498095 at *2 (S.D.N.Y. Nov.30, 1993) (Leval, D.J .) (dismissing complaint where prisoner's knee was x-rayed but he was not given an orthroscan, because plaintiff's medical "records indicate[d] an extensive and ongoing course of medical treatment" of his injury, and many of his allegations amounted to "second-guessing the treatments of his health care providers", and explaining that " '[a] prisoner's disagreement with his prescribed treatment does not afford a basis for relief under § 1983.' " ); *see also, e.g., Burley v. O.D.O.C.,* No. CV–99–1462, 2000 WL 1060658 at *4–5 (D.Or. July 11, 2000) (granting defendants summary judgment on Eighth Amendment claim where "[p]laintiff disputes that the lumbar/ sacral spine x-ray shows that nothing is wrong with his head, neck, and back" and "believes that only an 'MRI' or 'Cat Scan' can confirm his injuries in those areas"); *Lewis v. Herbert,* No. Civ. A. 96–2933, 1996 WL 663874 at *4 (E.D.Pa. Nov.14, 1996) ("[E]ven if Defendant's decision not to ... order an X–Ray or Cat Scan ... amounted to medical malpractice, a tort is not transformed into a constitutional violation simply because the victim is a prisoner."); *Coppage v. Mann,* 906 F.Supp. 1025, 1038–39 (E.D.Va.1995)

(rejecting plaintiff's argument that prison doctor was deliberately indifferent when he ordered two diagnostic tests which were less effective than an MRI; "The case law draws a clear distinction between situations in which the physician provides no medical care, which may amount to deliberate indifference, and those in which the physician provides merely substandard care, which amounts at most to negligence."); *Trejo v. Gomez,* No. C–93–0360, 1995 WL 429247 at *3 (N.D.Cal. July 13, 1995) (rejecting claim that prison doctor's failure to order CAT scan or MRI for inmate complaining of neck, back and shoulder pain constituted deliberate indifference); *Johnson v. Department of Corr.,* 92 Civ. 7716, 1995 WL 121295 at *3 (S.D.N.Y. Mar.21, 1995) (summary judgment for defendants where inmate suffering from hip condition who was examined and treated on numerous occasions complained he should have received an MRI; "the Eighth Amendment does not mandate the use of any particular medical technology or course of treatment"); *Wilkerson v. Marshall,* No. C 94–0009, 1994 WL 564650 at *1–4 (N.D.Cal. Oct.3, 1994) (rejecting inmate's claim that prison doctor's failure to order an MRI constituted deliberate indifference); *Lopez v. Medical Dep't,* Civ. A. No. 90–5287, 1990 WL 174361 at *1 (E.D.Pa. Nov.6, 1990) (prison medical staff's refusal to "take x-rays, perform a CAT scan and administer other medical tests" did not give rise to Eighth Amendment claim).

Nelson's claim regarding his allegedly torn knee ligament suffers from the same deficiencies, and should therefore be dismissed as well. (Am. Compl. at 5; *see* Nelson 4/30/02 Aff. ¶ 11.) His isolated assertion that "As i walk up the stair's my knee give out" fails to make out a claim. *See, e.g., Espinal v. Coughlin,* 98 Civ. 2579, 2002 WL 10450 at *4 (S.D.N.Y. Jan.3, 2002) (plaintiff's claim relating to "an exacerbated injury to his knee" was "at most an allegation of negligence or disagreement with a course of treatment which does not rise to the deliberate indifference standard").

**27**   The November 14, 2000 entry in his Dental Treatment Record states: "Doesn't want any dental filling done on him, he wants me to take out all his silver fillings in his mouth his request has been denied, he refused to sign the refusal slip."(Nelson 2/22/02 Aff. Ex. 8; *see* page 16 above.)

**28**   *Accord, e.g., Espinal v. Goord,* 00 Civ. 2292, 2001 WL 476070 at *10 (S.D.N.Y. May 7, 2001) (Peck, M.J.); *Sundwall v. Leuba,* No. Civ. A. 300CV1309, 2001 WL 58834 at *8 (D.Conn. Jan.23, 2001), *aff'd,*28 Fed. Appx. 11 (2d Cir.2001); *Cipolla v. County of Rensselaer,* 129 F.Supp.2d 436, 449 (N.D.N.Y.), *aff'd,*20 Fed. Appx. 84 (2d Cir.2001); *Santiago v. City of New York,* 98 Civ. 6543, 2000 WL 1532950 at *8 (S.D.N.Y. Oct.17, 2000).

---

2009 WL 909593
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Ralph Buck PHILLIPS, Plaintiff,

v.

Glen GOORD, Richard Roy, Erik Kriss, M.
Kirkpatrick, R. Marinaccio, K. Lebel, T. Doyle,
R. Henderson, J. Mewell, Christopher Moss,
Richard Rich, Ann "Doe," Joseph Gerace, J.S.
Hover, L. Greathouse and C. Drown, Defendants.

No. 08-CV-0957A(F).  |  April 1, 2009.

**Attorneys and Law Firms**

Ralph Buck Phillips, Dannemora, NY, pro se.

### ORDER

MICHAEL A. TELESCA, District Judge.

### INTRODUCTION

 **\*1**  Plaintiff, Ralph Buck Phillips, an inmate of the Clinton
Correctional Facility, has filed this *pro se* action seeking
relief under 42 U.S.C. § 1983 (Docket No. 1) and has both
requested permission to proceed *in forma pauperis* and filed
a signed Authorization (Docket No. 3 and 6). Plaintiff also
seeks the appointment of counsel. (Docket No. 4). Plaintiff's
complaint alleges various violations of his constitutional
rights for conduct that occurred both prior to and after his
much-publicized escape from the Erie County Correctional
Facility ("ECCF"), protracted search during which three New
York State Police Officers were shot, one fatally,[1] capture
and detention prior to and after his multiple pleas of guilty to
various offenses related to the escape and shootings. Among
other things, plaintiff alleges that a social worker at the
"Buffalo Halfway House" retaliated against him by filing a
false report which led to the revocation of his parole and
escape from ECCF; that upon his capture and arrest the New
York State Police Investigator who questioned him lied to
him about charges being lodged against his daughter and her
mother to coerce him to plead guilty; that he was placed in
administrative segregation at the Chemung and Chautauqua
County Jails without due process; that his detention in

administrative segregation was cruel and unusual[2] because
he was provided with only a mat upon which to sleep,
no clothes, no recreation and non-contact visits only; that
upon his transfer to the Elmira Correctional Facility he was
assaulted by correctional officers; and that following the
assault the correctional officers involved in the assault filed
false misbehavior reports and testified falsely against him
which led to a finding of guilt at a Tier III Superintendent's
Hearing that was later overturned during an administrative
appeal.

For the reasons discussed below, plaintiff's request to proceed
as a poor person is granted, his motion for the appointment
of counsel is denied without prejudice,[3] several of his claims
are dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and
1915A, and unless plaintiff files an amended complaint
as directed above, some of the remaining claims will be
dismissed with prejudice pursuant to § 1915(e)(2)(B) and
1915A.[4]

### DISCUSSION

Because plaintiff has met the statutory requirements of 28
U.S.C. § 1915(a) and filed an Authorization with respect to
this action, plaintiff is granted permission to proceed *in forma
pauperis*.Section 1915(e)(2)(B) of 28 U.S.C. provides that
the Court shall dismiss a case in which *in forma pauperis*
status has been granted if the Court determines that the action
(i) is frivolous or malicious; (ii) fails to state a claim upon
which relief may be granted; or (iii) seeks monetary relief
against a defendant who is immune from such relief. In
addition, 28 U.S.C. § 1915A(a) requires the Court to conduct
an initial screening of "a complaint in a civil action in which a
prisoner seeks redress from a governmental entity or officer or
employee of a governmental entity,"*id.,* regardless of whether
or not the inmate has sought *in forma pauperis* status under 28
U.S.C. § 1915. Sections 1915 and 1915A"provide an efficient
means by which a court can screen for and dismiss legally
insufficient claims."*Abbas v. Dixon,* 480 F.3d 636, 639 (2d
Cir.2007) (citing *Shakur v. Selsky,* 391 F.3d 106, 112 (2d
Cir.2004)).

 **\*2**  In evaluating the complaint, the Court must accept as true
all of the factual allegations and must draw all inferences in
plaintiff's favor. See *Larkin v. Savage,* 318 F.3d 138, 139 (2d
Cir.2003) (per curiam); *King v. Simpson,* 189 F.3d 284, 287
(2d Cir.1999). Moreover, "a court is obliged to construe [*pro*

*se* ] pleadings liberally, particularly when they allege civil rights violations." *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004); *and see Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998). Nevertheless, even pleadings submitted *pro se* must meet the notice requirements of Rule 8 of the Federal Rules of Civil Procedure. *Wynder v. McMahon,* 360 F.3d 73 (2d Cir.2004). "Specific facts are not necessary," and the plaintiff "need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, ----, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007)) (internal quotation marks and citation omitted); *see also ATSI Comms., Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient to 'raise a right to relief above the speculative level.' " (quoting *Twombly,* 127 S.Ct. at 1965)); *Boykin v. Keycorp,* 521 F.3d 202, 213 (2d Cir.2008) (discussing pleading standard in *pro se* cases after *Twombly* ). Generally, the Court will afford a *pro se* plaintiff an opportunity to amend or to be heard prior to dismissal "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim." " *Abbas,* 480 F.3d at 639 (quoting *Gomez v. USAA Federal Savings Bank,* 171 F.3d 794, 796 (2d Cir.1999) (*per curiam* )).

Plaintiff brings this action pursuant to 42 U.S.C. § 1983. "To [state] a claim under 42 U.S.C. § 1983, a plaintiff must 'show that [an] official, acting under color of state law, caused the deprivation of a federal right.' " *Johnson v. Goord,* 445 F.3d 532 (2d Cir.2006) (quoting *Coon v. Town of Springfield, Vt.,* 404 F.3d 683, 686 (2d Cir.2005) (internal citations omitted)). In other words, "the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton,* 126 F.3d 400, 405 (2d. Cir.1997) (citing *Eagleston v. Guido,* 41 F.3d 865, 875-76 (2d Cir.1994))

Based on its evaluation of the complaint, the Court finds that several of plaintiff's claims (Docket No. 1, Complaint, First thru Third Claim, ¶¶ 4-15, 53-55, Seventh Claim, ¶ 59; Tenth Claim, ¶ 62; Sixteenth Claim, ¶ 68; and Eighteenth Claim, ¶ 70) must be dismissed with prejudice pursuant to 28 U.S.C. § § 1915(e)(2)(B)(ii) and 1915A(b) because they fail to state a claim upon which relief may be granted. In addition, the Court

finds that two of plaintiff's claims must be dismissed unless he files an amended complaint as directed below (Complaint, Eighth Claim, ¶ 60; and Seventeenth Claim, ¶ ¶ 47-51, 69), and that the remaining claims may proceed, at this stage in the litigation, pursuant to the standards for reviewing *pro se* complaints set forth above (Complaint, Fourth thru Sixth Claim, ¶¶ 20-23, 56-58; Ninth Claim, ¶ 61; and Eleventh thru Sixteenth Claims, ¶¶ 27-38, 46, 64-68).

## PLAINTIFF'S CLAIMS

### A. Retaliation: First and Second Claims

**\*3** The First and Second Claims set forth in the Complaint (Complaint, ¶ ¶ 4-15, 53-54), allege that in 2006, prior to his escape from ECCF, defendant Greathouse, a "social worker" at the Buffalo Halfway House, filed a false report with plaintiff's parole officer and testified falsely in a parole revocation hearing in retaliation for plaintiff rebuffing her sexual advances. Plaintiff claims that the report and subsequent parole revocation were the reasons he escaped from ECCF on April 2, 2006.

### 1. Acting Under of Color of State Law

Plaintiff alleges that Greathouse retaliated against him by filing a false report and provided false testimony because he had rebuffed her advances. The Court notes, initially, that the complaint makes no factual allegations that Greathouse, a social worker at the Buffalo Halfway House was acting under color of state law for purposes of 42 U.S.C. § 1983.

In order to recover in an action under § 1983, a plaintiff must show a deprivation of his constitutional or statutory rights by a person acting under color of state law. *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Bryant v. Maffucci,* 923 F.2d 979, 982-83 (2d Cir.1991), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). In order to act under color of state law, a person must have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Polk County v. Dodson,* 454 U.S. 312, 317-18, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (quoting *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)). Similarly, as is the case in the context of the Fourteenth Amendment's state action requirement, a deprivation of a federal or constitutional right is actionable pursuant to § 1983 when the deprivation was caused "by the exercise of some right or privilege created by the State ... or by a person for whom the State is responsible." *Lugar v.*

*Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

Because there are no allegations that the Buffalo Halfway House nor defendant Greathouse are "state actors" the complaint fails to state a claim upon which relief can be granted. The Buffalo Halfway House, Inc's website states that "[it was] incorporated in 1983, [and] was formerly known as BUILD'S Halfway House, founded in 1974 by Eugene L. Pierce under the sponsorship of the BUILD organization. The halfway house is a not-for-profit agency ...." <http://www.bufalowh.orq/background.htm>. This alone would lead one to conclude that the Buffalo Halfway House is a private organization, that is not subject to liability under § 1983. While generally the Court would provide plaintiff an opportunity to amend the complaint with respect to this issue, such an amendment would be futile because the claim of retaliation itself fails to state a claim upon which relief could be granted.

**2. Retaliation**

The gravamen of plaintiff's claim against Greathouse is that she falsely accused him of misconduct which led to his parole revocation. Falsely accusing an inmate of wrongdoing does not rise to the level of a constitutional violation, *see Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997); *see also Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986) ("The prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest"), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988)."There must be more, such as retaliation against the prisoner for exercising a constitutional right."*Boddie,* 105 F.3d at 862.

**\*4** While plaintiff does allege that Greathouse retaliated against him, it is not alleged that this was as a result of the exercise of some constitutionally protected right. The allegation of retaliation for his rejection of sexual advances are simply too conclusory to state a claim, *see Pauls v. Donovan,* 3:04-CV-1525(RNC), 2008 WL 207697, at \*2 (D.Conn., Jan. 22, 2008) (citing *Yusuf v. Vassar Coll.,* 35 F.3d 709, 713 (2d Cir.1994); *Friedl v. City of New York,* 210 F.3d 79, 85-86 (2d Cir.2000)). Courts recognize that retaliation claims by prisoners are "prone to abuse" since prisoners can claim retaliation for every decision they dislike. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("Because we recognize both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and

the ease with which claims of retaliation may be fabricated, we examine prisoner's claims of retaliation with skepticism and particular care") (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)); *see also Graham v. v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Thus, "[a] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone [because i]n such a case, the prisoner has no factual basis for the claim."*Flaherty, supra.*Simply alleging that Greathouse lodged a false report against him for his rejection of her sexual advances does not state a claim for relief.

Additionally, as noted, there is no allegation that the retaliation was done because of plaintiff's exercise of a constitutional right. *See Mount Healthy School District v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). To make out a § 1983 retaliation claim, a prisoner must show: (1) that he was engaged in constitutionally protected conduct; and (2) that the prison official's conduct was taken in retaliation for the prisoner's protected conduct. *Graham,* 89 F.3d at 75;*see also Shine v. Hofman,* 548 F.Supp.2d 112, 121 (D.Vt.2008) (applying the same standard to pre-trial detainee) (citing *Morales v. Mackalm,* 278 F.3d 125, 131 (2d Cir.2002) (citations omitted)). Accordingly, for the reasons just set forth, the Court finds that plaintiff has not stated a plausible claim of retaliation against Greathouse, *see Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007), and any attempt to amend said claim would be futile.

**B. Improper Police Questioning: Third Claim**

Plaintiff alleges that upon his arrest he was initially questioned by defendant New York State Police Investigation J. Newell who lied to him about criminal charges being brought against plaintiff's daughter and her mother in order to elicit a confession. This claim must be dismissed because it is barred by the favorable termination rule of *Heck v. Humprehy,* 512 U.S. 477, 484, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994).

The essence of plaintiff's claims is that he was the victim of false and deceptive interrogation which led to his confession and subsequent guilty pleas. Although plaintiff seeks damages for his claims, in fact the underlying basis of his claims is that his conviction was unlawful and he is therefore improperly being detained. The Supreme Court has held, however, that such a claim does not constitute a cognizable cause of action under § 1983.

**\*5** [I]n order to recover damages for allegedly unconstitutional conviction

or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

*Heck v. Humphrey,* 512 U.S. at 484. Because success on this claim would call into to question the validity of plaintiff's convictions and said convictions have not been overruled or found invalid in any way, this claim is bared and must be dismissed.

## C. Claim Against Court Appointed Counsel ("Public Advocate): Seventh Claim

Plaintiff alleges that his court appointed counsel in Chemung County, defendant Richard Rich, induced him to plead guilty and prejudiced his right to a fair trial. Because Rich is not a person acting under color of law-*i.e.,* a "state actor"-the claims against him must be dismissed with prejudice. It is well established that an attorney representing a client in a criminal proceeding, whether that attorney is a public defender, legal aid attorney or court-appointed counsel, is not acting under the color of state law. *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981). Alternatively, plaintiff's claims against Rich would be barred under the favorable termination of *Heck,* 512 U.S. at 484.

## D. Inadequate Medical Treatment Claim: Eighth Claim

Plaintiff alleges that "Ann Doe," a Nurse at the Chemung County Jail, denied him adequate medical treatment for chronic back pain. Separate apart from needing to identify whom this defendant is, the complaint fails to state a claim against her inasmuch as it fails to allege that she was deliberately indifferent to a serious medical need of plaintiff.[5] "Claims by pretrial detainees for denial of adequate medical care are examined under the Fourteenth Amendment's Due Process Clause, [not the Eighth

Amendment's cruel and unusual punishment clause]," *Peterec v. Kroeger,* No. 08-CV-1626 (CS) (GAY), 2009 WL 320798, at *4 (citing *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996)), but courts apply the same analysis to both claim. *See, e.g., Cuoco v. Moritsugu,* 222 F.3d 99, 105 (2d Cir.2000) (noting that Second Circuit has often applied Eighth Amendment deliberate indifference test to pretrial detainees' claims under the Due Process Clause of the Fourteenth Amendment) (citation omitted).

A claim of inadequate medical care rises to the level of a constitutional violation only where the facts alleged show that defendant was deliberately indifferent to a plaintiff's serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)."A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'"*Harrison v. Barkley,* 219 F.3d 132, 136-137 (2d Cir.2000) (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks omitted)). The Second Circuit pointed out that

> **\*6** [medical] conditions ... vary in severity and ... a decision to leave a condition untreated will be constitutional or not depending on the facts of the particular case. Thus, a prisoner with a hang-nail has no constitutional right to treatment, but if prison officials deliberately ignore an infected gash, "the failure to provide appropriate treatment might well violate the Eighth Amendment."

*Id.* (quoting *Chance,* 143 F.3d at 702).

An isolated failure to provide medical treatment, without more, is generally not actionable unless "the surrounding circumstances suggest a degree of deliberateness, rather than inadvertence, in the failure to render meaningful treatment."*Gil v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987). Plaintiff has made no factual, non-conclusory allegations to suggest any degree of deliberateness on the part of Nurse Doe and therefore plaintiff has failed to allege a constitutional violation. Moreover, there are no factual allegations which support a claim that plaintiff's back pain was a serious medical condition; he simply alleges it was "chronic." Plaintiff's claim of inadequate medical care will therefore be dismissed unless he files an amended complaint, as directed below, setting forth facts sufficient to state a claim of deliberate indifference against Nurse Doe. *See Abbas,* 480 F.3d at 639.

## E. False Reports and Testimony: Tenth, Sixteenth and Eighteenth Claims

The complaint's Tenth (defendant Hover) and Sixteenth (defendants Kirkpatrick, Marinaccio, Henderson, Lebel and Doyle) Claims allege that the defendants named in said claims filed false reports and testified falsely at related internal prison disciplinary hearings (Tenth Claim, ¶ 66; Sixteenth Claim, ¶ ¶ 46, 68). The Eighteenth Claim alleges that defendant Kriss, DOCS' Director of Public Information, provided false information to the media about plaintiff's prison disciplinary charges and proceedings. (Eighteenth Claim, ¶ 70). These claims must be dismissed because, as noted above, an inmate "has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman,* 808 F.2d at 951. Thus, a claim for the filing of a false report or of providing false testimony by a correctional officer witness at a disciplinary hearing, in and of itself, does not state a cognizable claim that plaintiff's due process rights were violated. The only constitutional violation that could occur in this situation is if plaintiff were not provided adequate due process in the proceeding, and then the claim is not based on the filing of a false report. While a false report or claim may be actionable if made in retaliation for an exercise of a first amendment right or other constitutionally protected activity, *See Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988), claims of retaliation cannot be stated in conclusory terms and must be viewed skeptically by the courts. *See Flaherty,* 713 F.2d at 13.

**\*7** The claims of retaliation herein are exactly that and there are no allegations that plaintiff engaged in constitutionally protected activity that led to the filing of the false reports. The claims against correctional officers Kirkpatrick, Marinaccio, Henderson, Lebel and Doyle (Complaint, ¶ ¶ 27-38, 46, 68) were allegedly made following an assault on plaintiff and claimed by plaintiff to have been filed to cover up for the assault. If there is a claim related to said report, it is related to whether plaintiff obtained due process during the Tier III Superintendent's Hearing, not for the filing of the report in-and-of itself. *See Discussion,* Section F, *infra.* Accordingly, the Tenth, Sixteenth and Eighteenth Claims, to the extent they allege claims relating to the making of false reports or claims and testifying falsely, are dismissed with prejudice.

## F. Due Process/Tier III Disciplinary Hearing: Seventeenth Claim

The complaint alleges that following an assault by a number of defendant correctional officers (Complaint, ¶ ¶ 27-38, 65-67), the officers filed false misbehavior reports against him and at the Tier III Superintendent's Hearing conducted as a result of the charges, defendant Curtis Drown, the Hearing Officer, denied him due process when he found plaintiff guilty of the charges filed against him despite the false testimony provided by the correctional officers. The finding of guilt was later overturned during an administrative appeal. (*Id.,* ¶ 51). Plaintiff's complaint fails to state a claim of a procedural due process violation because it does not allege that plaintiff suffered an "atypical and significant hardship" as a result of the disciplinary hearing findings.

In *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court ruled that the Constitution did not require that restrictive confinement within a prison be preceded by procedural due process protections unless the confinement subjected the prisoner to "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 484. [6] "Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence impose by a court of law," 515 U.S. at 485, and it is only where the prisoner's conditions of disciplinary confinement become an atypical and significant hardship based on a liberty interest created by state law that federal due process standards must be met. *See Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir.1997) (holding that, while *Sandin* did not create a per se rule that disciplinary confinement may never implicate a liberty interest, where a prisoner fails to show the conditions to which he was subjected were "atypical and significant," summary judgment may nevertheless be granted).

Thus, in order to allege a cognizable due process claim, a § 1983 plaintiff must show that the "conditions of his [disciplinary] confinement ... were dramatically different from the basic conditions of [his] indeterminate sentence." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). In determining whether a prisoner has a liberty interest in remaining free from segregated confinement, district courts must make factual findings with respect to the alleged conditions of the confinement and the issue of its atypicality. *See, e.g., Welch v. Bartlett,* 196 F.3d 389, 393-95 (2d Cir.1999); *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997); *Miller,* 111 F.3d at 8-9; *Sealey v. Giltner,* 116 F.3d 47, 52 (2d Cir.1997). Several factors should be considered when assessing whether the particular restrictions imposed

on the prisoner are atypical and significant, including: (1) the effect of the segregation on the length of the plaintiff's prison confinement; (2) the extent to which the conditions at issue differ from other routine prison conditions; and (3) the duration of the prisoner's disciplinary confinement compared to the potential duration a prisoner may experience while in discretionary confinement. *Wright,* 132 F.3d at 136.

**\*8** "[T] he duration and the frequency of such deprivations are highly relevant to whether the conditions of a plaintiff's confinement should be considered atypical."*Welch,* 196 F.3d at 393;*see, e.g., Brooks,* 112 F.3d at 47. Although the Second Circuit has not established a bright-line rule as to how lengthy a SHU confinement will be considered atypical and significant, *see, e.g., Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000), it has characterized segregative sentences of 125-288 days as "relatively long," and thus necessitating "specific articulation of ... factual findings" before a district court could properly term the confinement atypical or insignificant, *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998) (describing the segregative confinements at issue in *Miller,* 111 F.3d at 9 (2d Cir.1997) (125 days)); *Brooks,* 112 F.3d at 49 (180 days); and *Wright,* 132 F.3d at 136 (168 days in SHU, followed by 120 days in keeplock). In *Colon,* the Second Circuit ruled that a prisoner's SHU confinement for 305 days was " 'atypical' and a 'severe hardship' within the meaning of *Sandin.*" 215 F.3d at 231. "The longest confinement in normal SHU conditions that [the Second Circuit] has ruled was not shown to meet the *Sandin* standard was 101 days,"*id.* at 231 (emphasis added), and it has been suggested that even that length might qualify as atypical and severe, *see Colon,* 215 F.3d at 232 n. 5 ("We do not exclude the possibility that SHU confinement of less than 101 days could be shown on a record more fully developed than the one in *Sealey* to constitute an atypical and severe hardship under *Sandin.*" ). The Second Circuit has instructed the district courts to develop detailed factual records "in cases challenging SHU confinements of durations within the range bracketed by 101 days and 305 days."*Colon,* 215 F.3d at 232 (footnote omitted).

In this matter, the complaint neither alleges the length of his confinement in SHU nor any other facts that would establish that the disciplinary confinement was atypical and significant. Accordingly, this claim will be dismissed unless plaintiff files an amended complaint which sets forth allegations that would establish, if proven, that his disciplinary confinement was an "atypical and significant hardship ... in relation to the ordinary incidents of prison life."*Sandin,* 515 U.S. at 484.

### CONCLUSION

Because plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a) and filed an Authorization, his request to proceed *in forma pauperis* is granted. For the reasons set forth above, the First, Second, Third, Seventh, Tenth, Sixteenth and Eighteenth Claims are dismissed with prejudice pursuant to 28 U.S.C. § § 1915(e) and 1915A. In addition, the Eighth and Seventeenth Claims must be dismissed pursuant to 28 U.S.C. § 1915(e) unless plaintiff files an amended complaint by May 20, 2009, in which he sufficiently pleads said claims as directed above and in a manner that complies with Rules 8 and 10 of the Federal Rules of Civil Procedure. The remaining claims-Fourth, Fifth, Sixth, Ninth, Eleventh, Twelfth, Thirteenth, Fourteenth and Fifteenth-will be allowed to proceed at this time.

**\*9** Plaintiff is advised that an amended complaint is intended to *completely replace* the prior complaint in the action, and thus it "renders [any prior complaint] of no legal effect."*International Controls Corp. v. Vesco,* 556 F.2d 665, 668 (2d Cir.1977), *cert. denied sub nom., Vesco & Co., Inc., v. International Controls Corp.,* 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 758 (1978); *see also Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). Therefore, plaintiff's amended complaint must include all of the allegations against each of the defendants against whom the case is going forward so that the amended complaint may stand alone as the sole complaint in this action which the defendants must answer.

Plaintiff is forewarned that if he fails to file an amended complaint as directed, the Eighth and Seventeenth Claims will be dismissed with prejudice pursuant to 28 U.S.C. § 1915(e) and service will be made of only the Fourth, Fifth, Sixth, Ninth, Eleventh, Twelfth, Thirteenth, Fourteenth and Fifteenth Claims.

### ORDER

IT HEREBY IS ORDERED, that plaintiff's motion to proceed *in forma pauperis* is granted, and his motion for the appointment of counsel is denied without prejudice;

FURTHER, that the complaint's First, Second, Third, Seventh, Tenth, Sixteenth and Eighteenth Claims are dismissed with prejudice and the Clerk of the Court is directed

to terminate defendants Leslie Greathouse, J. Newell, Richard Rich and Eric Kriss as parties to this action;

FURTHER, that plaintiff is granted leave to file an amended complaint regarding *only* the Eighth and Seventeenth Claims as directed above [7] by **May 20, 2009;**

FURTHER, that the Clerk of the Court is directed to send to plaintiff with this order a copy of the original complaint, a blank § 1983 complaint form, and the instructions for preparing an amended complaint;

FURTHER, that in the event plaintiff fails to file an amended complaint as directed above by **May 20, 2009,** the Eighth and Seventeenth claims will be dismissed with prejudice without further order of the Court and the Clerk of the Court shall terminate defendants Ann Doe, Nurse, and Curtis Drown as parties to this action; and

FURTHER, that in the event plaintiff fails to file an amended complaint as directed above by **May 20, 2009,**

the Clerk of the Court is directed to cause the United States Marshal to serve copies of the Summons, Complaint, and this Order regarding the Fourth, Fifth, Sixth, Ninth, Eleventh, Twelfth, Thirteenth, Fourteenth and Fifteenth Claims upon defendants Glenn Goord, former DOCS Commissioner; Richard Roy, DOCS, Inspector General; Christopher Moss, Sheriff, Chemung County; J.S. Hover, Deputy Sheriff, Chautauqua County Jail; Joseph Gerace, Sheriff, Chautauqua County; M. Kirkpatrick, Lieutenant, Elmira Correctional Facility; R. Marinaccio, Sergeant, Elmira Correctional Facility; K, Lebel, Correctional Officer, Elmira Correctional Facility; T. Doyle, Correctional Officer, Elmira Correctional Officer; and F. Henderson, Correctional Officer, Elmira Correctional Facility; without plaintiff's payment therefor, unpaid fees to be recoverable if this action terminates by monetary award in plaintiff's favor; and

**\*10** FURTHER, that, pursuant to 42 U.S.C. § 1997e(g), the defendants are directed to answer the complaint upon service.

**SO ORDERED.**

Footnotes

1    Plaintiff pled guilty to charges relating to these shootings.

2    The government may subject a pre-trial detainee to "restrictions inherent in confinement so long as the resulting conditions do not 'amount to punishment of the detainee.'"*Shine y. Hofman,* 548 F.Supp.2d 112, 119 (D.Vt.2008) (quoting *Bell v. Wolfish,* 441 U.S. 520, 536, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). Plaintiff's conditions of confinement claims as a pre-trial detainee fall within the purview of the Fourteenth Amendment and substantive due process, as opposed to the Eighth Amendment that applies to his cruel and unusual punishment claims after his conviction. *See Benjamin v. Fraser,* 343 F.3d 35, 49-50 (2d Cir.2003), As noted below, *see Discussion,* at 3-4, *infra,* plaintiff's allegations as to this claim, like others, are at least sufficiently pled to survive screening under 28 U.S.C. § § 1915(e) and 1915A. Not all claims, however, are sufficiently pled and will be dismissed either with or without an opportunity to be amended.

      Additionally, some recent Second Circuit case law "suggests that a federal pre-trial detainee ... has a liberty interest in not being placed in close custody for an extended period of time."*Shine,* 548 F.Supp.2d at 118 (citing *Iqbal v. Hasty,* 490 F.3d 143, 163 (2d Cir.2007), *cert. granted. sub nom.Ashcroft v. Iqbal,* --- U.S. ----, 128 S.Ct. 2931, 171 L.Ed.2d 863 (June 16, 2008)). Thus, to the extent that plaintiff alleges that he was placed in administrative segregation at the Chemung and Chauatauqua County Jails without due process, Complaint, ¶ ¶ 20-23, 56, 60, that claim too may proceed at this screening stage of the litigation.

3    There is insufficient information before the Court at this time to make the necessary assessment of plaintiff's claims under the standards promulgated by *Hendricks v. Coughlin,* 114 F.3d 390, 392 (2d Cir.1997), and *Hodge v. Police Officers,* 802 P.2d 58 (2d Cir.1986), as issue has yet to be joined. Therefore plaintiff's motion for appointment of counsel is denied without prejudice at this time. It is the plaintiff's responsibility to retain an attorney or press forward with this lawsuit pro se. 28 U.S.C. § 1654.

4    The Court will address below only those specific claims that are either being dismissed without opportunity to amend or dismissed but with opportunity to amend. The claims not addressed specifically below may proceed at this time and service will be directed with respect to them when plaintiff files his amended complaint and it is reviewed pursuant to 28 U.S.C. § § 1915(e)(2) (B) and 1915A. If plaintiff does not file an amended complaint, as directed, by May 20, 2009, the claims that are proceeding will be served on the remaining defendants.

5    Plaintiff's amended complaint regarding this claim should also conclude whatever information he have which would assist him and the Court in identifying Nurse Ann Doe–*e.g.,* physical description, dates and times or shifts he was treated by Nurse Doe. If plaintiff's amended complaint sets forth a cognizable claim against Nurse Doe, the Court will need to then enlist the assist of Chemung County to attempt to identify whom Nurse Doe may be. See *Valentin v. Dinkins,* 121 F.3d 72, 75 (2d Cir.1997).

6    *Sandin* compared inmates in the SHU for disciplinary purposes to inmates in both the general inmate population and those in administrative segregation and protective custody. 515 U.S. at 485-86. Based on that comparison, the Court held that the plaintiff's 30-day SHU punishment did not "work a major disruption in his environment," *id.* at 486, and was "within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life," *id.* at 487.

7    Plaintiff is reminded that he must also *include* in this amended complaint the Fourth, Fifth, Sixth, Ninth, Eleventh, Twelfth, Thirteenth, Fourteenth and Fifteenth claims against Glenn Goord, Richard Roy, Christopher Moss, J.S. Hover, Joseph Gerace, M. Kirkpatrick, R. Marinaccio, K. Lebel, T. Doyle, and F. Henderson. Because the amended complaint will become the sole complaint in the action, it is the only complaint which will be served on the parties. Failure to include these claims in it means that they will not be preserved for service on the defendants.

**End of Document**                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 3776698
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Bernard THOMAS, Plaintiff,

v.

William CONNOLLY, et al., Defendants.

No. 10 Civ. 2401(PAC)(MHD).    |    April 10, 2012.

### REPORT & RECOMMENDATION

[MICHAEL H. DOLINGER](), United States Magistrate Judge.

**\*1** TO THE HONORABLE PAUL A. CROTTY, U.S.D.J.:
*Pro se* plaintiff Bernard Thomas, an inmate in the New York State correctional system, commenced this section 1983 lawsuit against eight employees of the Fishkill Correctional Facility ("Fishkill") and an official of the New York State Department of Correctional Services ("DOCS"). He sues them in their individual and official capacities, asserting that on several occasions some of the defendants denied him his First Amendment right to practice his religion while housed at Fishkill, that another defendant denied him his due-process rights in connection with a disciplinary proceeding that left him in the Special Housing Unit ("SHU") of another State facility for several months, and that still others violated his Eighth Amendment rights by ordering his transfer from Fishkill to the Upstate Correctional Facility ("Upstate")— a journey of fourteen hours—in contravention of a medical directive that he not be exposed to such extended travel. For relief he seeks both compensatory and punitive damages from all of the defendants.

At the conclusion of discovery, defendants have moved for summary judgment on all four of plaintiff's sets of claims. They assert that plaintiff's claim for deliberate indifference to his medical condition is barred by his failure to exhaust his prison administrative remedies (Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem.") 5–7), that all of his constitutional claims are meritless as a matter of law (*id.* at 8–26), that two of the defendants named in his deliberate-indifference claim had no involvement in the events at issue (*id.* at 26–30), that defendants are entitled to immunity under the Eleventh Amendment insofar as plaintiff sues them in their official capacities (*id.* at 30), and that all of the

defendants are entitled to qualified immunity from personal liability. (*Id.* at 30–35). Plaintiff has submitted voluminous papers in opposition.

For the reasons that follow, we recommend that defendants' motion be granted. [1]

### I. *Plaintiff's Claims*
Plaintiff asserts four separate claims, each targeting a discrete set of events. We summarize each in turn.

### A. *The Zakat–ul–Fitr Claim*
Thomas is a practicing adherent of the Muslim faith. (Compl.¶ 3). Among the mandated observances of his religion, at the conclusion of Ramadan members of the faith are required to participate in a day-long set of prayers, consumption of meals to break the Ramadan fast and gift-giving. (*Id.* ¶ 15). This event is referred to as Eid–ul–Fitr. (*Id.*). The gift-giving involves an act of charity, which is to be performed before the prayers and is known as Zakat–ul–Fitr or Sadaqat–ul–Fitr. (*Id.* ¶¶ 14–15).

Plaintiff alleges that on "approximately" October 6, 2007, "several correctional officers" denied him and others the opportunity to engage in the Zakat–ul–Fitr, assertedly at the direction of defendants William Connolly, the facility Superintendent, and Charles Kelly, the Deputy Superintendent of Security. (*Id.* ¶ 15). According to Thomas, he and other inmates filed a grievance on October 15, 2007, which the Superintendent upheld in part on November 1, 2007, stating that "zakat-ul-fitr" had in fact been distributed. (*Id.* ¶¶ 16–17). The complaint goes on to note, in quoting the grievance, that the request from the prison Imam, Mr. Muhammad, to arrange the Zakat–ul–Fitr was not provided to Deputy Superintendent Kelly until the "week of 10/7/07," that the Superintendent in fact approved the distribution of food-as requested by the Imam-to satisfy the Zakat–ul–Fitr requirement, and that this ceremony took place under the supervision of the Imam. (*Id.*).

**\*2** Plaintiff seems to imply that this event was improperly delayed until after Ramadan. (*Id.* ¶¶ 16–18, 20). In addition to allegedly being denied the opportunity to participate on a timely basis in the required acts of charity, Thomas alleges that he was also denied participation in the Eid–ul–Fitr prayers at that same time. (*Id.* ¶¶ 15, 18, 20). He again targets defendants Connolly and Kelly for this violation of his First Amendment rights. (*Id.* ¶¶ 15, 18).

## B. *The Tenth–Day–of–Muharram Claim*

Plaintiff's second claim also concerns an alleged denial of the opportunity to participate in a required religious observance, this time on the first and last days of the so-called Ten Days of Muharram Festival, on January 10 and 19, 2008. (*Id.* ¶¶ 21–25). The four defendants against whom he presses this claim are Deputy Superintendent Kelly; Fedele Fiore, the Assistant Deputy Superintendent of Programs; Deputy Superintendent for Programs Roland Larkin; and Corrections Officer Thomas Rough. (*Id.* ¶ 21).

As explained in the complaint, the celebration of Muharram involves ten days of fasting, with the last day of the process-involving ceremonies and a breaking of the fast-viewed as the most important. (*Id.* ¶¶ 23, 31). According to plaintiff, the prison arranged for ten Muslim inmates-including Thomas-to attend daily prayers and other forms of celebration from January 11 to 18, 2008, and he did participate. (*Id.* ¶ 22). He alleges, however, that on January 10 and 19, 2008, the first and last days of Muharram, the facility failed to include these inmates on the general sign-out list that is daily circulated in the prison to allow listed inmates to be released from their ordinary locations for participation in specified events, including Muharram.(*Id.* ¶¶ 22–23). He reports that on January 19, 2008 he was nonetheless released and went to the site of the planned activities, only to find that no other inmates were there. (*Id.* ¶¶ 23–24). He recounts that Officer Rough was present and told him that he had cancelled the event because most of the inmates scheduled to attend had not come. (*Id.* ¶ 24). He reports that Rough told him that three other inmates had shown up earlier, but the one in charge had left for a scheduled visit and that he (Rough) had cancelled the food for the event, as a result of which the other two had left in apparent frustration. (*Id.* ¶ 25;*see also* Opp'n to the Defs. ['] Undisputed Material Facts[ ] Local Rule 56.1(b)(E) ("Pl.'s Rule 56.1 Statement") ¶ 39). As a result, plaintiff alleges, he returned to his housing unit and was unable to participate in the last day of Muharram proceedings. (Compl.¶ 25).

Plaintiff alleges that the failure to hold the January 19, 2008 event was attributable to two oversights. The first, he says, was that the prison callout list for that day did not include the ten inmates who were celebrating the Muharram Festival-an omission that he characterizes as a "willful and deliberate failure" of defendants Kelly, Fiore, and Rough. (*Id.* ¶ 30). [2] Second, although it became necessary for Officer Rough to call the various housing units on the morning of January 19 to

ensure that those inmates would be included in the callout, he failed to do so. (*Id* . ¶¶ 30–31). He also complains that Rough canceled the events scheduled for January 19 without proper approval or authorization. (*Id.* ¶ 30).

## C. *The Due–Process Claim*

**\*3** Plaintiff alleges that on January 17, 2008 he was removed from the general prison population at Fishkill and "placed in solitary confinement and punitive segregation" in the SHU, (*Id.* ¶ 34). [3] He asserts that he was finally given a misbehavior report on March 20, 2008 for the improper use of a third-party phone on an occasion when he purportedly telephoned a prison chaplain at a DOCS Harlem office. (*Id.*). Plaintiff asserts that the charges included communicating by phone with a DOCS employee without authorization, use of a third-party phone, false statements and impersonation. (*Id.*).

According to an investigative report prepared by the Inspector General's Office, the chaplain reported the incident and assertedly said that he had recognized the voice on the other end of the phone as plaintiff's. (*Id.*). The investigator is also said to have determined that phone records showed that plaintiff was using someone else's phone at the time when the chaplain received the call. (*Id.* (quoting Inmate Misbehavior Report); *see also* Roberts Decl. Ex. A).

As a result of the charges, Thomas was subjected to a March 25, 2008 hearing at which the hearing officer, defendant Stephen Roberts, allegedly denied his request to call the chaplain as a witness and to give a reason for that denial. (Compl.¶¶ 35–36). At the conclusion of the hearing, Roberts found Thomas guilty and imposed penalties of six months in SHU, and six-months loss of packages, commissary and phone privileges. (*Id.* ¶ 37;*see also* Roberts Decl, Ex. D, at 763). Plaintiff appealed the conviction, arguing that the delay between his initial confinement in isolation and the start of the hearing was a violation of DOCS rules, and that the hearing officer's refusal to call the chaplain as a witness had also violated his rights. (Compl. ¶ 38; *see also* Roberts Decl. Ex. E). Plaintiff recounts that the DOCS Director of Special Housing/Inmate Disciplinary Program, Norman Bezio, reversed the conviction, but did not do so until May 13, 2008. (Compl.¶ 38).

Thomas asserts that the hearing officer violated his rights in two respects. First, he did not conduct the hearing until eight days after plaintiff was first confined, one day more than DOCS regulations permitted absent an extension, which

was never shown to plaintiff. (*Id.* ¶ 39). Second, the denial, without stated reasons, of plaintiff's request for the chaplain to appear as a witness assertedly violated plaintiff's due-process rights.(*Id.*). He further alleges that as a result of this wrongful conviction, he was left in confinement for a number of months (until June 6, 2008), and during that period he lost program privileges, the ability to participate in religious services with other prisoners and access to family visits. (*Id.* ¶¶ 40–44). He also reports that his transfer to Upstate, which was solely as a result of the conviction, inflicted considerable physical hardship on him. (*Id.* ¶ 45).

### D. *The Deliberate–Indifference Claim*

**\*4** Plaintiff's last claim is based on his transfer to the Upstate Correctional Facility. He alleges that as a result of previously diagnosed spinal problems, his medical file contained a physician-ordained restriction precluding his being forced to travel by bus for more than two hours. (*E.g., Id.* ¶¶ 45, 48–53, 61–62). Notwithstanding that restriction, he alleges that, following his disciplinary conviction he was obliged to ride for fourteen hours from Fishkill to Upstate, causing him considerable physical hardship and necessitating treatment upon his arrival at Upstate. (*Id.* ¶¶ 56–58). He goes on to allege that he believes that three of the defendants—in this case Elizabeth Ritter, [4] the Fishkill Deputy Superintendent of Health; Joy Albright, the Fishkill Nurse Administrator; and Theresa Knapp–David, the DOCS Associate Commissioner of Population Management—were aware of that restriction and disregarded it in ordering his transfer, or alternatively that someone removed the document containing the restriction from his medical file. (*Id.* ¶¶ 61–66).

### *ANALYSIS*

We address each of defendants' arguments more or less in the order in which they present them. Before doing so, we summarize the standards that govern the assessment of summary-judgment motions.

### I. *Rule 56 Standards*

The court may enter summary judgment only if it concludes that there is no genuine dispute as to the material facts and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. Pro. 56(c); see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986); *Feingold v. New York,* 366 F.3d 138,

148 (2d Cir.2004).*"*An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law ...' [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Shade v. Hous. Auth. of New Haven,* 251 F.3d 307, 314 (2d Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). It is axiomatic that the responsibility of the court in deciding a summary-judgment motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F .2d 9, 11 (2d Cir.1986); *see, e.g., Anderson,* 477 U.S. at 255; *Howley v. Town of Stratford,* 217 F.3d 141, 150– 51 (2d Cir.2000).

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact. *Fed. R. Civ. Pro. 56(c); see, e.g., Celotex,* 477 U.S. at 323; *Koch v. Town of Brattleboro, Vt.,* 287 F.3d 162, 165 (2d Cir.2002). If the non-moving party has the burden of proof on a specific issue, the movant may satisfy his initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. *See, e.g., Celotex,* 477 U.S. at 322–23, 325; *PepsiCo, Inc. v. Coca– Cola Co.,* 315 F.3d 101, 105 (2d Cir.2002); *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). If the movant fails to meet his initial burden, however, the motion will fail even if the opponent does not submit any evidentiary materials to establish a genuine factual issue for trial. *See, e.g., Adickes v.. S.H. Kress & Co.,* 398 U.S. 144, 160 (1970); *Giannullo v. City of N.Y.,* 322 F.3d 139, 140–41 (2d Cir.2003). If the moving party carries his initial burden, the opposing party must then shoulder the burden of demonstrating a genuine issue of material fact on any such challenged element of its claim. *See, e.g., Beard v. Banks,* 548 U.S. 521, 529 (2006); *Celotex,* 477 U.S. at 323– 24; *Santos v. Murdock,* 243 F.3d 681, 683 (2d Cir.2001). In doing so, the opposing party may not rest on "mere allegations or denials" of the factual assertions of the movant, *see, e.g., Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti,* 374 F.3d 56, 59–60 (2d Cir.2004), nor may he rely on his pleadings or on merely conclusory factual

allegations. *See, e.g., Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000). He must also "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *see also Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 75 (2d Cir.2005). Rather, he must present specific evidence in support of his contention that there is a genuine dispute as to the material facts. *See, e.g., Celotex,* 477 U.S. at 324; *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 526 (2d Cir.1994).

## II. *Exhaustion of Administrative Remedies: The Deliberate–Indifference Claim*

**\*5** Defendants first target plaintiff's fourth claim, which in substance is premised on the notion that defendants Ritter, David and Albright violated Thomas's Eighth Amendment rights by subjecting him to a fourteen-hour journey to the Upstate Correctional Facility after his disciplinary conviction at Fishkill, a trip that assertedly was ordered in contradiction to a documented medical restriction limiting his ground travel to two hours. Defendants assert that although plaintiff filed a grievance about this journey when he was at Upstate, he never pursued that grievance through all of the required steps, including specifically an appeal to the Central Office Review Committee ("CORC"), and that as a result his claim is barred from consideration here. (Defs.' Mem. 5–7; Reply Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Reply Mem .") 2–4.)

Plaintiff appears to argue that he satisfied the exhaustion requirement by virtue of a grievance that he filed in the wake of his disciplinary conviction but before his transfer, a grievance in which he (1) asserted that the disciplinary charges and his conviction and punishment were in retaliation for his previously filing a lawsuit against two prison medical personnel and (2) warned against the possible lifting of the medical restriction on ground travel. (Reply Mem. of Law in Opp'n to Def. Summ. J. Mot ("Pl.'s Opp'n"), "REPLY Point # 1 Exhaustion" ("Point I"), 2–4). He also suggests that his post-transfer grievance may have been consolidated for appeal purposes with the appeal of this pre-transfer grievance. (*Id.* at 2) Finally, he implies that he should be excused from fully complying with the exhaustion requirement because he was effectively prevented from appealing the denial of his Upstate grievance. (*Id.* at 3–4).

## A. *The Exhaustion Requirement*

The Prison Litigation Reform Act ("PLRA") prohibits a prisoner from bringing a prison-condition claim under 42 U.S.C. § 1983 "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e (a). The goal of this requirement is " 'to reduce the quantity and improve the quality of prisoner suits ... [and to afford] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Amador v. Andrews,* 655 F.3d 89, 96 (2d Cir.2011) (quoting *Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004) (quoting *Porter v. Nussle,* 534 U.S. 516, 524–25 (2002))). The PLRA requires "proper exhaustion," which the Supreme Court has characterized as " 'using all the steps that the agency holds out, and doing so *properly.*' " *Woodford v. Ngo,* 548 U.S. 81, 90 (2006) (emphasis in original) (quoting *Pozo v. McCaughtry,* 286 F.3d 1022, 1024 (7th Cir.2002)); *accord, e.g .,* *Amador,* 655 F.3d at 96.

The route to exhaustion is presumptively that laid out by the pertinent prison system in its applicable regulations. *See, e.g., Jones v. Bock,* 549 U.S. 199, 219 (2007). Of particular note, "an untimely or otherwise procedurally defective" use of the grievance procedure does not satisfy the exhaustion requirement. *Woodford,* 548 U.S. at 83–84. The defense of failure to exhaust is treated as an affirmative defense, and hence the defendants must prove its factual basis. *Jones,* 549 U.S. at 216–17.

**\*6** Under DOCS regulations, in most circumstances inmates must pursue a three-tiered administrative review and appeals system. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5 (2012). The first step for the inmate is to file a grievance complaint form or written grievance with the Inmate Grievance Resolution Committee ("IGRC") within 21 days of the incident that is the subject of the complaint, including a concise description of the problem and any steps taken prior to filing to address it. *See id.* § 701.5(a). [5]

Members of the IGRC have sixteen days after the filing of the grievance to resolve it informally. *Id.* § 701.5(b). If it is not resolved, the committee must conduct a hearing, at which the inmate may appear if he is not specially confined. *Id.* After the hearing, the committee must return a decision in writing within two business days or orally immediately following its deliberations. *Id.* If an inmate is not satisfied with the decision, he may appeal it to the superintendent, a process that requires him to complete and sign the appeal section of the IGRC response form and submit it to the grievance clerk within seven days after receipt of the decision. *Id.* § 701.5(c).

The superintendent must return a decision within twenty days of receipt of the appeal unless the matter concerns revision of a departmental policy, in which case he must forward it to CORC. *Id.* The final step available to prisoners is an appeal to the CORC. *Id.* § 701.5(d). In order to appeal to the CORC, an inmate must complete and sign another form and submit it to the grievance clerk within seven days after receipt of the superintendent's decision. *Id.* The CORC must render a decision within thirty calendar days of receiving the appeal. *Id.; see generally Amador,* 655 F.3d at 96–97.

The regulations specify a somewhat more expedited process for claims of harassment of prisoners by DOCS employees. In that circumstance, the superintendent must respond to a *bona fide* harassment grievance by initiating or requesting an investigation and rendering a decision within twenty-five days. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.8 (2012). If the superintendent finds that the grievance does not raise a *bona fide* issue, he must return it to the IGRC for normal processing. *Id.* § 701.8(c). Finally, an inmate may appeal the superintendent's decision within seven days of receiving it, or may assert the grievance on appeal to the CORC if the superintendent does not respond within the allotted time frame. *Id.* § 701.8(g) & (h). The CORC then must issue a decision within 30 days of receipt of the appeal. *Id.* § 701.5(d).

Finally, complaints about the handling of a disciplinary hearing must be addressed by an appeal of the hearing officer's decision rather than through the grievance process. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.3(e)(2). Tier III hearings, such as plaintiff's disciplinary hearing, may be appealed to the Commissioner within thirty days of receipt of the disposition. *Id.* § 254.8.

**\*7** Under the PLRA, if an inmate fails to exhaust all applicable prison remedies with respect to a claim, the federal court is barred from considering that claim when asserted under section 1983. *Johnson v. Rowley,* 569 F.3d 40, 45 (2d Cir.2009) (quoting, *inter alia, Jones,* 549 U.S. at 211); *Torres v. Carry,* 672 F.Supp.2d 338, 342–43 (S.D.N.Y.2009). The Second Circuit has, however, recognized three exceptions to the PLRA's exhaustion requirements. A prisoner may proceed with a prison-conditions claim even where he has not exhausted his administrative remedies if "(1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such as way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to

comply with the exhaustion requirement."*Ruggiero v. Cnty. of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

The Second Circuit has not yet definitively stated whether a successful invocation of any of these exceptions would survive the Supreme Court's decision in *Woodford v. Ngo,* which requires that prisoners properly exhaust their administrative remedies by "using all steps that the agency holds out, and doing so *properly."Woodford,* 548 U.S. at 90 (emphasis in original) (quoting *Pozo,* 286 F.3d at 1024). Nonetheless, courts within the circuit have continued to apply the three-exception analysis to prison-condition claims where the prisoner is alleged to have failed to properly exhaust his remedies. *Compare, e.g., Amador,* 655 F.3d at 102–03 (invoking *Macias v. Zenk,* 495 F.3d 37, 43 n. 1 (2d Cir.2007), which declined to "decide what effect *Woodford* has on *Hemphill* 's" three-exception rule), *and Ruggiero,* 467 F.3d at 176,*with Vogelfang v. Riverhead Cnty. Jail Officers,* 2009 WL 230132, at \*2 (2d Cir. Feb. 2, 2009) (remanding a summary-judgment decision to the district court, which had failed to "consider whether [plaintiff's] failure ... to exhaust administrative remedies should be excused under the *Hemphill* line of cases"), *Jones v. Allen,* 2010 WL 3260081, at \*3 (S.D.N.Y. Aug. 9, 2010) (suggesting that at least the first two exceptions to the exhaustion requirement remain valid post-*Woodford* ),*and Partee v. Goord,* 2007 WL 2164529, at \*4 (S.D.N.Y. July 25, 2007) (concluding that plaintiff was justified in failing to exhaust his claim with CORC where the IGRC decision declared his grievance to be outside its purview).

**B.** *Assessing Defendants' Exhaustion Defense*
Defendants note that on May 22, 2008 plaintiff filed a grievance at the Upstate Correctional Facility concerning his April 30, 2008 transfer to that facility from Fishkill. (Defs.' Mem. 7 (citing Decl. of Inna Reznik ("Reznik Decl.") Ex. B)). In support of that grievance, he argued that the transfer had been in violation of a medical hold that was documented in his file. (Reznik Decl. Ex. B). [6] The IGRC rejected that grievance on June 4, 2008, based on its finding that his medical file contained no such hold. (Reznik Decl. Ex. C). The record does not reflect whether plaintiff appealed that denial to the facility Superintendent. According to defendants, however, DOCS conducted a search through CORC's files for all grievance appeals to CORC made by Thomas, and that search established that plaintiff had never filed an appeal to CORC in connection with his May 22 grievance (Decl. of Karen

Bellamy ("Bellamy Decl.") ¶¶ 2–11 & Ex. A), an omission that demonstrates a fatal failure to exhaust administrative remedies. (*See* Defs.' Mem. 7).

**\*8** Plaintiff does not directly dispute these factual assertions. Rather, he seems to say that his appeal of this grievance was somehow consolidated with the appeal of one of his earlier grievances, or else that his appeal of that earlier complaint somehow excused him from appealing the one that he had filed at Upstate. (Pl.'s Opp'n Point # 1, 2–4). Neither argument is sustainable.

The earlier grievance to which plaintiff apparently points was dated April 4, 2008 and filed at the Fishkill facility, before he was transferred to Upstate. (Pl.'s Opp'n Point I 2 & Ex. A). In that grievance plaintiff observed that he had been the subject of disciplinary charges of which he had been convicted on March 25, 2008. (*Id.* Ex. A). He accused the Fishkill medical staff of instigating the filing of those charges and his resultant conviction, and claimed that they had done so because of retaliatory animus against him.(*Id.* at 707–10). According to Thomas, the trigger for that animus was his filing earlier in March 2008 of a lawsuit against two Fishkill medical staffers, identified as "Ms. Stone" and "Dr. Mamis," who he claimed were served with his lawsuit papers on March 17, 2008, the date on which he was confined on disciplinary charges. [7] (*Id.* at 707). As part of his April 4 grievance, he also speculated in vague terms that the prison staff might be considering lifting a medical hold that assertedly prevented his transfer to a distant prison, and he warned that if this occurred, he would sue. (*Id.* at 709–10, 712–14).

The Superintendent investigated the April 4 grievance, treating it as a claim for retaliation in the form of being placed in SHU, and rejected the grievance on April 24, 2008. (Pl.'s Opp'n Point I Ex. A, at 723). In doing so, Superintendent Connolly noted that Ms. Stone had denied any animus and had had no involvement in the filing of disciplinary charges against Thomas. (*Id.*). As for Dr. Mamis, he advised that he was not plaintiff's treating doctor and would therefore not have been in a position to place or remove any medical hold on him. (*Id.*).

Plaintiff appealed this decision to the CORC on April 28, 2008. (*Id.*). CORC then denied the grievance appeal on June 11, 2008. (*Id.* at 724). In doing so CORC found no reason to question the outcome of the Superintendent's investigation of Thomas's complaint and observed that his disciplinary

conviction was attributable to his own misconduct rather than animus by prison staff. (*Id.*).

Plaintiff's proffer does not create a triable dispute regarding whether he satisfied the exhaustion requirement for his deliberate-indifference claim. He offers no evidence at all that CORC consolidated two grievances or even considered the challenge that he had made in his May 22 grievance when it upheld the rejection of his earlier, April 4 grievance.

The April 4 grievance was centered on plaintiff's contention that the medical staff, specifically Ms. Stone and Dr. Mamis, had arranged for the filing of disciplinary charges against him and that they might also alter his medical status in retaliation for his prior institution of a civil suit against them. At the time that he filed that grievance on April 4, he had been convicted of disciplinary violations, but he had not yet been transferred to Upstate. In contrast, the May 22 grievance was focused solely on his transfer to Upstate, which had required that he undergo a fourteen-hour trip between prisons, and he targeted defendants Ritter and Albright (the Fishkill Nurse Administrator) for having supposedly approved the transfer in the face of an alleged medical hold in his file. (Reznik Decl. Ex. B). The June 11 decision by CORC on the April 4 grievance offers no indication that CORC was aware of the actual transfer to which he had been subjected, much less assessed its significance in rejecting the earlier grievance. (Pl.'s Opp'n Point I Ex. A, at 724). Indeed, absent an appeal by plaintiff from the denial of the May 22 grievance, there is no basis to infer that CORC would have known of the facts underlying that second grievance, including the transfer and claimed resultant back pain. (*Cf., e.g.,* Reznik Decl. Ex. C (IGRC rejection of May 22 grievance)).

**\*9** Apart from the absence of any evidence of consolidation of appeals, Thomas's assertion is belied by the timing of the two proceedings. If IGRC's denial of his May 22, 2008 grievance did not issue until June 4, 2 008 (*see id.*), presumably the next step at that point would have been an appeal to the Superintendent, a process that would inevitably have taken some number of days for issuance of a decision, followed by an appeal to CORC. Yet by that time plaintiff's appeal from the denial of his April 4, 2008 grievance had been pending before CORC for more than a month, and it issued its decision only one week later. (*See* Pl.'s Opp'n Point I Ex. A, at 724). Moreover, CORC issued that decision on a form that specified the grievance that it was reviewing, and the only grievance that it listed was that which Thomas had filed in Fishkill on April 4. (*Id.* at 707 (plaintiff's April

4, 2008 grievance filed April 8 and identified by stamp as "30949–08"), 724 (referencing only Grievance Number "FCF–30949–08" filed April 8, 2008)). [8]

These circumstances also preclude deeming plaintiff to have exhausted his remedies on the possible basis that both grievances touched upon the treatment of the alleged medical hold. As noted, the essence of plaintiff's second grievance concerned the specifics of his being compelled to travel fourteen hours, in violation of that asserted hold, a circumstance not present in connection with the earlier grievance or its appeal. Moreover, plaintiff obviously understood that distinction since he chose to file the May 22 grievance rather than rest on his allegations from the earlier grievance, the appeal of which was still pending as of May 22. To allow an inmate to ignore the requirement of complete exhaustion in these circumstances would substantially undercut the premise for the complete-exhaustion rule emphasized in *Ngo.*

Summary judgment on this defense may also not be withheld on the basis that plaintiff might be able to fit himself within one of the exceptions to complete exhaustion recognized by the Second Circuit in *Hemphill* and related decisions, although plaintiff makes an effort to invoke one of those three exceptions.

It cannot be said that plaintiff reasonably misunderstood the necessity of appealing an adverse decision on a grievance to preserve the claim. As reflected in Exhibit A to the Bellamy Declaration, he is an experienced grievant, and plainly was well aware of the procedural requirements. Furthermore, defendants have not waived the exhaustion defense, having asserted it in their answers (*see* Answer by Defs. to the Compl. ¶ 82; Answer by Def. Albright to the Compl. ¶ 82), and then moved for summary judgment on it.

The one exception that plaintiff invites us to consider pertains to the availability of the full panoply of grievance procedures. According to plaintiff, he filed the pertinent May 22 grievance at the Upstate Correctional Facility while in punitive segregation. (Pl.'s Opp'n Point I 3). He reports that on or about May 22, 2008, [9] he received two memoranda from the Upstate IGRC. (*Id.*). The first advised that the IGRC had determined that a grievance dated May 28 (presumably the one at issue here) was untimely, because the pertinent events had occurred on March 17, 2008 and he had filed his grievance well past the twenty-one-day deadline. The memorandum went on to say that his grievance was therefore

being returned to him. (*Id.* at 3 & Ex. C). He then received a second memorandum from IGRC, also dated May 28, reciting that it had received two grievances from him, one of which (UST–35600–08) concerned his transfer from Fishkill. (*Id.* at 3 & Ex. D). This second memorandum stated that the IGRC would consider both grievances and send him a copy of its decision when rendered. (*Id.*). Plaintiff represents that, while at Upstate, he never received the June 4 IGRC decision rejecting his transfer grievance, that he was subsequently transferred to another facility (presumably Woodbourne Correctional Facility), and that he never learned of the June 4 decision until he obtained discovery in this litigation. (*Id.* at 3–4).

**\*10** This argument is not responded to by defendants in their reply, but even so it is legally insufficient to justify possible invocation of the unavailability exception under *Hemphill* and its progeny. The DOCS regulations specify a deadline for the IGRC to decide a grievance, and they provide that if the IGRC fails to respond within the time limits, the inmate may move to the next stage of the grievance process. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.6(g)(2). Given this provision, the courts have consistently held that a failure by the IGRC to respond timely does not excuse the inmate from pursuing all further stages of the grievance process. *See, e.g., Pacheco v. Drown,* 2010 WL 144400, at \*19 & n. 21 (N.D.N.Y. Jan. 11, 2010) (citing cases); *Banks v. Stewart,* 2010 WL 2697075, at \*8 (S.D.N.Y. July 6, 2010); *Torres v. Carry,* 672 F.Supp.2d 338, 343 (S.D.N.Y.2009); *Veloz v. New York,* 339 F. Sup.2d 505, 515–17 (S.D.N.Y.2004), *aff'd,*178 F. App'x 39 (2d Cir.2006). [10] Moreover, as an experienced grievant plaintiff may certainly be charged with knowledge of these requirements. [11]

In sum, the deliberate-indifference claim is barred by plaintiff's failure to exhaust his administrative remedies.

## II. *The Merits of Plaintiff's Free–Exercise Claims*

Plaintiff's first two claims target events in October 2007 and January 2008 that, according to plaintiff, interfered with his ability to practice his religion in two specific respects. He thus asserts that certain of the named defendants should be held liable to him on the premise that they were responsible for the apparent errors that led to his claimed injury.

Defendants acknowledge that in one, and possibly two, discrete respects the prison failed to follow the entirety of its own plans to enable Muslim inmates to celebrate with

complete fidelity one set of Muslim holiday rites—those occurring in January 2008–but they argue that the record reflects that these omissions were isolated and unintended errors and that they did not substantially burden plaintiff's exercise of his right to practice his religion. (Defs.' Mem. 13–19). They further assert that plaintiff and his fellow Muslim inmates were afforded a fully adequate means of participating in their religious rites in October 2007. (Defs.' Mem. 8–13). Alternatively, defendants argue that the named defendants on these claims are entitled to qualified immunity from liability. (Defs.' Mem. 30–33).

We conclude that the undisputed facts demonstrate that plaintiff cannot sustain his burden on either of his First Amendment claims.

### A. Free–Exercise Standards in a Prison Setting

We start with the basic standards that govern First Amendment claims of the sort that plaintiff is pressing here. It is well-settled that inmates are entitled to practice their religion and must be offered "reasonable opportunities" by their jailers to do so. See, e.g., Hudson v. Palmer, 468 U.S. 517, 523 (1984) (quoting Cruz v. Beto, 405 U.S. 319, 322 n. 2 (1972) (per curiam)). To justify restrictions on a prisoner's religious observances, prison officials must demonstrate that the restrictions are " 'reasonably related to legitimate penological interests.' " O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987) (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)); see also Pugh v. Goord, 571 F.Supp.2d 477, 497 (S.D.N.Y.2008) (noting that the reasonableness test applied to inmates' free-exercise claims is less stringent than standard for non-inmate claims).

*11 To establish a free-exercise claim, an incarcerated plaintiff must first demonstrate that the targeted policy or practice constitutes a burden on his religious beliefs, although the extent of the burden that must be shown is a matter of some uncertainty within this Circuit. See id. at 497 & n. 10.The Second Circuit has stated that in order to prevail on a free-exercise claim "[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs."Salahuddin v. Goord, 467 F.3d 263, 274–75 (2d Cir.2006); accord Skoros v. City of N.Y., 437 F.3d 1, 39 (2d Cir.2006). This "substantial-burden" standard has its roots in the Supreme Court's decision in Sherbert v. Verner, which held that, to prevail on a constitutional claim, a plaintiff must establish that a challenged policy represents a substantial burden on his religious exercise. 374 U.S. 398, 402–06 (1963). However, the Circuit has

avoided addressing the question of whether an inmate must still establish a "substantial burden" on his rights in order to prevail on a free-exercise claim in light of the Supreme Court's invalidation of the Religious Freedom Restoration Act of 1993 ("RFRA") in City of Boerne v. Flores, 521 U.S. 507, 536 (1997).See, e.g., Salahuddin, 467 F.3d at 275 n. 5;see generally Ford v. McGinnis, 352 F.3d 582, 591–92 (2d Cir.2003) (noting circuit split as to the applicability of the "substantial-burden" standard following the City of Boerne decision, but applying test absent briefing by parties as to its continuing viability). That Act had mandated the application of the Sherbert standard to all free-exercise claims following the Supreme Court's invalidation of the Sherbert test in certain instances in Emp't Div., Dep't of Human Res. v. Smith, 494 U.S. 872 (1990).See Ford, 352 F.3d at 592. [12]

Here, defendants assert that the "substantial-burden" standard applies (see Defs.' Mem. 9), and plaintiff does not argue otherwise. Therefore, following the lead of the Second Circuit, we assume that a plaintiff must initially establish that the policies or practices about which he complains impose a substantial burden on his religious exercise. See Ford, 352 F.3d at 592;accord Salahuddin, 467 F.3d at 274–75 & n. 5; Pugh, 571 F.Supp.2d at 497 n. 10 (assuming that the substantial-burden test applied to plaintiffs' free-exercise claims because plaintiffs introduced sufficient evidence of the burden of the challenged practices to satisfy the test). A substantial burden is imposed on a plaintiff when "the state 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.' " Jolly v. Coughlin, 76 F.3d 468, 477 (2d Cir.1996) (quoting Thomas v. Review Bd. of the Ind. Emp't Sec. Div., 450 U.S. 707, 718 (1981)) [13]; accord McEachin v. McGuinnis, 357 F.3d 197, 202 n. 4 (2d Cir.2004); Tafari v. Annets, 2008 WL 2413995, at *14 n. 32 (S.D .N.Y. June 12, 2008).

*12 Once an incarcerated plaintiff has established that his religious exercise has been substantially burdened, the court evaluates the reasonableness of the challenged act or policy under a four-factor test. The considerations include "whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests."Salahuddin, 467 F.3d at 274 (citing Turner, 482 U.S. at 90–91);accord Zargary v. City of N.Y., 607 F.Supp.2d

609, 612 (S.D.N.Y.2009); *Bush v. Goord,* 2009 WL 790358, at *2 (W.D.N.Y. Mar. 25, 2009). We note that the first factor must be satisfied by the defendant—that is, the defendant must show that the challenged action or policy bears a rational connection to a legitimate governmental objective and that that objective actually motivated the challenged conduct—in order for it to prevail. *Salahuddin,* 467 F.3d at 274, 276–77 (citing, *inter alia, O'Lone,* 482 U.S. at 350–51, 353).

The foregoing form of analysis will not assist a plaintiff who does not demonstrate that the challenged actions of the defendants constituted a prison policy or practice. If the conduct about which the plaintiff complains involves an isolated departure from otherwise proper procedures, the court will not find that it imposed a severe burden on the inmate's religious exercise. *E.g., Ford,* 352 F.3d at 594 n. 12; *Smith v. Graziano,* 2010 WL 1330019, at *7–9 (N.D.N.Y. Mar. 16, 2010) (denial of Protestant service on two occasions *de minimis* ) (citing cases); *Tafari,* 2008 WL 2413995, at *16– 17 (denial of Kosher meals on four occasions only *de minimis* burden on plaintiff's religious exercise); *Thomas v.. Picio,* 2008 WL 820740, at *6 & n. 8 (S.D.N.Y. Mar. 26, 2008) (denial of Kosher meals for one day is not substantial burden on inmate's religious exercise).

## B. *The Zakat–ul–Fitr Claim*

Plaintiff's first claim is that defendants Kelly and Connolly interfered with his right to the free exercise of religion in connection with their handling of one aspect of the ceremonies required to be performed by adherents of the Muslim religion at the end of Ramadan. (*See* Pl's Opp'n "Point II. 'A' " ("Point 11(A)") 1). We conclude that this claim is baseless.

According to both plaintiff and defendants, at the end of the period of Ramadan, which involves daytime fasting and prayers for forty days, devout Muslims are to undertake certain prayers, on a day known as Eid–ul–Fitr. (Compl. ¶¶ 14–15; Decl. of Charles Kelly in Supp. of Defs'. Mot. for Summ. J. ("Kelly Decl.") Ex. D; Decl. of Imam Salahuddin M. Muhammad ("Muhammad Decl.") ¶ 10). They are also expected, prior to offering the prayers, to participate in what is known as "Zakat–ul–Fitr" or "Sadaqat–ul–Fitr." This obligation involves an act of charity, typically, the provision of money or (more traditionally) food to someone indigent or otherwise in need, as a means of purifying the giver for the sins that he has committed during the preceding year. (Muhammad Decl. ¶¶ 5–10). According to the Imam of the Fishkill facility, the performance of this act of charity is

permissible either on the day of Eid or prior to it. (*Id.* ¶ 9). In 2007 the Eid occurred on October 13. (*Id.*). Plaintiff appears to complain that the Zakat–ul–Fitr ceremony was untimely in 2007. (Compl. ¶¶ 18, 20). [14]

**\*13** The pertinent events may be briefly summarized. In a prison setting, the Imam believed, the fulfilment of the Zakat–ul–Fitr obligation is more readily achieved through the donation of food, since foodstuffs are readily available to the inmates. (Muhammad Decl. ¶ 8). In order to ensure the availability of this form of observance to Muslim inmates, the Imam sent a memorandum to the Assistant Deputy Superintendent for Programs, Mr. George Jessen, discussing how to provide an opportunity for the Ramadan ceremonies and the fulfilment of the obligation for Zakat–ul–Fitr. (*Id.* ¶ 10; Kelly Decl. Ex. C; Connolly Decl. Ex. C). In that memorandum, the Imam anticipated that the Eid prayer would be scheduled for October 11 or 12. (Muhammad Decl. ¶ 10; Kelly Decl. Ex. C; Connolly Decl. Ex. C).

The question as to how to arrange the Zakat–ul–Fitr was initially addressed by Deputy Superintendent of Security Charles Kelly, who opted for an exchange of money rather than, as the Imam had suggested, the distribution of food. (Kelly Decl. ¶¶ 7, 11–12). Thus he indicated that participating inmates could withdraw $3.50 from their commissary accounts—what he estimated to be the equivalent of one full meal—for this purpose. (*Id.* ¶¶ 7, 9, 11). According to Kelly, he made this decision both because prison policy did not permit inmates to carry food items throughout the facility unless returning to their units from the commissary and because the DOCS Standards of Inmate Behavior prohibited inmates from buying, selling, giving or loaning personal property without authorization. (*Id.* ¶ 11). Kelly was also concerned that, absent supervision, food exchanges could lead to fights or other security threats within the prison, and that rules against SHU-confined inmates participating in food-giving or -receiving might lead to complaints of discrimination. (*Id.* ¶¶ 9–14 & Ex. B). [15]

Plaintiff filed a grievance in advance of the Eid ceremonies, asking that he be allowed to give the Zakat–ul–Fitr. (*Id.* Ex. A). That grievance was filed on October 10, 2007, three days before Eid. (*Id.*). In the meantime, Superintendent Connolly modified Deputy Kelly's decision so as to permit the use of food as a means of undertaking the charitable acts required of Muslim inmates. (Connolly Decl. ¶ 5). He did so in part because the Imam had agreed to undertake the food distribution, thus alleviating the concern of Kelly that the

process could disintegrate into a "food grab." (*Id.* ¶ 6). He also scheduled the Zakat–ul–Fitr to take place on October 12, one day before Eid. (*Id.* ¶ 5). That distribution did in fact take place on schedule, with the Imam presiding. (*Id.* ¶ 8; Kelly Decl. ¶ 15 & Ex. E).

Superintendent Connolly substantially denied plaintiff's grievance on November 1, 2007, because the charitable offerings had in fact already been distributed. (Connolly Decl. ¶¶ 9–10 & Ex. B). Plaintiff appealed that denial, complaining that the exchange was late (*id.* Ex. B), but since Eid occurred that year on October 13, there was nothing in the record to suggest that this complaint had any basis. (Muhammad Decl. ¶ 9; Connolly Decl. ¶ 10).

*\*14* In view of this record of events that are not in genuine dispute, a trier of fact could not reasonably find liability. The prison made reasonable accommodations for the Muslim inmates to perform their Zakat–ul–Fitr obligations, and it cannot be said that those accommodations substantially burdened the plaintiff's exercise of his right to practice his religion. Moreover, even if plaintiff might contend that the event should have been arranged differently, he fails to show that the way in which the matter was handled contravened the precepts of his religion or substantially burdened his exercise of his religious obligations, much less show that this one event reflects a policy or practice of the institution to violate his First Amendment rights. [16]

Finally, it is possible that Thomas means to argue that the conclusion of Ramadan fell on a date earlier than October 13, the date specified by the Imam. (*See* Pl.'s Rule 56.1 Statement ¶ 10 (stating that Eid–ul–Fitr should have occurred on October 11, 2007)). Even if he does so contend, it is obvious that the facility personnel handling the scheduling and details of the events in question were entitled to rely on the Imam's representation that the correct date was October 13, 2007. (Muhammad Decl. ¶ 9; Kelly Decl. Ex. C).

Given these conclusions, we need not address defendants' alternative argument that they are protected by qualified immunity. That said, it is apparent that defendants Kelly and Connolly had ample reason to believe that their actions in regard to the conducting of these religious ceremonies did not violate any constitutional right of the plaintiff. That being the case, they would in any event be immunized from liability for damages to the plaintiff. *Cf. Barnes v. Fedele,* 760 F.Supp.2d 296, 303, 305 (W.D.N.Y.2011) (stating that it was "possible, if not probable" that defendant DOCS employee

was entitled to qualified immunity for his written responses to plaintiff prisoner's letters concerning the alleged wrongful confiscation of his religious head wear based on defendant's reliance on a DOCS directive and on the advice of the New York State Board of Rabbis in drafting his responses; court compares *Ford,* 352 F.3d at 597–98, reversing district court's grant of summary judgment for prison authorities on qualified-immunity grounds based on district court's finding that it was objectively reasonable for defendants to rely on advice of DOCS religious authorities in concluding that certain feast was without religious significance because the proper inquiry was whether plaintiff's belief was sincerely held and religious in plaintiff's "own scheme of things"); *Johnson v. Rock,* 2010 WL 3910153, at *3 (N.D.N.Y. Sept. 30, 2010) (granting summary judgment based on qualified immunity for defendant Superintendent of correctional facility where court found that a reasonable official in defendant's position would have no reason to suspect the restricted diet that defendant was provided during Ramadan impinged on his Muslim beliefs; court relied in part on declaration of facility Imam); *Koehl v. Greene,* 2008 WL 4822520, at *9 (N.D.N.Y. Oct. 31, 2008) (qualified immunity justified based on defendants' deference to Rabbi's determination).

### C. *The Muharram Claim*

*\*15* Plaintiff's next claim concerns the handling of a set of ceremonies known as the Ten Days of Muharram Festival or Ashura. In 2008 those days encompassed January 10 through 19. (Pl.'s Opp'n "REPLY Point II, 'B' " ("Point 11(B)") 1; Compl. ¶¶ 22–23). In plaintiff's complaint he asserts that although services were scheduled for each day through January 18 in the prison mosque, the prison failed to arrange a general callout on January 10 and 19 for the ten Muslim inmates who had signed up to participate. (Compl.¶¶ 22–23). He names defendants Kelly, Fiore, Larkin and Rough as the prison officials responsible for the problems encountered on January 10 and 19. (*Id.* ¶ 21).

The procedure for arranging religious observances for Muslim inmates starts with the Imam, who is to prepare requests for prisoner releases, scheduling and other logistical matters that are needed to ensure that celebrants are able to carry out their religious obligations. (Decl. of Roland Larkin in Supp. of Defs.' Mot. for Summ. J. ("Larkin Decl.") ¶ 5). The Imam, like other religious chaplains assigned to the prison, would prepare a memorandum and event packet and submit them to Deputy Superintendent Larkin. (*Id.*). The Imam would also prepare a list of inmates who were to participate

and were therefore to be called out from their regular locations to attend services. (*Id.*). Larkin's staff would then review these materials to ensure compliance with DOCS guidelines and to confirm that the listed inmates were appropriate participants. (*Id.*). The Imam, like other prison chaplains, would then be responsible for transmitting the approved list of inmates to the callout office for inclusion in the master list of prisoners to be called out for the specific dates from each housing unit. (*Id.;* Decl. of Thomas Rough in Supp. of Defs.' Mot. for Summ. J. ("Rough Decl.") ¶ 6; Decl. of Fedele Fiore in Supp. of Defs.' Mot. for Summ. J. ("Fiore Decl.") ¶ 7).

On January 3, 2008 the Imam wrote to Larkin by memorandum, requesting approval for the Ten Days of Muharram festival. (Larkin Decl. ¶ 6 & Ex. A). That same day Larkin received a Special Events Final Coordination and Approval Package from the Imam. (*Id.* ¶ 7 & Ex. B). This submission included a list of inmate participants, approved menus for breakfast, lunch and dessert, and program specifics. (*Id.*). Although the Imam's memorandum had listed the pertinent dates as running from January 10 though 19, the packet—apparently erroneously—listed the end date as January 18 and included specific logistical requests, including food menus, only for January 10 through 18. (*Id.* ¶ 8 & Exs. A–B).

On January 10, the first day of the Muharram Festival, there was what defendants describe as some confusion about the callout of inmates for the first day of Muharram, and they all profess no certainty about whether there was such a callout that day. (Fiore Decl. ¶ 8; Kelly Decl. ¶ 21). For present purposes, we must therefore assume that there was none, as plaintiff contends. It is not genuinely disputed, however, that none of the named defendants was responsible for submission of the callout list to the facility's callout office. (Fiore Decl. ¶ 7; Larkin Decl. ¶ 5; Kelly Decl. ¶ 22; Rough Decl. ¶ 8). Moreover, plaintiff offers no competent evidence that this omission was intentional rather than a bureaucratic oversight. In contrast, the Imam reports, based on 26 years of arranging services at the prison, that occasionally the callout lists have been submitted late or misplaced, but he and the prison staff exert themselves to ensure that eligible inmates are released to participate in religious services. (Muhammad Decl. ¶¶ 1, 12).

**\*16** There is also no dispute that callouts were properly made for the Muharram services on January 11 through January 18. (Kelly Decl. ¶ 21). As for the events of January 19, it is conceded that they did not go according to plan. (*E.g.,* Kelly Decl. ¶¶ 21–22; Rough Decl. ¶ 7, 9–16). That last day

was intended to include prayers, an address by the Imam and a meal, with activities to start at about 8:15 a.m. (Fiore Decl. Ex. C).

It appears that the Imam did not correct the dating error from the original packet until as late as January 18. (Fiore Decl. ¶ 8 & Ex. C). On that date, the Imam sent defendant Fiore, the Assistant Deputy Superintendent of Programs, a memorandum mentioning that January 19 was to be last day of the Muharram Festival. (*Id.*). Fiore approved this request (*id.*), but it apparently remained the Imam's obligation to submit the list of participating inmates to the callout office. (*Id.* ¶ 7).

The ten Muslim inmates who had signed up for the ceremony were not included on the prison's master callout list for January 19, presumably because their names had not been sent in time to the callout office. (Rough Decl. ¶¶ 6–7). The record does not explicitly disclose why the Muharram prisoner list for that date was not timely sent to the callout office or who was responsible for this error, though it is undisputed that the four defendants named in this claim were not involved in the transmission of the list to the callout office, and, as noted, it was the Imam's role to communicate with that office. [17] In any event, Officer Rough, who, as Chapel Checkpoint Officer, was assigned to the prison mosque to coordinate these events, reports that he received notice late on January 18 that there was to be a last-minute callout the next day for inmates eligible to participate in the Muharram Festival. (*Id* . ¶¶ 5, 10).

In anticipation of a potential problem with getting the eligible inmates released on time, early on January 19 Rough had the prison radio room make an announcement to officers in the various housing units to the effect that a Muslim festival was to occur that morning and that the officers should release the participating inmates to attend. (*Id.* ¶ 11). He also began telephoning the various housing units to tell the officers there to call out the listed inmates. [18] (*Id.*).

Rough was also aware that the participating inmates were to receive a special meal on the last day of the Festival. (*Id.* ¶ 12). Concerned that this message might not have been properly communicated, he called the mess hall before 10:00 a.m. to ask that mess trays be sent to the mosque. (*Id.*). The mess hall personnel advised him, however, that because of a lack of advance notice, they would be able to send only regular feed-up trays of food.(*Id.*).

Apparently as a result of the oversight in not timely transmitting the list of Muharram participants, and despite Rough's efforts, the listed inmates were not all released from their usual assignments. (*E.g., id.* ¶ 13). While Officer Rough waited at the mosque, one inmate who had signed up for Muharram appeared and reported that no callout had occurred for the event, at least in his unit.(*Id.*). That prisoner then left because he had a visit and chose to meet that visitor rather than wait to attend the last day of Muharram since only regular food was being served. (*Id.*).

**\*17** Shortly thereafter—whether as a result of Rough's efforts is not clear—two additional inmates appeared for the service but were apparently disappointed to hear that only "regular" food was to be served rather than the special meal that had been requested by the Imam, and they soon left. (*Id.*). [19] Ultimately the food trays were delivered to the mosque, even though Rough had called to cancel the order because he had no inmates in attendance. (*Id.* ¶ 14).

At around 10:00 a.m., plaintiff appeared, apparently because he had a law library pass for that time. (*Id.* ¶ 15; Compl. ¶ 23). When advised of the situation, he became angry and left without waiting for the service. (Rough Decl. ¶ 15).

In seeking summary judgment on this claim, the defendants targeted by plaintiff argue that they were not responsible for the preparation of the general callout list for the prison, on which the names of the inmates eligible to celebrate the Muharram Festival were to be included, or for transmission of the list of Muharram inmates to the callout office. They also note that, when confronted on January 19 with a circumstance for which he bore no responsibility, Officer Rough attempted to remedy the situation. In addition, defendants observe that, notwithstanding the apparent snafues of January 19, as well as the uncertainty as to what occurred on January 10, these were isolated incidents involving, at most, human error rather than a prison policy to deny Muslim inmates the opportunity to practice their religion. Consequently, they say, these events cannot form the basis for holding any defendants liable to plaintiff for a First Amendment violation. Finally, they assert in the alternative that each of the named defendants is entitled to qualified immunity. (*See generally* Defs.' Mem. 13–19, 30–32).

Plaintiff's claim fails for at least two reasons. First, the events, as outlined, cannot be deemed to be part of a policy or practice at the Fishkill facility to deny Muslim inmates their right to practice their religion. It is evident that for at least eight of the

ten days of Muharram in January 2008, the eligible inmates, including plaintiff, were afforded the ability to participate in the celebrations attendant to the Muharram Festival, and they apparently did so. The possible failure to call out inmates on January 10, 2008 and the errors that led to a failure of the prison's efforts to hold a final-day celebration, while surely regrettable, cannot form a predicate for liability on the part of any of the defendants because these events cannot be described as anything but isolated logistical errors. Indeed, the efforts of Officer Rough attest to the commitment of the prison staff to permit inmates to honor their religious obligations. Moreover, the uncontested evidence is that the facility had in place a set of procedures to permit ceremonies such as the Muharram Festival to proceed. In this case it is evident that identifiable confusions, notably the error in the original packet prepared by the Imam, contributed to, if it did not fully account for, the difficulties encountered on January 19.

**\*18** Second, apart from the isolated nature of the events that plaintiff targets, his claim fails because he offers no basis for a trier of fact to conclude that any of the named defendants were personally responsible for the alleged errors. That is plaintiff's burden, since a government employee may not be held liable under section 1983 unless he can be shown to have participated in a violation of a plaintiff's constitutional rights. *Ashcroft v. Iqbal,* 556 U.S. 662, ——, 129 S.Ct. 1937, 1945–46, 1948 (2009); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987); *Lloyd v. Lee,* 570 F.Supp.2d 556, 565 (S.D.N.Y.2008) (citing *Jones v. Westchester Cnty. Dep't of Corrs. Med. Dep't,* 557 F.Supp.2d 408, 413–14 (S.D.N.Y.2008)). In this case there is no evidence in the record suggesting that any defendant had any hand in a possible failure to call out the inmates on January 10, and equally no showing of a link between these individuals and the apparent problems in organizing the last day of the Festival for January 19. Indeed, we note that it is undisputed that insofar as the list of inmates eligible to attend that day was apparently not timely supplied to the prison callout office, that appears to have been the responsibility of the Imam. Moreover, the failure of timely preparation for that day's events may also be attributable to the dating error found in the festival package, which was prepared by the Imam and sent to the office of Deputy Superintendent Larkin. In any event, plaintiff cannot meet his burden here on pure speculation as to who was responsible for the errors, and that is all that he offers.

In short, summary judgment should be granted for defendants on this claim.

### III. *The Due–Process Claim*

On March 17, 2008, plaintiff was placed in administrative confinement pending an investigation of possible disciplinary violations. (Compl. ¶ 34 (quoting Inmate Misbehavior Report); Roberts Decl. ¶¶ 7–9). DOCS Captain L. Fields and Inspector General Investigator Pinze conducted an investigation, and on March 19 Fields prepared an Inmate Misbehavior Report concerning the plaintiff. (Roberts Decl. ¶¶ 7–8 & Ex. A). In that report he recounted that a DOCS Muslim chaplain named Abdul Mubdi had advised that on March 13, 2008, while in a DOCS Harlem office, he had received a telephone call from someone purporting to be "Abdul Jabbar," and that during the conversation he in fact recognized the voice of the caller as that of plaintiff Thomas. (*Id.* Ex. A). He knew that Thomas was then confined at Fishkill and that the phone number on his readout was not a prison number. (*Id.*). He therefore wrote down the phone number and ended the call. (*Id.*). According to Fields' report, Investigator Pinze verified that the call had been made through a third-party phone, and in fact plaintiff's phone log confirmed that he had placed a telephone call at the time that the chaplain received the call in question. (*Id.*). Based on these events, Fields preferred four charges: (1) communicating by phone with a DOCS employee without authorization, (2) making a third-party phone call, (3) making false statements, and (4) impersonation. (*Id.* ¶ 7 & Ex. A).

**\*19** Under DOCS regulations, a disciplinary hearing must be conducted within seven days of the inmate's pre-hearing confinement, unless an extension is obtained. N.Y. Comp.Codes R. & Regs. tit. 7, § 251–5.1(a); *see* Roberts Decl. ¶ 10. In this case the prison staff applied on March 21, 2008 for an adjournment of the hearing, an application that was granted until March 25, 2008. (Roberts Decl. ¶ 10 & Ex. B). The hearing took place, as scheduled, on March 25, with plaintiff pleading not guilty. (*Id.* ¶ 11 & Ex. C). At the conclusion of the hearing the hearing officer, defendant Stephen Roberts, found plaintiff guilty on all charges. (*Id.* ¶ 13 & Ex. D). He sentenced plaintiff to six months of keeplock and six months loss of package, commissary and phone privileges. (*Id.*).

Plaintiff appealed his conviction on March 28, 2008. (*Id.* ¶ 14 & Ex. E). He asserted a variety of challenges to the manner in which the hearing had been conducted. (*Id.* Ex. E). Thus he complained that the misbehavior report and hearing

were untimely, in violation of DOCS regulations. (*Id.*). He further asserted that he had requested what he referred to as "a Chapter 5" from "the Assistance" and that it had not been produced. (*Id.*). Plaintiff also stated that he had requested the appearance of the chaplain as a witness, and although he had then waived that appearance, he asserted that the hearing officer had been required, and had failed, to prepare a written statement of refusal.(*Id.*). He also complained that no evidence had been produced at the hearing and, finally, that his sentence was "excessive and too harsh." (*Id.*).

While plaintiff's appeal was pending, DOCS transferred him from Fishkill to the Upstate Correctional Facility to serve his six-month sentence, which was set to expire on September 13, 2008, approximately six months after his initial confinement. (*Id.* Ex. D). On May 13, 2008 Norman Bezio, the DOCS Director of Special Housing/Inmate Discipline, reversed the conviction because the original misbehavior report had been based on an investigation, a circumstance that required the hearing officer to call in the reporting official (presumably Captain Fields) to testify at the hearing. According to Bezio, since Fields had not appeared at the hearing, the conviction could not stand. (*Id.* ¶¶ 15, 17 & Ex. F). Plaintiff was held in SHU for twenty-four days after his conviction was reversed, until June 6, 2008 (for a total of almost three months in punitive confinement). (Compl.¶ 44).

Based on this series of events, plaintiff asserts a claim against defendant Roberts, Deputy Superintendent for Administrative Affairs, for his role as hearing officer at his disciplinary hearing. (Compl.¶ 33). Plaintiff specifically claims only that the disciplinary hearing, held eight days after his initial confinement, was untimely, and that he was denied his right to due process because Roberts did not call the chaplain as a witness. (*Id.* ¶¶ 35–36, 39).[20]

**\*20** In response defendants argue that the hearing was timely since an adjournment was requested by the prison and granted by the hearing officer. (Defs.' Mem. 21–22). As for the purported denial of plaintiff's request for an appearance by the chaplain, defendants note that although plaintiff initially requested that he testify, he subsequently waived the chaplain's presence (*id.* at 22), a waiver documented in the hearing form prepared by Roberts and apparently initialed by plaintiff. (Roberts Decl. ¶ 11 & Ex. C). They also note that although DOCS later reversed the conviction, it did so on an entirely different ground, that is, the hearing officer's failure to call the reporting officer who had summarized the investigation that had led to the charges being filed against

Thomas. (*Id.* ¶¶ 15–16 & Ex. F). Moreover, they point out that this ground was not even asserted by Thomas on his appeal from his disciplinary conviction. (*See id.* ¶ 16 & Ex. E).

In plaintiff's response he does not deny that he waived his request for an appearance by the chaplain. (Pl.'s Opp'n "REARGUMENT POINT 11(c)" ("Point 11(c)") Ex. B). He seems to argue, nonetheless, that he was deprived of his rights because the hearing officer did not articulate a reason for the chaplain not being called. (*Id.*). In addition, he asserts for the first time in this case that the hearing officer failed to provide due process because he convicted plaintiff in the absence of any evidence of guilt and because he failed to articulate the reasons for his verdict. (*Id.* at ¶¶ 9(A)-(B)).

We start with some basic principles governing an assessment of prisoner claims arising from the conduct of disciplinary hearings. Plaintiff claims that Deputy Superintendent Roberts deprived him of his due-process rights during his disciplinary hearing. (Compl.¶ 33). To establish this claim, plaintiff must show: " '(1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process.' " *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (quoting *Giano v. Selsky,* 37 F.Supp.2d l62, 167 (N.D.N.Y.1999)); *Joseph v. Fischer,* 2009 WL 3321011, at *11 (S.D.N.Y. Oct. 8, 2009).

To pursue a due-process claim, the inmate must first establish that he possessed a liberty interest. *Frazier v. Coughlin,* 81 F .3d 313, 317 (2d Cir.1996); *Joseph,* 2009 WL 3321011, at *11. A prisoner's liberty interest is implicated by SHU confinement only if the discipline " 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Palmer,* 364 F.3d at 64 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). [21] Following *Sandin* and *Palmer,* a court must look to the actual punishment in making its determination. *Palmer,* 364 F.3d at 64 (citing *Scott v. Albury,* 156 F.3d 283, 287 (2d Cir.1998)). Factors to aid in determining whether the plaintiff endured an "atypical and significant hardship" include "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions" and "the duration of the disciplinary segregation imposed compared to discretionary confinement." *Id.* (quoting *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)).

**\*21** In the present case, defendants have not challenged plaintiff's claim insofar as he is alleging that he was exposed to an atypical and significant hardship. Rather, they assert that

the plaintiff's challenges to the manner in which the hearing was conducted are either meritless or unpreserved, and that in any event the hearing officer did not transgress any of plaintiff's constitutionally mandated procedural rights. (Defs.' Mem. 19, 22–23).

Accordingly, we now look to whether the manner in which the hearing was conducted failed to meet due-process standards. *See Giano,* 238 F.3d at 225. We start with the two criticisms that plaintiff included in his complaint and further elaborated on in his motion papers—that the hearing was improperly delayed and that defendant Roberts did not call the chaplain or explain his reasons for not doing so.

The timeliness argument is plainly meritless for two reasons. First, the requirements governing the timing of the hearing are functions of a state agency regulation, in this case promulgated by DOCS. Even if the hearing officer had violated a DOCS procedural requirement, that would not, in itself, trigger a due-process violation. *See, e.g., Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990) (citing *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541 (1985)); *Rodriguez v. Diaz,* 2010 WL 1838814, at *8 (S.D.N.Y. May 5, 2010); *Zamakshari v. Dvoskin,* 899 F.Supp. 1097, 1109 n. 6 (S.D.N.Y.1995). Second, in any event the record reflects no such state-law violation. It is not genuinely disputed that the prison was granted a brief extension from March 21 to 25 for the hearing, and that the proceeding took place on that adjourn date. Since the DOCS regulation cited by plaintiff makes provision for such adjournments to be granted, the hearing officer acted consistently with the pertinent requirements. [22]

We turn therefore to plaintiff's complaint that he was denied a witness at the hearing as well as the two criticisms that were not included in his original pleading but are asserted on the current motion. We first summarize the pertinent constitutional standards.

Essential to due process is freedom from arbitrary governmental action.*Wolff v. McDonnell,* 418 U.S. 539, 558 (1974). Nonetheless, "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply."*Id.* at 556.Among the protections that an inmate does retain in this context, as summarized in *Wolff,* are advance written notice of the charges, a qualified opportunity to call witnesses and a written decision explaining the basis for the decision. *See id.* at 563–67.Additionally the hearing officer must be

unbiased, *see, e.g., Edwards v. Balisok,* 520 U.S. 641, 647 (1997), and his decision must be based on at least "some evidence." *See, e.g., Superintendent v. Hill,* 472 U.S. 445, 455 (1982); *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). Of particular relevance here, the Supreme Court has noted that "[c]hief among the due process minima outlined in *Wolff* was the right of an inmate to call and present witnesses and documentary evidence in his defense before the disciplinary board." *Ponte v. Real,* 471 U.S. 491, 495 (1985). That said, both *Wolff* and *Baxter v. Palmigiano,* 425 U.S. 308, 320–21 (1976), have held that "ordinarily the right to present evidence is basic to a fair hearing, but the inmate's right to present witnesses is necessarily circumscribed by the penological need to provide swift discipline in individual cases." *Ponte,* 471 U.S. at 495. The Court in *Ponte* emphasized that "[t]his right is additionally circumscribed by the very real dangers in prison life which may result from violence or intimidation directed at either other inmates or staff." *Id.*

**\*22** The Supreme Court has consistently held that prison officials must be accorded the discretion necessary to keep a hearing within reasonable limits and to refuse to call witnesses when summoning them may create a risk of reprisal or undermine authority. *Wolff,* 418 U.S. at 566 ("Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence."). Additionally, a hearing officer may deny a prisoner's request to call a witness "on the basis of irrelevance or lack of necessity." *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991).

It would aid reviewing courts if prison disciplinary officers gave their reasons for denying an inmate's request for witnesses, but "nowhere in *Wolff* or *Baxter* did [the Supreme Court] require the disciplinary board to explain why it denied the prisoner's request, nor did [the Court] require that those reasons otherwise appear in the administrative record." *Ponte,* 471 U.S. at 496. Accordingly, the Supreme Court in *Ponte* refused to "prescribe" that the reasons for refusing to call a witness be stated in writing. *Id.* The Court also declined to hold that the Due Process Clause required the administrative record to include the board's justifications or reasons for denying the witness. *Id* .

Plaintiff's claim about the denial of a witness, as articulated in his complaint, plainly fails because, although he initially requested the appearance of the chaplain, he subsequently waived that appearance. Indeed, not only is that waiver reflected in the hearing sheet at a section that plaintiff initialed, but he also does not deny this waiver in his responsive papers. (Roberts Decl. Ex. C; Pl.'s Opp'n Point II(C) Ex. B; *see also* "Second [Reply] Opp'n Mot. to the Defs. ['] Summ. J. Mot." ("Pl.'s Sur–Reply") "Reply# 2 Point II, (C)" ("Point II(C)") 7 (plaintiff admits that he did not call any witnesses at the hearing)). Moreover, as defendant Roberts asserts without contradiction in his declaration on the current motion, if plaintiff had not waived the chaplain's appearance, he would have honored that request. (Roberts Decl. ¶ 12).

Under these circumstances, plaintiff's claim, however phrased, is necessarily meritless. The pertinent constitutional right of the inmate is to have his request for a witness seriously considered by the hearing officer and for that request not to be denied without a colorable reason. An inmate's waiver of a request for a witness obviously leaves the hearing officer with no obligation either to call the witness or to offer a rationale for having not called him. In short, by virtue of plaintiff's waiver of an appearance by the chaplain, he surrendered any potential claim based on the failure of the hearing officer to call that individual.

**\*23** As for plaintiff's two newly articulated attacks on the hearing officer's conduct of the hearing, neither survives scrutiny. In this respect we assess the merits of these arguments despite plaintiff's failure to plead them, choosing in this case to do so in view of plaintiff's status as a more or less untutored *pro se* litigant. That liberality, however, does not save these claims.

Insofar as plaintiff argues that the hearing officer failed to explain his decision, the claim is factually flawed. The hearing disposition sheet includes a statement by the hearing officer in which he explicitly invokes the findings of the investigators, as summarized by Captain Fields in the misbehavior report, and also explains the severity of the punishment that he was meting out. Thus the hearing officer recited:

A. *STATEMENT OF EVIDENCE RELIED UPON:* MISBEHAVIOR REPORT DATED 3/13/08 SIGNED BY CAPT. FIELDS SUMMARIZING AN INVESTIGATION WHICH VERIFIED A 3RD PARTY CALL MADE BY YOU TO A DEPARTMENT EMPLOYEE.

B. *REASONS FOR DISPOSITION:* PHONE VIOLATIONS ARE SERIOUS[,] MADE MORE

SERIOUS IN THIS CASE DUE TO THE FACT THAT AN EMPLOYEE WAS THE TARGET OF THE CALL. THIS IS GIVEN TO DISCOURAGE SUCH IN THE FUTURE.

(Roberts Decl. Ex. D). This summary is plainly adequate to satisfy the constitutional requirement of an explanation, particularly in view of the detail provided in the Misbehavior Report that the hearing officer invoked. (*See id.* Ex. A). [23]

As for plaintiff's remaining complaint—that the hearing officer's decision was not supported by any evidence—it is equally groundless. The hearing officer relied on the report of the investigative officer, a report that included his findings from an interview with the chaplain whom plaintiff had telephoned. (*See id.*). That report was admissible and sufficient for purposes of a prison disciplinary hearing, since the inmate does not have a right of confrontation, and hearsay evidence is permitted. *See, e.g., Baxter,* 425 U.S. at 322–23; *Wolff,* 418 U.S. at 567–68; *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993) ("an inmate has no constitutional right of confrontation"); *Louis v. Ricks,* 2002 WL 31051633, at \*13 n. 25 (S.D.N.Y. Sept. 13, 2002) (gathering cases).

Finally, we note that plaintiff cannot rescue his claim based on the DOCS determination that the hearing officer should have called the reporting officer to testify. This ruling appears to be a product solely of DOCS policy, rather than a constitutional mandate, and requirements of state law are not automatically incorporated into due-process jurisprudence. *Russell,* 910 F.2d at 78 n. 1. In any event plaintiff neither pleaded such a claim nor even asserted it in his motion papers in opposition to the current motion.

In sum, plaintiff's due-process claim is meritless.

## IV. *The Eighth Amendment Claim*

As we have noted, plaintiff failed to pursue to completion the available DOCS grievance procedures with regard to his Eighth Amendment claim, which is based on his transfer to the Upstate Correctional Facility. If that failure to exhaust were ignored or excused, we would be compelled to address the merits of the underlying claim. For the guidance of the District Court, we address the merits in the alternative and conclude that if plaintiff had properly exhausted this claim, it would fail with respect to defendants Elizabeth Ritter and Theresa Knapp–David, but would survive summary judgment with respect to defendant Joy Albright. [24]

## A. *Standard of Review*

**\*24** To establish a constitutional claim for denial of rights based on the medical care provided by the defendants, an inmate plaintiff must demonstrate " 'deliberate indifference to [his] serious medical needs.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (alteration in original) (quoting *Estelle v. Gamble,* 429 U .S. 97, 104 (1976)). The physical condition of the plaintiff must be sufficiently serious and the failure to render proper care must result from "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)); *accord Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). This two-part test embodies both an objective and a subjective component.

The Second Circuit has commented favorably on defining a serious medical condition as a situation in which " 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gutierrez v.. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997)) (internal quotation marks omitted). As more recently described, the deprivation must be " 'sufficiently serious,' " that is, " 'one that may produce death, degeneration, or extreme pain." *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005) (quoting *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998)). Among the relevant factors in what is a fact-intensive inquiry, are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 702 (alteration in original) (quoting *McGuckin v. Smith,* 974 F.3d 1050, 1059–60 (9th Cir.1992)). "The Second Circuit, along with other circuits, has interpreted this standard as signifying that a defendant's act of deliberate indifference may form the basis of an Eighth Amendment claim based on a plaintiff's pain and suffering, even when the severity of a plaintiff's condition is not necessarily worsened by the act." *Stevens v. Goord,* 535 F. Supp .2d 373, 384 (S.D.N.Y.2008). "[I]t's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir.2003) (citing *Chance,* 143 F.3d at 702–03).

An official acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). Disagreement with a course of treatment chosen by a medical provider does not suffice to demonstrate such indifference. Indeed, even negligence tantamount to medical malpractice does not amount to an Eighth Amendment violation. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703. Nonetheless, an act of malpractice will amount to deliberate indifference if "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (quoting *Farmer,* 511 U.S. at 839);*accord Farid v. Ellen,* 593 F.3d 233, 248 (2d Cir.2010) (citing *Salahuddin,* 467 F.3d at 280); *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003). The subjective element requires a state of mind that is the equivalent of criminal recklessness. *Hathaway,* 99 F.3d at 553. This element " 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Id.* (alteration in original) (quoting *Farmer,* 511 U.S. at 835).

**\*25** We further reiterate that proof of an individual defendant's involvement in the alleged violation is a prerequisite to finding liability on a claim for damages brought under § 1983. *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001); *cf. Iqbal,* 556 U.S. at ——, 129 S.Ct. at 1940 ("Because vicarious liability is inapplicable to ...§ 1983 suits, the plaintiff in a suit such as the present one must plead that each Government-official defendant, through his own individual actions, has violated the Constitution.")."The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring."*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)).

**B.** *Analysis*

Plaintiff documents that he has had severe back problems since at least 2001. (*See generally* Pl.'s Opp'n Point II(D)). In June 2001, he received an MRI that showed that he was suffering from disc protrusions that resulted in "central canal stenosis" with "bilateral neural foraminal stenosis."[25] (*Id.* at 3 & Ex. B). In a physical-therapy evaluation following his MRI in July 2001, he described his pain as a seven out of ten when standing and was prescribed "nzprosen."[26] (*Id.* Ex. G). He has long received treatment for this "chronic and recurring" pain, including back-pain medication and anti-inflammatory drugs, a back brace, and regular physical therapy. (*Id.* at 3, 5 & Ex. A, at 0000015 (DOCS health record dated Feb. 2, 2007 stating that plaintiff "has had chronic & recurrent L–5 pain,"[27] "wears a Back Support," has taken "Robaxin"[28] since October 2006, and has had physical therapy "off & on")). On June 13, 2008, plaintiff's medical file notes that he was permitted to wear a "sacral belt"—a back brace—and that he was exempted for medical reasons from "HUB" bus and van trips. (*Id.* Ex. G, at 000048). On July 26, 2008 plaintiff complained of lower back pain with radiation down his legs. The medical consultant noted his MRI results in the appointment notes and scheduled an electromyogram ("EMG").[29] (*Id.* Ex. G, at 000019). On October 27, 2008 plaintiff submitted a request for a medical consultation because his lower back "still hurt [ ]." (*Id.*Ex. G, at 000024 (requesting that plaintiff be scheduled for physical therapy twice weekly for four weeks for his "chronic low back pain" that is "unrelieved by NSAIDS;"[30] consultant notes that plaintiff's earlier EMG showed "evidence of L5–S1 radiculopathy"[31] )). He anticipates surgery in the near future. (*Id.* at 6).

**\*26** Plaintiff claims that in connection with his April 30, 2008 transfer to Upstate, defendants Ritter, Davis, and Albright knowingly disregarded a medical hold that limited his travel time to two hours. (*See id.*Ex. C ("should not travel long distance[s] for more than 2 hrs")). He further documents the presence of such a hold in his medical file for periods preceding and overlapping the time when he was transported by bus to Upstate. (*See id.*Ex. C, at 380 & Ex. D, at Ex. A, Medical Work Status Assignment, Jan. 22, 2007).[32] Plaintiff's transfer to Upstate took approximately fourteen hours, during which time plaintiff claims that he "had to

go through hell and severe [ ] and excruciating pain"—he describes the trip succinctly as a "nightmare." (*Id.* at 5, 7). Once he arrived at Upstate, he had to be taken to the hospital for treatment of his pain and "mental anguish." (*Id.* at 7). [33] In his deposition, plaintiff testified that the trip had "exacerbated his condition." (Defs.' Mem. 26 & Ex. D).

Defendants argue that plaintiff fails to meet both the objective and the subjective elements of an Eight Amendment claim against all three named defendants-Ritter, David, and Albright. (Defs.' Mem. 24). They argue that plaintiff has had back problems since 2001—which he admits—and that he has submitted no evidence that the trip to Upstate either injured him or "exacerbated" his existing condition. (Defs.' Mem. 25). Defendants also argue that there is no evidence that Ritter, Davis, and Albright knew that plaintiff faced a substantial risk of serious harm that they disregarded, and that Ritter and David were not personally involved in the alleged violation because they were not involved in the decision to transfer plaintiff to Upstate. (Defs.' Mem. 26–30 (citing Decl. of Theresa Knapp–David in Supp. of Defs.' Mot. for Summ. J. ("David Decl.") ¶ 7; Decl. of Elizabeth Ann Ritter in Supp. of Defs.' Mot. for Summ. J. ("Ritter Decl.") ¶¶ 8–9)).

### 1. *Plaintiff's Eighth Amendment Claim: The Objective Component*

Depending on the circumstances, severe back pain can rise to the level of a "serious medical condition." *Flemming v. City of N.Y .,* 2009 WL 3174060, at *8 & n. 9 (E.D.N.Y. Sept. 30, 2009); *Williams v. Smith,* 2009 WL 2431948, at *9 (S.D.N.Y. Aug. 10, 2009) (gathering cases); *Morrison v. Mamis,* 2008 WL 5451639, at *8 (S.D.N.Y. Dec. 18, 2008) (finding in summary-judgment analysis that a reasonable factfinder could consider plaintiff's diagnosed condition of degenerative disc disease a "serious medical need"); *Nelson v. Rodas,* 2002 WL 31075804, at *14 (S.D.N.Y. Sept. 17, 2002) (holding that "severe back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment" but finding that plaintiff's allegations of "back spasms" without descriptions of the intensity or duration of the pain did not demonstrate such a condition); *cf. Gillespie v. N.Y. State Dep't of Corr. Servs.,* 2010 WL 1006634, at *5 (N.D.N.Y. Feb. 22, 2010) (finding that it was "extremely questionable" that plaintiff had alleged that his "degenerative osteoarthritis of his lower back" constituted a serious medical condition where medical records documented that, over a three-year period, plaintiff "periodically" claimed to suffer pain described as "intermittent," "chronic," "increasing;"

plaintiff had only once described his pain as "severe" and never used adjectives such as "extreme," "excruciating," or "unbearable"); *Phillips v. Goord,* 2009 WL 909593, at *6 (W.D.N.Y. Apr. 1, 2009) (complaint of "chronic" back pain without more insufficient to find a serious medical condition); *Jackson v. Fairchild,* 2007 WL 778133, at *2 (N.D.N.Y. Mar. 12, 2007) (finding that plaintiff did not raise an issue of fact regarding alleged severe medical impairment based on back and knee pain when he only complained about his back pain three times over the relevant period and did not request pain medication "beyond simple Ibuprofen and similar over-the-counter medications").

**\*27** In this case, plaintiff claims that his transfer to Upstate, in violation of his operative medical hold, caused him "severe[ ] and excruciating pain" and exacerbated his existing condition. (Pl.'s Opp'n Point II(D) 5, 7; Compl. ¶ 57). Plaintiff also alleges that he was unable to sit for an extended period during the drive because of the pain, and was threatened repeatedly with a misbehavior report for standing even though "he was unable to bear the pain and had to stand for a significant period of time" including while the vehicle was moving. (Compl.¶ 57). He states that his back condition has been well-documented, such that evidence of a "substantial risk" to his health was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official[s] ... had been exposed to" that information and thus "must have known about it." (Pl.'s Mem. Part II(D) 2–3 (quoting *Farmer,* 511 U.S. at 842)).

In his deposition—which occurred on December 23, 2010, almost two years and eight months after the transfer—plaintiff testified that he had an underlying back condition and asserted that the trip had "added on to it." (Reznik Decl. Ex. D, at 64:7–9). He reported that he was "healing slowly" and that he would eventually "be all right." (*Id.* at 65:5–25). He explained that when he had arrived at Upstate, he was immediately taken to "the medical" and provided with muscle relaxers and "the medication that [he] was really prescribed through the admin."(*Id.* at 66:2–10). Plaintiff also admitted that it was not a life-threatening situation. (*Id.* at 66:14–15). As far as on-going treatment, plaintiff explained that he received physical therapy "recently last year" but that the physical therapy had stopped to allow him to pursue alternative treatment "avenues." (*Id.* at 66:17–24). He does not elaborate as to what those may be.

Defendants principally argue that plaintiff fails to show that he was injured during, or had an existing injury exacerbated by, the transfer. (*See* Defs.' Mem. 25–26). However, a showing of a new injury or exacerbation of an existing injury is not necessary to sustain an Eighth Amendment claim—plaintiff can instead demonstrate that he experienced pain and suffering as a result of defendants' deliberate indifference. *See Stevens,* 535 F.Supp.2d at 384 (citing *McKenna v. Wright,* 386 F.3d 432, 437 (2d Cir.2004)) (holding that "a defendant's act of deliberate indifference may form the basis of an Eighth Amendment claim based on a plaintiff's pain and suffering, even when the severity of a plaintiff's condition is not necessarily worsened by the act"). Defendants do not directly address plaintiff's testimony regarding the severe pain that he suffered during that transfer, and do not deny that plaintiff required immediate medical attention upon his arrival at Upstate. (*See* Defs.' Mem. 25).

**\*28** Resolving all ambiguities in favor of plaintiff, we find that a factfinder could consider the severe pain that plaintiff experienced during his transfer to Upstate to rise to the level of a "serious medical need." *Cf. Abdul–Matiyn v. Pataki,* 2008 WL 974409, at \*9 (N.D.N.Y. Apr. 8, 2008) (finding on motion to dismiss that plaintiff alleged a serious medical condition when he (1) claimed that he had a history of back pain; (2) on the date in issue, the back pain he was experiencing was so severe that it was "making it almost impossible to walk" and was not addressed for three-and-one-half hours; (3) plaintiff also alleged chest pain; and (4) the combination of pain had him "twisted over in a bending position" and made him cry).

## 2. *Plaintiff's Eighth Amendment Claim: The Subjective Component*

There remains the question of whether there is a triable issue regarding the subjective component of the deliberate-indifference test. In defendants' motion, they argue principally that two of the three defendants—Ritter and David—had no involvement in the decision to transfer plaintiff. (*See* Defs.' Mem. 25–30). If this is true, these defendants would not have harbored the requisite state of mind to expose them to liability. More generally, defendants may be heard to argue that even if one of the defendants—impliedly Ms. Albright—knew of the medical hold and ignored it while authorizing the fourteen-hour trip, she could not be deemed to have been deliberately indifferent to plaintiff's condition and the cited medical documentation stating that he should not be bused more than two hours. Finally, they also

argue that plaintiff has not presented any evidence beyond "conclusory allegations" demonstrating that all three of the named defendants had knowledge of his medical issues that they allegedly disregarded in transferring him to Upstate. (*Id.* at 26).

To assess these questions, we separately address the record with respect to each of these three defendants. We conclude that if the exhaustion defense does not bar the claim at this stage, summary judgment should be denied with respect to defendant Albright and granted with respect to defendants Ritter and David.

### i. *Albright*

Plaintiff claims that Nurse Administrator Albright knew of his medical condition and travel restrictions because she had arranged for him to appear remotely at a certain proceeding based on his back condition in a civil case that he had filed in the New York State Court of Claims. (Pl.'s Opp'n "POINT III PERSONAL INVOLVEMENT" ("Point III") 2 & Ex. D). He asserts that she received all court correspondence regarding the remote appearance, and was involved in scheduling his appearance at the Regional Medical Unit. (*Id.* at 2). Plaintiff also suggests more generally that because of Albright's position as Nurse Administrator, she would have been aware of plaintiff's medical condition and any related medical holds. (*Id.* at 2–3). To similar effect, plaintiff testified in his deposition that "they knew [he] had a bad condition."(Reznik Decl. Ex. D, at 65:4). Lastly, plaintiff claims that he attempted to inquire directly to Albright about his medical hold, as directed by Ritter, but that he received no response from her prior to his transfer.(*Id.* at 3). [34]

**\*29** Defendants assert that plaintiff has not submitted evidence beyond "conclusory allegations" to establish that defendants, including Albright, acted with deliberate indifference, because there is no evidence that Albright (or the other named defendants) knew that plaintiff faced a substantial risk of harm or disregarded that risk. (Def.'s Mem. 25–26).

### a. *The Existence of an Operative Medical Hold at the Time of Plaintiff's Transfer*

Based on the documentary evidence, we must assume for summary-judgment purposes that plaintiff had in place a medical hold restricting his travel time to two hours on the date that he was transferred to Upstate. (Pl.'s Mem. Point

II(D) Ex C ("Medical Work Status Assignment" from Fishkill stating that plaintiff "should not travel long distance[s] for more than 2 hrs")). [35]

**b.** *Albright's Knowledge of the Operative Medical Hold at the Time of Plaintiff's Transfer*
Defendants specifically address plaintiff's attempt to demonstrate Albright's knowledge of his medical hold based on her alleged involvement in coordinating a remote court appearance for plaintiff in 2007. (Defs.' Reply Mem. 12 (citing Pl.'s Mem. Point 11(D) 4)). They note that the documents that plaintiff provides, including his motion to appear remotely and the court order granting that motion (*see* Pl.'s Mem. Point II(D) Ex. D) do not mention Albright or at all suggest her participation in scheduling the appearance. They continue that even if plaintiff had had a medical hold in place in 2007 (presumably one that Albright knew about in connection with the remote appearance), that would not necessarily mean that she would have had knowledge that either the 2007 hold or a subsequent hold was applicable as of the transfer date. (Defs.' Reply Mem. 12). [36]

However, with respect to Albright's knowledge of the medical hold in place at the time of his transfer, plaintiff asserts that Ritter approached Albright multiple times about his medical hold and his concern that the facility officials were going to transfer him out of the facility. (Pl.'s Mem. Point III 1). During his conversations with Ritter that were apparently passed on to Albright, he "stressed to her" that he did have a medical hold in place.(*Id.*). Plaintiff further states that "every time" that he spoke with Ritter, "she kept referring [him] to Ms. Albright [and kept] asking [him if Albright had] contact[ed] [him] in reference to [his] medical hold."(*Id.* at 3). Each time he replied that Albright had not yet contacted him. (*Id.*). He never received a response from her, because it was "not too long after inquiring" to Ritter (and/or Albright) about his medical hold that he was transferred to Upstate. (*Id.*). [37]

We also note that, according to defendant David, it was the responsibility of the transferring facility—Fishkill— to specify plaintiff's "transfer considerations," including any information regarding his medical condition, when it submitted its transfer request to the Office of Classification and Movement. (David Decl. ¶ 11). Based on this information, a trier of fact could reasonably infer that Albright, as Nurse Administrator at Fishkill, was required to review plaintiff's medical file, including any pertinent medical holds, in order to provide that DOCS office with

any relevant information regarding plaintiff's fitness for transfer. Thus, the trier of fact could find that she reviewed, and therefore had knowledge of, plaintiff's medical history, including his operative medical hold, at the time of his transfer.

**\*30** Based on the record before us, there exists a triable issue of fact regarding whether Albright had knowledge of plaintiff's 2008 medical hold.

**c.** *Albright's Personal Involvement in the Transfer Decision*
On behalf of Albright, defendants (1) submit no affidavit or declaration; (2) do not assert any undisputed facts; and (3) do not make any specific arguments concerning her involvement, or lack thereof, in plaintiff's transfer to Upstate, or her state of mind when she participated in that decision. These omissions are glaring. Thus, defendants have not met their initial burden of affirmatively demonstrating the lack of a genuine issue of fact with respect to Albright's involvement in the transfer decision.

Resolving all reasonable inferences against the movants, we find that triable issues of fact remain that preclude summary judgment on plaintiff's Eighth Amendment claim against Albright.

**ii.** *Ritter*
Plaintiff does not demonstrate facts sufficient to raise a triable issue with respect to Ritter's involvement in the decision to transfer him to Upstate.

Defendant Ritter was Deputy Superintendent of Health at the regional medical unit at Fishkill at the time that plaintiff was transferred to Upstate. (Ritter Decl. ¶ 2). In that role, she states that she made weekly rounds in the SHU during which she consulted with inmates. (*Id.* ¶¶ 3, 6). However, she did not have her own patients or routinely examine or treat patients. (*Id.* ¶ 3).

Plaintiff states that Ritter "knows [him] personally" through mutual attendance at "I.L.C. meetings," and that they have spoken "numerous [ ] times" about his health issues. (Pl.'s Opp'n Point III 1). During one such conversation regarding his back problems, plaintiff claims, he raised his concern that he would be transferred from Fishkill in apparent violation of his medical hold. (*Id.*). In response, plaintiff states, Ms. Ritter suggested that he raise his concerns with the Nurse

Administrator, Ms. Albright.(*Id.*). [38] Although Ritter does not recall whether she spoke with plaintiff regarding his transfer or the existence of a medical hold, she was not his direct health care provider or nurse and thus was not responsible for his direct care. (*Id.* ¶¶ 7–9). Plaintiff submits no evidence to the contrary. He therefore fails to raise any facts suggesting that Ms. Ritter personally acted with deliberate indifference in relation to his transfer to Upstate.

### iii. *David*

Plaintiff does not demonstrate facts sufficient to raise a triable issue with respect to David's asserted deliberate indifference to his fate.

David was (and is) the Associate Commissioner of Population Management at DOCS when plaintiff was transferred to Upstate. (David Decl. ¶ 3). In that role, she is responsible for overseeing DOCS Office of Classification and Movement, Temporary Release, Program Planning and Research and for managing the inmate population. (*Id.*). She states that in 2008 she was not responsible for the classification or approval of transfers of any individual inmate between facilities. (*Id.* ¶ 7). Instead, her office conducts regularly scheduled transfer reviews at three-month intervals for eligible inmates and unscheduled transfer reviews at any other time that the facility determines that a transfer might be appropriate. (*Id.* ¶¶ 8–9). Classification analysts in the Office of Classification and Movement review inmates' transfer files based on an inmate's records and those received from the inmate's current correctional facility. (*Id.* ¶ 7).

 **\*31** David states that Fishkill provided her office with an unscheduled transfer review regarding plaintiff on April 17, 2008. (*Id.* ¶¶ 10–11). However, David states that this transfer review did not list any pertinent "transfer considerations." (*Id.*). It is the responsibility of the transferring facility to specify an inmate's "transfer considerations," including any information regarding an inmate's medical condition and suitability for transfer. (*Id.* ¶ 11). David states that she personally reviewed the transfer record, and based upon her review, plaintiff was approved for transfer to Upstate because of his "unsuitable behavior"—namely his six-month keeplock sentence that was imposed following his Tier III hearing.(*Id.* ¶¶ 10, 14). Although David admits that she personally reviewed plaintiff's transfer records-based on which review he was approved for transfer —David cannot be said to have known or disregarded any medical condition or limitation of plaintiff's when that

information, if applicable, was absent from the official transfer-review records that Fishkill had provided. (*See id.*Ex. A).

Plaintiff also asserts that he sent David a April 6, 2008 letter regarding his imminent transfer, to which she never responded. (Pl.'s Opp'n Point III 3 & Ex. D). In that letter, he asked not to be transferred because of his serious medical conditions, and referenced the medical hold restricting his travel time to two hours. (*Id.* Ex. D).

While this letter may have arguably put Ms. David on notice of plaintiff's travel restrictions, it is clear that a prison official's receipt of a letter is insufficient to impute § 1983 liability. *See Goris v. Breslin,* 402 F. App'x 582, 584 (2d Cir.2010) (citing *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997)); *see also Voorhees v. Goord,* 2006 WL 1888638, at \*5 (S.D.N.Y. Feb. 24, 2006) (collecting cases) (explaining that because "high-level DOCS officials delegate the task of reading and responding to inmate mail to subordinates ... a letter sent to such an official often does not constitute actual notice").

Thus, plaintiff fails to raise a triable issue regarding Ms. David's personal involvement in plaintiff's transfer to Upstate.

## V. *The Official–Capacity Issue*

The foregoing analysis justifies entry of summary judgment for defendants on all claims (except to the extent that rejection of the exhaustion defense would leave the Eighth Amendment claim pending against Ms. Albright). We nonetheless' briefly address one additional argument by which defendants seek to invoke Eleventh Amendment immunity for some, or the entirety, of the plaintiff's claims.

As noted, plaintiff purports to sue each of the defendants in both their individual and their official capacities. Defendants respond by arguing that insofar as he sues them in their official capacities, the claims are barred by the Eleventh Amendment. (Defs.' Mem. 30). In this respect they are correct. A suit against a government official, if pursued against him in his official capacity, is in substance a suit against his employer—in this case the State—and is barred by Eleventh Amendment immunity absent waiver by Congress. *See, e.g., Will v. Mich. Dep't of State Police,* 491 U.S. 58, 70–71 (1989) (suit against state official in his official capacity is, in reality, suit against official's office and thus is no different from suit against State itself); *Kentucky v. Graham,* 473 U.S. 159, 169 (1985); *Pennhurst State Sch. & Hosp. v. Halderman,*

465 U.S. 89, 100–02 (1984). Congress did not waive such state immunity by its enactment of section 1983. *Will,* 491 U.S. at 69–71. Hence, plaintiff's official-capacity claims, for which he seeks only damages, are barred. [39]

### CONCLUSION

**\*32** For the reasons stated, we recommend that defendants' motion for summary judgment be granted.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Paul A. Crotty, Room 735, 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn,* 474 U.S. 140, 150 (1985); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Footnotes

1   As we discuss below, plaintiff's deliberate-indifference claim should be dismissed for failure to exhaust administrative remedies. In the event that the court declines to dismiss on that ground, we recommend that the claim survive summary judgment as against one defendant, Joy Albright. *See infra* pp. 81–86.

2   Although plaintiff also names defendant Roland Larkin, the Fishkill Deputy Superintendent of Security, on this claim, he does not allege the basis for Larkin's personal responsibility.

3   This aspect of plaintiff's pleading is apparently in error. The pertinent documentation reflects that Thomas was confined on March 17, not January 17, 2008. (Decl. of Stephen Roberts in Supp. of Defs.' Mot. for Summ. J. ("Roberts Decl.") ¶ 9 & Ex. A).

4   Plaintiff sues Dr. Ritter as Elizabeth Williams.

5   Grievances for strip frisks or searches, harassment, or discrimination are processed according to a similar but somewhat expedited procedure. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(a) (2).

6   We note that the relevant medical hold did not expire until July 7, 2008. (*See* Pl.'s Opp'n " 'Point II, 'D' REPLY" ("Point II(D)") Ex. C).

7   In plaintiff's grievance he also mentioned another form of alleged retaliation, stating that on March 17, 2008, he had been called down to the medical unit, and upon his arrival, he had been promptly sent away after being told by the "steady officer" "[n]evermind, I just wanted to see which '[T]homas' it was!!!"(Pl.'s Opp'n Point I Ex. A, at 707–08). He goes on to note that this was the day on which Ms. Stone and Dr. Mamis were served with his civil complaint, seemingly implying that his brief trip to the medical unit somehow involved a form of retaliation. (*Id.*). Perhaps the inference that plaintiff attempts to invite is that the staff wanted to discover which inmate named "Thomas" they were to direct their retaliation efforts against. However, one of the officers present, Mr. Picard, responded to plaintiff's grievance in a letter to defendant Fiore, and explained that he had "mistakenly" called plaintiff from his housing unit when he had needed to speak with a different inmate named Mr. Thomas.(*Id.* at 720). In any event, Thomas does not explain how this apparent inconsequential error constituted any form of adverse action.

8   We note that, pursuant to DOCS regulations, "like grievances" are normally consolidated at the IGRC level, although the timing of plaintiff's grievances would have precluded such IGRC consolidation.N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(a)(3) (" 'Like grievances' may be consolidated at the option of the IGP supervisor or IGRC and assigned one grievance calendar number."). These regulations also suggest that if plaintiff's grievances had been consolidated, he would have received notice of that fact because he was the only "named" inmate on those grievances. *Id.* (grievant(s) of record receive notice of all activity in consolidated grievances).

9   Plaintiff misstates the date of the correspondence—it is dated May 28, 2008. (*See* Pl.'s Opp'n Point I Ex. C).

10  It bears mention that in recognizing in general terms the exception to exhaustion for unavailable remedies, the Second Circuit in *Hemphill* noted in passing the possibility that if no response at all was received from the prison authorities, the unavailability exception might apply, but it also seemed to suggest that this might occur only if the grievance authorities did not record the grievance as required by DOCS regulations. *See Hemphill,* 380 F.3d at 686 n. 6. Subsequent decisions have indicated that this distinction may be the pertinent one in these circumstances, *e.g., Randolph v. City of N.Y. Dep't of Corrs.,* 2007 WL 2660282, at \*9 n. 10 (S.D.N.Y. Sept. 7, 2007) (citing cases), and in this case there is no question that the prison grievance system took account of plaintiff's May 22 grievance and even promised a decision, as reflected in the two May 28, 2008 memoranda proffered by plaintiff.

11   If the IGRC had not considered plaintiff's grievance because it was untimely (as represented in one of the May 28 memoranda), it is clear that plaintiff still could not have claimed that he exhausted his administrative remedies. *Ngo,* 548 U.S. 81, 83–84; *accord Ruggiero,* 467 F.3d at 176.

12   It bears mention that to the extent that plaintiff may be asserting claims under section 3 of the Religious Land Use and Institutionalized Persons Act, § 2000cc-l, the pertinent standard is also "substantial burden". *See, e.g., Salahuddin,* 467 F.3d at 273. That provision requires the State to justify any such substantial burden by showing that that burden furthers a "compelling governmental interest" by the "least restrictive means." 42 U.S.C. § 2000cc–1(a).

13   We note that the court in *Jolly* was defining the concept of a substantial burden in the context of a claim under RFRA, which has since been invalidated, as we discussed above. However, the court's definition was drawn from cases, including *Sherbert,* that discussed generally the concept of a substantial burden as it applied to a First Amendment free-exercise claim. *See Jolly,* 76 F.3d at 477.

14   In plaintiff's complaint he also alleges in passing that he was denied his rights in connection with the prayers required on Eid–ul–Fitr. (Compl.¶¶ 15, 18, 20). His grievance pertaining to the events at issue in October 2007, however, does not mention such a denial (Decl. of William Connolly in Supp. of Defs.' Mot. for Summ. J. ("Connolly Decl.") ¶¶ 4, 7 & Ex. A (referring only to obligation to perform Zakat–ul–Fitr)), and hence any such claim would be barred. In any event the record does not reflect any such denial of a right to pray.

15   Plaintiff says that these stated grounds are baseless because inmates routinely transport food items through the prison. (Pl.'s Rule 56.1 Statement ¶¶ 15–18). This dispute is immaterial since the Superintendent overruled Kelly and allowed the use of food to fulfill the Zakat–ul–Fitr requirement.

16   Plaintiff spends much briefing space arguing that defendant Kelly's decision to require the Zakat–ul–Fitr ceremony to utilize money rather than food was theologically impermissible. (Pl.'s Rule 56.1 Statement ¶ 7; Pl.'s Opp't Part II(A) 1–3, 6–7 & Exs. A, G). As noted, however, the Superintendent authorized the use of food. Moreover, although the memorandum that the Imam sent to Mr. Jessen regarding Zakat–ul–Fitr only mentioned the gifting of food specifically (*see* Kelly Decl. Ex. C), the Imam indicates that either approach was permitted (Muhammad Decl. ¶¶ 7–8), and defendants would have been justified in relying on his interpretation of religious requirements.

17   Given the undisputed series of communications, it appears that the error was, at least in part, probably attributable to the fact that the Imam's special events package, which he had sent to Deputy Superintendent Larkin, erroneously listed the enddate for Muharram as January 18.

18   Plaintiff disputes Rough's representations as to his efforts that morning. (Pl.'s Opp't Part II(B) 2–5; Pl.'s Rule 56.1 Statement ¶¶ 36–37 (denying the allegations contained in paragraphs 34 and 35 of defendants' Rule 56.1 Statement)). Nonetheless, other than plaintiff's report that Rough told him on that occasion that he was uncertain how to proceed (*see* Pl.'s Opp't Part II(B) 4), his denial of Rough's account is based on speculation concerning events that he did not witness, and hence his opposition is, in this respect, not based on competent evidence. (*See* Pl.'s Opp't Part II(B) 2–5).

19   Plaintiff briefly complains that this food would have been "properly blessed" for fast-breaking purposes. (Compl.¶ 32). However, the record does not reflect whether the special meal that had originally been expected embodied any religious requirements.

20   In order to qualify his sentence as triggering due-process protections, plaintiff contends that his sentence and subsequent confinement at SHU caused him to suffer "an atypical and significant hardship," notably because that confinement precluded his full participation in religious and social activities. (Compl.¶¶ 40–41, 43–44).

21   Apart from the atypicality showing, the plaintiff must also establish that the state regulations impose certain substantive predicates to punishment in order to trigger due-process protections. *See, e.g., Sealey v. Giltner,* 197 F.3d 578, 584 (2d Cir.1999) (explaining that the substantive-predicate analysis found in *Hewitt v. Helms,* 459 U.S. 460 (1983), and later cases was not abolished by the Supreme Court's decision in *Sandin v. Conner,* 515 U.S. 472 (1995), but was "only limited to those instances where a finding of such a predicate results in confinement to conditions of atypical and significant hardship"). The Second Circuit has long recognized, however, that the disciplinary regulations enacted by DOCS do impose such prerequisites to punishment. *See, e.g., Gittens v. Lefevre,* 891 F.2d 38, 40 (2d Cir.1989) (quoting N.Y. Comp.Codes R. & Regs. tit. 7, § 251–1.6) (finding that New York prison regulations require specific substantive predicates for placing inmates in keeplock); *Matiyn v. Henderson,* 841 F.2d 31, 35–36 (2d Cir.1988) (finding that New York prison regulations governing protective admission to the SHU specify substantive predicates); *Silva v. Sanford,* 1998 WL 205326, at *18 & n. 22 (S.D.N.Y. Apr. 24, 1998) (citing cases where courts had found that discipline-related prison regulations created certain due-process rights pre-*Sandin* ); *Edmonson v. Coughlin,* 21 F.Supp.2d 242, 248 (W.D.N.Y.1998).

22   Plaintiff appears to complain that he did not receive a copy of the adjournment order. (Pl.'s Opp't Point II(C) ¶¶ 8–9). Whether that be the case is irrelevant for our purposes since (1) the DOCS regulations do not require that the prisoner receive a copy of such an order and (2) in any event neither the adjournment nor the alleged failure to provide written notice to plaintiff amounts to a due-process violation.

23   It necessarily also follows that the hearing officer is protected in any event by qualified immunity since it would have been perfectly reasonable for him to assume that his explanation was constitutionally adequate.

24 Plaintiff submits an affirmation and a declaration in support of his opposition, both of which are endorsed under penalty of perjury. In his affirmation, he states that he has "personal knowledge" of the facts that "bear on" this motion, but does not assert any of the facts in that document. (*See* Affirmation in Opp'n to Defs.['] Summ. J. Mot., Nov. 1, 2011). Similarly, in plaintiff's declaration, he explains that he is "fully familiar" with the facts in the case and has "personal knowledge of this action," but only attaches exhibits to that declaration. (Decl. of Bernard Thomas Pro–Se Pl., Nov. 1, 2011). It appears that plaintiff is attempting to swear to the truth of all of the factual assertions he makes in connection with this motion under penalty of perjury. Plaintiff being *pro se,* for purposes of this motion we will consider any facts asserted in plaintiff's moving papers about which he would clearly have personal knowledge to be the equivalent of facts asserted in a testimonial submission.

25 Narrowing of the "intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space."*Dorland's Illustrated Medical Dictionary,* 1698 (29th ed.2000).

26 This appears to be a reference to naproxen, "a nonsteroidal anti-inflammatory agent ... used for treatment of osteoarthritis and rheumatoid arthritis."*Dorland's, supra* note 25, at 1177.

27 "L5" refers to the fifth lumbar vertebrae, located in the lower spine. Dan J. Tennenhouse, *Attorneys' Medical Deskbook* § 5:14 (4th ed.2006–2011), *available* at Westlaw MEDDESK.

28 A muscle relaxant. Tennenhouse, *supra* note 27, § 26:29.

29 A record obtained by "an electrodiagnostic technique for recording the extracelluar activity ... of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation."*Dorland's, supra* note 25, at 576–77.

30 Nonsteroidal anti-inflammatory drugs. *Dorland's, supra* note 25, 1236.

31 Radiculopathy is "[a] disease of the nerve roots."*Dorland's, supra* note 25, at 1511.

32 We note that this documentation contradicts the finding of the IGRC that no such medical hold could be found. (*See* Reznik Decl. Ex. C).

33 No records of this medical visit are provided.

34 Apparently plaintiff wrote a letter to Nurse Administrator N. Smith at Upstate regarding defendants' alleged disregard of his medical hold. Smith replied by letter dated May 5, 2008, explaining that plaintiff's records showed no medical hold on file and none of his medical records reflected a need for restricted travel. (*Id.* Ex. F). She advised him to address any medical concerns through "sick call" and "MD callouts." (*Id.*).

35 Even though the pertinent medical hold specifically concerns plaintiff's work-related limitations, it is endorsed by Fishkill medical staff, and it would be absurd to conclude that plaintiff was medically fit to travel more than two hours for non-work-related purposes.

36 We note that the hold that plaintiff submitted to the court from 2007 expired in January 2008. (*See* Pl.'s Mem. Ex. D, Medical Work Status Assignment, Jan. 22, 2007).

37 Based on this statement, we can assume that the medical hold to which plaintiff is referring would have been operative both at the time of these conversations and at the stage of his transfer, since he was transferred "not too long" after the conversations had taken place, and the relevant medical hold was to remain in effect from January 7 to July 7, 2008. (Pl.'s Mem. Point II(D) Ex. C).

38 We note that this further supports the implication that Albright played a potential role in the transfer decision.

39 We note a point of possible confusion in defendants' briefing of this issue. The title of the Eleventh Amendment section of their memorandum of law appears to make a different point, stating "DEFENDANTS ARE ENTITLED TO 11TH AMENDMENT IMMUNITY FOR ANY CLAIMS AGAINST THEM FOR MONEY DAMAGES FOR ACTIONS TAKEN IN THEIR OFFICIAL CAPACITIES."(Defs.' Mem. 30). This is plainly incorrect. As noted, a claim for damages asserted against a state employee in his "official capacity" is deemed to be a claim against the state and hence barred by Eleventh Amendment immunity. If, however, the plaintiff asserts a claim for damages against a state employee in his individual capacity, it is not subject to such an immunity defense. *See, e.g., Hafer v. Melo,* 502 U.S. 21, 27–31 (1991). A claim for damages against a state, county or municipal employee will be viewed as one asserted against him in his individual capacity if it is the plaintiff's intent—as manifested in the pleading or otherwise—to seek the relief directly from that individual rather than from the employing government or agency. *See, e.g., Davis v. New York,* 316 F.3d 93, 101–02 (2d Cir.2002) (citing *Hafer,* 502 U.S. at 27–31); *Huang v. Johnson,* 251 F.3d 65, 70 (2d Cir.2001); *Rodriguez v. Phillips,* 66 F.3d 470, 481–82 (2d Cir.1995); *accord, e.g., Curley v. Vill. of Suffern,* 268 F.3d 65, 72 (2d Cir.2001). To assert a section 1983 claim against a government employee in his individual capacity, the plaintiff must allege (and ultimately prove) that the defendant was acting "under color of state law," that is, that he was exercising in some way the power of his office.*Graham,* 473 U.S. at 166 (citing *Monroe v. Pape,* 365 U.S. 167 (1961)). Necessarily, then, to state such a claim the plaintiff must in fact allege action by the individual defendant as a government employee or official, that is, action by him in his official capacity. *See, e.g., id.; see also West v. Atkins,* 487 U.S. 42, 48–50 (1988); *Johnson v. Goord,* 445 F.3d 532, 534 (2d Cir.2006). If a claim against a state employee based on such conduct by him were barred by the Eleventh Amendment, then no claims could ever be asserted for constitutional torts committed by state agents. That is of course not the law. *Cf. Hodge v. Sidorowicz,* 2011 WL 1226280, at *4 (S .D.N.Y. Mar. 24,

2011). Hence even if plaintiff alleges that the defendants were acting in their official capacity, his pleading does not justify invocation of the Eleventh Amendment on that basis.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 2431948
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Andrew WILLIAMS, Plaintiff,

v.

J(A) SMITH (First Deputy Supt.), Dr. J.
Perilli (F.H.S.D.), Mrs. Capuano (Nurse
Admin.), Mr. Williams (Physician Assistant),
T.G. Eagan (Grievance Director), Sergeant
Krusen, Sergeant MacNamara, Correction
Officer Clark, Correction Officer Maldonado,
Correction Officer Goffe, Defendants.

No. 02 Civ. 4558(DLC).  |  Aug. 10, 2009.

West KeySummary

1      **Prisons**
    Particular Conditions and Treatments
    **Sentencing and Punishment**
    Medical Care and Treatment

A prison doctor was not deliberately indifferent
to a prisoner's serious medical need in violation
of the Eighth Amendment when he determined
that morning showers were no longer necessary
to treat the prisoner's back condition. The
prisoner argued that the doctor had denied the
request for continued daily showers because the
prisoner had filed grievances about the security
staff not allowing him to take the daily morning
showers. However, the prisoner failed to raise
a question of material fact as to whether the
doctor acted with the necessary intent. U.S.C.A.
Const.Amend. 8.

Cases that cite this headnote

**Attorneys and Law Firms**

Andrew Williams, Woodbourne, NY, pro se.

Thomas M. Biesty, State of New York, Office of the Attorney
General, New York, NY, for Defendants.

*OPINION & ORDER*

DENISE COTE, District Judge.

**\*1** Andrew Williams ("Williams"), an inmate at Sing
Sing Correctional Facility ("Sing Sing"), has brought this
*pro se* civil rights action pursuant to 42 U.S.C. § 1983
against First Deputy Superintendent Joseph Smith ("Smith"),
Facility Health Services Director John Perilli ("Perilli"),
Nurse Administrator Kimberly Capuano ("Capuano"),
Physician Assistant Phillip Williams ("P.A.Williams"),
Grievance Director Thomas Eagan ("Eagan"), Sergeants
John MacNamara ("MacNamara") and Robert Krusen
("Krusen"), and Corrections Officers John Clark ("Clark"),
Enrique Maldonado ("Maldonado"), and Melvin Goffe
("Goffe") (collectively, "Defendants") [1] for their deliberate
indifference to his serious medical needs in violation of the
Eighth Amendment, and for retaliation in violation of the
First Amendment. Williams had an arthritic right knee and he
injured his back in 1996. He had back surgery in 1997. This
lawsuit complains that the defendants failed to accommodate
these ailments following that surgery, in particular by denying
him access to daily morning showers to relieve his back pain
and requiring him to climb stairs despite his knee condition.
Defendants have moved for summary judgment. For the
following reasons, summary judgment is granted in part.

**Background**

Unless otherwise noted, the following facts are undisputed.
While an inmate, Williams fell down a flight of stairs in
1996 and hurt his back, suffering multiple disc herniations.
In December 1997, Williams underwent surgery for these
injuries. After he returned to Sing Sing later that month, he
continued to suffer from degenerative disc disease in his spine
and a bulging disc and herniation in his back. In addition, he
suffered from arthritis in his right knee.

Soon after Williams returned to Sing Sing following surgery,
Sing Sing began referring him to outside specialists and
physical therapists regularly, often multiple times per month.
Between his 1997 surgery and the filing of this summary
judgment motion, he had over 100 medical consultations. He
was regularly given pain and anti-inflammatory medication,
was provided with a back brace, and was issued medical
passes that were supposed to allow him to be moved to the
flats, [2] to take a daily shower, to use the elevator, to sleep on

a firm bed, and to be served dinner in his cell on a "feed-up" tray. [3] Nonetheless, Williams experienced pain, tenderness, and decreased range of motion in his back and legs through his filing of this suit in 2002.

### *Daily Morning Shower*

Williams complained frequently about back pain that occasionally radiated to his shoulders, buttocks, and legs. He had difficulty "bending, twisting, standing or sitting for long duration ... [and] with certain movements and lifting heavy objects." Williams also complained about pain, stiffness, tightness, and spasms in his back, particularly in the morning. Outside specialists prescribed daily morning showers as heat treatment to alleviate these symptoms.

**\*2** Inmates at Sing Sing are generally entitled to shower three evenings per week. Beginning in 1999, Williams was issued a medical pass for a daily morning shower. Despite his possession of that pass, Williams asserts that on occasion certain defendants refused to honor his right to a daily morning shower, and instead allowed him to shower only three evenings per week.

### a. Goffe, Maldonado, MacNamara, Krusen and Smith

Williams presented a valid pass for his daily morning showers to officers Goffe and Maldonado for the first time on April 30, 1999. [4] Despite this pass, Goffe and Maldonado refused to permit a morning shower, asserting their understanding that administrative and safety considerations, as well as the housing block operating policy, did not allow inmates to take morning showers unless they were in keeplock (i.e., confined to their cells) or were inmate porters. Goffe and Maldonado consulted their superiors Krusen and MacNamara in making this determination. After this incident, officers repeatedly refused to honor his shower pass. In September 1999, Williams filed a grievance about the denial of his morning showers, which Smith asserts he rejected in reliance on "the medical department's conclusion that plaintiff did not need morning showers." He wrote on the denial that "although [Williams's] pass says AM showers, block policy dictates otherwise," and "staff can find no reason for AM shower."

### b. Capuano and Eagan

When Williams's September 1999 grievance was denied, he appealed to the Central Office Review Committee ("CORC") in Albany. CORC asked Nurse Capuano for information regarding the underlying events. According to Capuano, she

spoke with Dr. Perilli about Williams's case and then relayed to CORC that Williams did not need daily morning showers. Relying on evidence showing that Capuano spoke to Dr. Perilli on December 23, 1999, eight days after CORC had already denied Williams's grievance on December 15, and on evidence that Dr. Perilli did not withdraw the authorization for Williams to have a daily shower until the following year, Williams claims that Capuano never spoke to Dr. Perilli about this appeal, and instead changed Williams's treatment plan herself.

As Director of the Inmate Grievance Program for the New York State Department of Correctional Services, Eagan was responsible for the administrative function of the inmate grievance program. Although was not a voting member of CORC, he signed the December 15, 1999 CORC decision. Williams claims that Eagan was aware of Capuano's alleged misrepresentation and did not intervene. Williams does not explain how Eagan learned of Capuano's alleged misrepresentation.

### c. P.A. Williams

On July 31, 2000, an outside specialist wrote in Williams's medical chart "Daily shower x 3 mos (for lumbar pain)—AM." Williams claims that when P.A. Williams reviewed this instruction, he crossed out "AM" and wrote "not indicated, has daily shower written 6/27 x 3 mos." P.A. Williams does not remember reviewing this entry for "AM" showers, and neither admits nor denies that the handwritten annotation was his. He adds that if he altered the prescription for a pass, he did so because it called for a morning shower, and the medical pass form did not permit the designation of a time for showers. Although he authorized thousands of daily shower passes, as a general practice, he authorized passes for a certain time of day "extremely rarely" because "facility, security and administrative policies weighed against" doing so.

### d. Dr. Perilli

**\*3** Dr. Perilli began serving as Facility Health Services Director in December 1999. Williams had a daily morning shower pass at that time and Dr. Perilli renewed it. On October 16, 2000, however, Dr. Perilli reviewed Williams's medical chart and wrote in it *"no* need for daily shower based on his medical diagnosis." At a November 16, 2000 consultation, Dr. Perilli refused to renew Williams's pass for daily morning showers. Dr. Perilli noted in Williams's medical file on that date, "discussion held about shower pass—[patient] has

chronic back problem. I will recommend shower per block, but *not* daily showers."

Williams claims that Dr. Perilli denied his request for daily shower passes at the November 16 meeting for non-medical reasons. Williams says that he told Dr. Perilli at the meeting that he had filed grievances in September 1999 about the security staff not allowing him to take daily morning showers. In response, Dr. Perilli said "you file[d] grievance[s], oh I don't know about this," shook his head, and rescinded Williams's shower pass. Williams also claims that Dr. Perilli told him at this meeting that he would no longer issue daily morning shower passes because the security staff did not want to honor them, and the administration wanted Dr. Perilli to reduce the number of medical passes issued.

On November 20, Dr. Perilli wrote in Williams's medical file

> I have reviewed ortho consultation 11–14–00 + recommendation for shower. Any outside consultant recommendations are always subject to provider review + DOC policies. As this is a chronic condition, there is no specific indicator for a daily shower (i.e., acute sprain, colostomies, etc.), but I will give shower per block [policy].

Subsequently, a number of outside specialists and physical therapists recommended daily morning showers, but Dr. Perilli repeatedly declined to issue Williams a pass for such showers, asserting it was not medically necessary.

### e. Williams's Assertions of Pain Related to Deprivation of Daily Morning Showers

On November 11, 1999, Williams reported to a physical therapist that his back pain was an eight out of ten in intensity, and that this pain was relieved by hot showers. At a physical therapy appointment on April 5, 2000, he reported that showers relaxed his back, and at an appointment eight days later, the physical therapist noted that Williams's back was responding to heat and stretching. Williams asserts that he reported to an outside orthopedic specialist on November 14, 2000 that his back pain and spasms were reduced with heat treatment, but Williams's medical record does not reflect such a comment.

Williams's complaints about his back after Dr. Perilli terminated his shower pass on November 16, 2000 were similar to his complaints before. In both time periods, he complained about back spasms, back pain radiating to other parts of his body, and difficulty sitting. Williams does not make specific assertions, in either his medical records or in his opposition to this motion, that his back pain increased after Dr. Perilli terminated his daily morning shower pass. On September 25, 2002, almost two years after Dr. Perilli initially denied Williams a daily morning shower pass, Williams reported his pain to be a persistent five to seven out of ten in intensity, a decrease from the eight he reported November 1999.

### Climbing Stairs

 **\*4** Williams had right knee surgery in 1996. Subsequently, he suffered from arthritis, stiffness, limited range of motion, and pain. As a result, doctors recommended that Williams limit his stair climbing.

### a. Feed–Up and Flats Passes

Williams was issued feed-up and flats passes so he would not have to climb stairs regularly. He claims that he presented valid feed-up and flats passes on April 30, 1999 to officers Goffe and Maldonado. Williams claims Goffe and Maldonado said they would work on accomodating these passes. A month and a half later, Williams started receiving his feed-up tray. He does not claim defendants rejected his feed-up pass or directly interfered with it in any way. Goffe, Maldonado, and Krusen assert that they had no role in determining whether Williams should be served meals in his cell or in implementing such an accommodation; Krusen asserts that he did not even know about Williams's request.

Goffe, Maldonado, and Krusen claim they also had no role in the decision to move Williams to a new cell. Williams says Goffe and Maldonado intentionally delayed his move to the flats, never notified the appropriate authorities about his request, and told him the more he asked the longer he had to wait to be moved. Williams does not explain how Krusen delayed his move to the flats; he asserts only that Krusen told him that there was no room in the flats and that a gallery officer would inform him when there was room. Williams claims that other inmates were being moved to the flats ahead of him. He was moved to the flats in October 2000, eighteen months after first presenting his flats pass.

**b. Fishkill Stairs**

Sing Sing sent Williams to Fishkill Correctional Facility ("Fishkill") for physical therapy from April 1999 through December 2000. Clark worked at Fishkill and escorted Williams to the clinic there a number of times. Williams claims that "on approximately 10 occasions" Clark refused to allow Williams to use the elevator, and, instead, made Williams walk up six flights of stairs to the treatment unit, despite the fact that he had an elevator pass at Sing Sing. Williams claims that on April 13, 2000, Clark told him the elevator was not working properly and was only to be used in emergencies; after he walked up the stairs, though, he saw other inmates using the elevator. Williams refused to attend therapy sessions at Fishkill in October, November, and December 2000. He was discharged from the Fishkill clinic in December because of his refusal to attend, and he was immediately sent to another facility for therapy where he did not need to walk up stairs.

**c. Williams's Assertions of Pain Related to Climbing Stairs**

Over the course of the period in question, Williams complained about knee pain at dozens of medical consultations. He had limited range of motion in his right knee, complained about it giving out occasionally and being painful on range of motion tests, and he was diagnosed with right knee effusion. [5]

  **\*5** Doctors recommended that he limit his stair climbing. Williams does not make specific assertions about the quantity or quality of pain he experienced directly related to climbing stairs. He instead asserts generally that he had "perplexities" walking up stairs, and that he eventually refused to attend physical therapy at Fishkill because it was too painful to walk up six flights of stairs to the treatment unit.

**Procedural History**

Williams filed an amended complaint on November 12, 2002. Defendants moved to dismiss the suit on January 22, 2003. By a Memorandum and Order dated September 18, 2003, the Honorable Lawrence McKenna, to whom this case was then assigned, granted the motion to dismiss with respect to only one defendant, Superintendent Brian Fisher. Defendants filed a motion for summary judgment on May 15, 2007, which became fully submitted on March 5, 2009. On June 5, 2009, this case was reassigned from Judge McKenna to this Court.

**DISCUSSION**

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Sista v. CDC Ixis N. Amer., Inc.,* 445 F.3d 161, 169 (2d Cir.2006). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot rest "merely on allegations or denials in its own pleading." Fed.R.Civ.P. 56(e); *accord Sista,* 445 F.3d at 169. "It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they *suggest.*" *Triestman v. Fed. Bur. of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (per curiam) (citation omitted).

This Opinion first addresses Williams's Eighth Amendment claim, discussing in turn: personal involvement, deliberate indifference, and qualified immunity. This Opinion then discusses Williams's First Amendment retaliation claim.

*Personal Involvement*

Defendants Smith and Eagan move for summary judgment on the ground that they were not personally involved in the alleged deprivation of Williams's rights. Section 1983 provides in part that

> [e]very person who, under color of any statutes, ordinance, regulation, custom or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured.

  **\*6** 42 U.S.C. § 1983. To state a claim under Section 1983, a plaintiff must show: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages." *Roe v. City of Waterbury,* 542 F.3d 31, 36 (2d Cir.2008).

A defendant's conduct must be a proximate cause of the claimed violation in order to find that the defendant deprived the plaintiff of his rights. *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). As a consequence, "the doctrine of respondeat superior ... does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity." *Hayut v. State Univ. of N.Y.,* 352 F.3d 733, 753 (2d Cir.2003); *see also Reynolds v. Giuliani,* 506 F.3d 183, 190–191 (2d Cir.2007) (discussing municipal liability). It is thus "well settled" that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (citation omitted); *accord Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009).

The personal involvement and liability of supervisory personnel is established when the supervisory official has "actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act." *Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989) (citation omitted); *Blyden v. Mancusi,* 186 F.3d 252, 265 (2d Cir.1999). Thus, a plaintiff may establish a supervisor's personal involvement by showing that the supervisor:

> (1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated.

*Iqbal v. Hasty,* 490 F.3d 143, 152–153 (2d Cir.2007) (citation omitted).

Defendants argue that Smith and Eagan are entitled to summary judgment as they were not personally involved in the alleged deprivation of Williams's rights. Williams has not asserted that either Eagan or Smith were directly involved in interfering with Williams's medical treatment. Williams instead argues that Eagan is liable because he was aware of Capuano's alleged misrepresentation and failed to intervene.

Williams has failed, however, to explain how Eagan became aware of Capuano's alleged misrepresentation or how he was otherwise personally involved in the deprivation of his rights. Eagan is therefore entitled to summary judgment.

Williams argues that Smith was personally involved in depriving Williams of his rights by denying Williams's grievance. Under Second Circuit law, it is "questionable" whether Smith's denial of Williams's grievance constitutes sufficient personal involvement to make him liable. *McKenna v. Wright,* 386 F.3d 432, 437–38 (2d Cir.2004).*See also Rahman v. Fisher,* 607 F.Supp.2d 580, at 585 (S.D.N.Y.2009) (personal involvement may exist where supervisor fails to act on reports of violation and violation continues). It is not necessary to reach this issue, though, as Smith is entitled to summary judgment on Williams's deliberate indifference claim for other reasons, as discussed below.

### Deliberate Indifference

**\*7** All of the defendants argue that Williams has failed to show that he suffered a serious lapse in care for his back and knee conditions or that the defendants were deliberately indifferent to his medical needs. Although the "Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care," it is well-established that "not every lapse in medical care is a constitutional wrong." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006)."[A] prison official violates the Eighth Amendment only when two requirements are met."*Id.* (citation omitted). The first requirement is that the alleged deprivation must be "sufficiently serious." *Id.* (citation omitted). The second requirement is that "the charged official must act with a sufficiently culpable state of mind."*Id.* at 280.

To determine whether the deprivation was sufficiently serious, a court must first ascertain whether "the prisoner was actually deprived of adequate medical care," keeping in mind that "the prison official's duty is only to provide reasonable care."*Id.* at 279.An inmate is not entitled to treatment by every available medical alternative as long as his treatment is reasonable.*Estelle v. Gamble,* 429 U.S. 97, 107, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Nonetheless, even if a plaintiff receives "extensive" and "comprehensive, if not doting, health care," he may still be able to identify deficiencies in care that establish a deliberate indifference claim, particularly when the issue is a failure to treat pain. *Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984).

A court must consider whether any deprivation was itself "sufficiently serious." *Salahuddin,* 467 F.3d at 280. This inquiry requires an examination of "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."*Id.* If the inadequacy at issue is "a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's [underlying] medical condition is sufficiently serious."*Id.* If, however, "the inadequacy is in the medical treatment given, the seriousness inquiry is narrower."*Id.* Then, "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."*Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir.2003). Even in cases where an inmate "suffers from an admittedly serious medical condition," if the alleged deficiencies in treatment are "minor and inconsequential," those lapses will not sustain an Eighth Amendment claim.*Id.*"[T]he actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm."*Id.* at 187.

**\*8** "Because the objective component of an Eighth Amendment claim is necessarily contextual and fact-specific, the serious medical need inquiry must be tailored to the specific circumstances of each case."*Id.* at 185 (citation omitted). Courts use a number of factors to determine whether a medical condition is serious. These factors, which are also instructive in determining whether the medical consequences of a denial of certain treatment are serious, include: "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain."*Salahuddin,* 467 F.3d at 280 (citation omitted)."Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation."*Id.* at 279 (citation omitted).

Second Circuit decisions have primarily discussed the serious medical need standard in the context of total failures to treat underlying medical conditions. *Smith,* 316 F.3d at 184 n. 8. In this context, courts in this district have determined that claims that fail to meet the constitutional standard of seriousness include: a "cut finger, even where skin is ripped off,"*Sonds v. St. Barnabas Hosp. Correctional Health Servs.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001); a broken

finger, *Henderson v. Doe,* No. 98 Civ. 5011(WHP), 1999 WL 378333, at \*2 (S.D.N.Y. June 10, 1999); and a foot condition involving a fracture, bone cyst and degenerative arthritis, *Veloz v. New York,* 35 F.Supp.2d 305, 312 (S.D.N.Y.1999). Claims that have met the constitutional standard of seriousness include failures to treat, *inter alia:* a painful facial keloid scar, *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003); a dental cavity at risk of "acute infections, debilitating pain and tooth loss,"*Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000); abscessed teeth causing "great pain" for six months and tooth degeneration, *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998); ruptured Achilles tendon that resulted in swelling and pain, *Hemmings v. Gorczyk,* 134 F.3d 104, 106–09 (2d Cir.1998) (per curiam); eye problems that resulted in loss of vision in one eye, *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); and three-year extreme hip pain caused by embedded broken pins, *Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994).

The question of whether persistent back pain rises to a level of constitutional significance depends upon the circumstances of the particular case presented. *Compare Mendoza v. McGinnis,* No. 05 Civ. 1124 (TJM/DEP), 2008 WL 4239760, \*10 (N.D.N.Y. Sept.11, 2008) (finding degenerative disc disease to constitute a serious medical need); *Guarneri v. Hazzard,* No. 06 Civ. 0985, 2008 WL 552872, at \* 6 (N.D.N.Y. Feb. 27, 2008) ("Severe back pain, especially if lasting an extended period of time, can amount to a serious medical need under the Eighth Amendment.") (citation omitted); *Faraday v. Lantz,* No. 03 Civ. 1520(SRU), 2005 WL 3465846, at \*5 (D. Conn. Dec 12, 2005) (persistent complaints of "lower back pain caused by herniated, migrated discs [and] sciatica" leading to severe pain constitutes a serious medical need), *with Cain v. Jackson,* No. 05 Civ. 3914(LAP), 2007 WL 2193997, \*6 (S.D.N.Y. July 27, 2007) (degenerative disc disease in cervical spine, which was compounded when plaintiff fell from her cell bunk and injured her back, was not sufficiently serious); *Jackson v. Fairchild,* No. 04 Civ. 73 (FJS/DRP), 2007 U.S. Dist. LEXIS 17497, \*5, \*9 (N.D.N.Y Mar. 12, 2007) (back pain did not constitute serious medical need where despite being seen frequently by prison medical officials, plaintiff "did not voice a significant number of concerns regarding pain, nor did he request pain medication beyond simple Ibuprofen and similar over-the-counter medications."); *Veloz v. New York,* 339 F.Supp.2d 505, 522–26 (S.D.N.Y.2004) (plaintiff's chronic back pain and mild to moderate degenerative arthritis of spinal vertebrae did not establish a serious medical need); *Davis v. Reilly,* 324

F.Supp.2d 361, 368 (E.D.N.Y.2004) (A "sprained back and neck ... do not constitute a serious medical condition.").

**\*9** To show that a defendant acted with a sufficiently culpable state of mind, "it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health," which "is a mental state equivalent to subjective recklessness, as the term is used in criminal law."*Salahuddin,* 467 F.3d at 280. "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result."*Id.*

Prison medical staff is given wide discretion in determining how to treat inmates. In this context, "[t]he decisions of physicians regarding the care and safety of patients are entitled to a presumption of correctness."*Kulak v. City of New York,* 88 F.3d 63, 77 (2d Cir.1996) (citation omitted); *Church v. Hegstrom,* 416 F.2d 449, 450 (2d Cir.1969) (Section 1983 "does not authorize federal courts to interfere in the ordinary medical practices ... of state prisons."). As such, a disagreement between an inmate and medical personnel over the course of treatment does not give rise to a deliberate indifference claim. *Chance,* 143 F.3d at 703. Moreover, a prison doctor who relies on his medical judgment to modify or disagree with an outside specialist's recommendation of how to treat an inmate is not said to act with deliberate indifference. *See, e.g., Revenell v. Van Der Steeg,* No. 05 Civ. 4042(WHP), 2007 U.S. Dist LEXIS 17868, \*16–17, 2007 WL 765716 (S.D.N.Y. Mar. 14, 2007); *Sully–Martinez v. Glover,* No. 00 Civ. 5997(GEL), 2001 WL 1491278, \*4 (S.D.N.Y. Nov.26, 2001).

Non-medical prison staff cannot, however, alter an inmate's treatment plan. "Prison officials are more than merely negligent if they deliberately defy the express instructions of a prisoner's doctors."*Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987). "[A] deliberate indifference claim can [therefore] lie where prison officials deliberately ignore" such medical recommendations. *Johnson v. Wright,* 412 F.3d 398, 404 (2d Cir.2005).

**a. Shower Pass**

Defendants argue that they are entitled to summary judgment because the denial of Williams's daily morning showers did not cause a serious enough injury to sustain an Eighth Amendment claim. Defendants point to the fact that Williams received extensive treatment for his back, including surgery, pain and anti-inflammatory drugs, a back brace, and regular physical therapy sessions, which Williams admits helped the

very back condition for which the showers were prescribed. Dr. Perilli opines that denial of Williams's daily showers did not create a serious risk of harm. Williams does not show that he suffered greater back pain in the periods when he was denied daily morning showers than when he was permitted them. In fact, almost two years after Dr. Perilli refused to renew Williams's shower pass, Williams reported his back pain to be somewhat less intense than it was during a period when he was taking daily morning showers. Moreover, Williams has made no showing that the lack of showers affected his daily activities.

**\*10** Williams does, however, show contemporaneous reports by him and by his doctors that daily morning showers helped his painful back condition. In addition, outside specialists repeatedly found Williams's back condition and his need for daily morning showers worthy of comment. Moreover, a failure to treat serious, chronic pain adequately when such treatment is available can constitute a sufficiently serious deprivation of medical care. *See Salahuddin,* 467 F.3d at 281 (applying presumption that five month failure to treat pain causes sufficiently serious harm). This is true even when other, substantial medical care is given for the underlying condition. Although the record suggests that Williams may have difficulty meeting the seriousness inquiry at trial, all inferences must be drawn in Williams's favor at the summary judgment stage, particularly because he is proceeding *pro se.* As such, although not every denial or even series of repeated denials of medical showers constitutes a serious medical injury, the record does not permit a finding as a matter of law that the deficiency in Williams's treatment was "minor and inconsequential," or that the deficiency did not create "a significant risk of serious harm."*Smith,* 316 F.3d at 187. Williams's papers must be read as showing that for approximately a year and a half, until Dr. Perilli revoked his medical pass for daily morning showers, the defendants denied him medically prescribed treatment for the chronic pain he experienced due to a back injury from which no one disputes that Williams suffered.

Defendants argue that they are entitled to summary judgment on the second prong of the deliberate indifference inquiry. Indeed, Smith and Dr. Perilli are. Smith asserts that he deferred to the medical staff's recommendation to deny Williams's grievance. Williams does not contest that Smith did so; and Williams offers no evidence that raises a question as to whether Smith actually took this course of action or whether this course of action reflected recklessness. Dr. Perilli shows that in his medical opinion he determined

daily morning heat treatment was no longer necessary for Williams's condition. As discussed below, Williams attempts but fails to raise a question as to whether Dr. Perilli's decision was based on an ulterior motive rather than on medical judgment. Williams therefore has not raised a question of material fact as to whether Dr. Perilli acted with the intent necessary to satisfy the second prong of the deliberate indifference inquiry. Both Smith and Dr. Perilli are therefore entitled to summary judgment.

None of the remaining defendants identified as depriving Williams of a medically prescribed shower are entitled to full summary judgment on this prong. It is undisputed that Williams presented a valid medical pass for morning showers and that Goffe, Maldonado, Krusen and MacNamara did not honor that pass. Despite these defendants' claims that they were following facility protocol, a reasonable jury could conclude that their disregard of a medical pass constituted recklessness. P.A. Williams's assertion that if he changed Williams's prescription of morning showers he did so to comply with facility protocol is subject to the same analysis. As for Capuano, evidence suggesting that she changed Williams's treatment plan without consulting Dr. Perilli raises a question of material fact as to whether she acted not just recklessly but intentionally. None of these defendants is therefore entitled to full summary judgment on Williams's deliberate indifference claim related to shower passes.

**\*11** Goffe, Maldonado, Krusen, and MacNamara, are, however, entitled to partial summary judgment. After Dr. Perilli rescinded Williams's shower pass on November 16, 2000, these defendants were entitled to rely on Williams's lack of a valid medical pass to deny him daily morning showers. Williams has raised no question of material fact about whether these defendants acted recklessly in denying him daily morning showers after he no longer possessed a shower pass.

**b. Climbing Stairs**

Defendants are entitled to partial summary judgment on Williams's deliberate indifference claims related to climbing stairs. Dr. Perilli opines that climbing stairs at Fishkill when Clark refused to honor Williams's elevator pass and climbing stairs at Sing Sing when Williams's feed-up and flats passes were delayed did not create a serious medical risk of death, degeneration, or extreme pain. Although Williams has made only a limited showing about the pain climbing stairs caused him, he has asserted that climbing stairs did cause him pain, and outside specialists found the issue worthy of comment,

and recommended that he avoid climbing stairs. Moreover, the pain of climbing stairs was apparently intense enough to cause Williams to choose not to attend physical therapy sessions that required him to walk up stairs. Although a serious medical injury is not inflicted every time an inmate with a bad knee is required to climb stairs, in this case, with all inferences drawn in his favor, Williams has raised a question of material fact as to whether the pain caused by climbing stairs was serious enough to sustain an Eighth Amendment claim.

Goffe, Maldonado, and Krusen are entitled to summary judgment on Williams's deliberate indifference claim related to his feed-up pass. They claim that they were not responsible for accommodating Williams's feed-up pass, and Williams offers no evidence that they interfered with his pass being accommodated. Krusen is entitled to summary judgment for Williams's claim related to his flats pass, as well. Williams asserts that he had a conversation with Krusen about the delay in accommodating his pass, but he does not explain how Krusen was responsible for that delay. Goffe and Maldonado are not, however, entitled to summary judgment related to the flats pass claim. Despite their assertions that they had no responsibility for accommodating this pass, Williams's assertions that they threatened to delay his move, paired with the fact that his flats pass was not accommodated until eighteen months after his first conversation with Goffe and Maldonado, raise a question of material fact as to whether they did interfere with his move and thereby acted recklessly. Although an ordinary delay in moving an inmate to a new cell to accommodate his medical condition would not constitute a serious medical injury, Williams has alleged that these defendants intentionally delayed his move to the flats for a year and a half, while other inmates were getting moved there ahead of him.

**\*12** Clark is not entitled to summary judgment. There is no dispute that Clark knew that Williams had an elevator pass due to his knee condition. Although Clark asserts that he denied Williams access to an elevator because the Fishkill elevator had maintenance problems and was only to be used for emergencies, Williams's assertion that he saw inmates using the elevator has raised a question of material fact as to whether Clark acted intentionally or recklessly in denying Williams use of the elevator. While an occasional denial of access to an elevator would not rise to the level of serious injury to Williams's health, Williams has alleged that Clark repeatedly, and without justification, refused over a period of months to allow Williams to use the elevator.

*Qualified Immunity*

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* ––– U.S. ––––, ––––, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (citation omitted). In determining whether a defendant is entitled to qualified immunity, the "appropriate question is the objective inquiry whether a reasonable officer could have believed that his actions were lawful in light of clearly established law and the information the officer possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (citation omitted). To assess a qualified immunity claim, a court must therefore consider:

> (1) whether the right in question was defined with reasonable specificity; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005) (citation omitted).

Williams has defined with sufficient specificity the Eighth Amendment right upon which his deliberate indifference claim rests; and the Supreme Court and Second Circuit have clearly established that right. As for the third prong, Goffe, Maldonado, Krusen, MacNamara, P.A. Williams and Capuano cannot avail themselves of qualified immunity as they are all alleged to have knowingly disregarded or altered Williams's medical passes or treatment plan, which was unlawful. *See Gill,* 824 F.2d at 196. Bald assertions by Goffe, Maldonado, Krusen, and MacNamara that they took their respective actions to comply with administrative and safety concerns do not provide an adequate ground for finding these actions objectively reasonable. These defendants have not explained the bases of their administrative and safety concerns or how their actions addressed those concerns. It is therefore impossible at this point to determine as a matter of law that these defendants acted reasonably in choosing to serve those purposes rather than honor Williams's medical

passes and treatment plans. If Capuano is liable to Williams, it is because she unilaterally changed his treatment plan. Although she contests the underlying allegation that she altered his plan, she offers no explanation of why a defendant who does, in fact, take such actions could reasonably believe she is acting lawfully. P.A. Williams offers a potential explanation for his actions, suggesting it was impossible for him to grant Williams's prescription for a morning shower pass because there was no place on the standard pass to indicate timing of showers. P.A. Williams's acknowledgment, however, that he has authorized medical passes for a certain time of day, albeit rarely, undercuts his explanation of why he overrode Williams's prescription in this case. He therefore offers an inadequate explanation of why a reasonable officer in his position would feel his actions were lawful.

*Retaliation*

**\*13** To prove a First Amendment retaliation claim, "a prisoner must show that (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord,* 554 F.3d 216, 227 (2d Cir.2009) (citation omitted). Exercising the right to petition for redress of a grievance is protected conduct. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir.2001). "A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal,* 554 F.3d at 228. "[I]f taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

Williams claims that after he filed a grievance in September 1999 about the security officers denying his morning shower pass, Dr. Perilli retaliated against him by rescinding Williams's daily morning shower pass on November 16, 2000. Williams argues that there was a temporal connection between these two events, because Dr. Perilli did not know about the grievances until Williams told Dr. Perilli about them at the November 16 meeting. This argument fails. Dr. Perilli made a note one month before the November 16 meeting concluding that Williams had no medical reason for daily morning showers. This prior note requires a finding that Dr. Perilli had a proper reason to deny Williams a morning

shower pass even after Williams described his grievance filing to Dr. Perilli. Williams has thus failed to raise a question of material fact as to whether Dr. Perilli's allegedly retaliatory action was causally related to Williams's filing of grievances. Dr. Perilli is therefore entitled to summary judgment on the retaliation claim.

**CONCLUSION**

Defendants' May 15, 2007 motion for summary judgment is granted in full as to Dr. Perilli, Eagan, and Smith. Summary judgment is also granted as to Goffe, Maldonado, Krusen, and MacNamara for Williams's deliberate indifference claim

related to his shower pass after November 11, 2000; summary judgment is granted as to Goffe, Maldonado, and Krusen for Williams's deliberate indifference claim related to his feed-up pass; and summary judgment is granted to Krusen for Williams's deliberate indifference claim related to his flats pass. Summary judgment is denied in all other respects as to defendants Goffe, Maldonado, Krusen, MacNamara, P.A. Williams, Capuano, and Clark.

SO ORDERED.

Footnotes

1    Williams also named Physical Therapist Mr. Abraham as a defendant in his Amended Complaint. The Court noted in its September 18, 2003 Memorandum and Order that the plaintiff had provided no proof of service of Abraham. Plaintiff having failed to cure this defect, this Order and Opinion does not address Williams's allegations concerning Abraham.

2    A flats pass allows an inmate to be housed on the first floor of a facility so as to avoid climbing stairs.

3    The pass allowing an inmate to have dinner delivered to his cell is called a feed-up pass.

4    Williams's medical record shows that an outside specialist first prescribed hot showers on April 23, 1999. Before that date, he was prescribed "moist heat" and heat packs.

5    Knee effusion is a condition where excess fluid accumulates in and around the knee joint.

WestlawNext® © 2015 Thomson Reuters. No claim to original U.S. Government Works.